**TRENK, DiPASQUALE, WEBSTER,**
**DELLA FERA & SODONO, P.C.**
347 Mount Pleasant Avenue
West Orange, New Jersey 07052
(973) 243-8600
Joseph J. DiPasquale (JD 3330)
Thomas M. Walsh (TW 0645)
*Proposed Attorneys for Debtor-in-Possession, Hudson Healthcare, Inc.*

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>HUDSON HEALTHCARE, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 11-33014 (DHS)<br><br>Honorable Donald H. Steckroth |

**DECLARATION OF VINCENT RICCITELLI**
**IN SUPPORT OF FIRST DAY MATTERS**

**VINCENT RICCITELLI**, being of full age, hereby declares as follows, pursuant to 28 U.S.C. § 1746:

1. I am the chief executive officer of Hudson Healthcare, Inc. ("HHI" or the "Debtor"), the debtor and debtor-in-possession in the above-captioned chapter 11 bankruptcy case. I am authorized by HHI's Board of Directors to submit this Declaration. I am fully familiar with the business and affairs of the Debtor, including the facts and circumstances set forth herein.

2. I submit this declaration (the "Declaration") in support of the Debtor's voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the relief that the Debtor has requested from the Court in various motions and applications filed contemporaneously herewith (the "First-Day Pleadings"). I believe that the relief sought in each of the First-Day Pleadings (i) is necessary to enable to the Debtor the operate in chapter 11

with minimal disruption in its operations or loss of value and (ii) best serves the interests of the Debtor's estate and creditors.

3. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtor's management or its professionals, information learned from my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. This Declaration is intended to provide a brief background of HHI, a description of the Hospital and its services, the reasons for HHI's chapter 11 filing, HHI's objectives in the chapter 11 process, and a summary of the relief sought in each of the First-Day Pleadings. If called as a witness in the Debtor's bankruptcy proceedings, I could and would testify competently to the facts set forth in this Declaration. Unless otherwise indicated, all financial information set forth in this Declaration is presented on an unaudited basis.

## OVERVIEW OF HHI AND THE HOSPITAL

4. The Debtor is a not-for-profit corporation formed under the laws of the State of New Jersey, and is tax exempt pursuant to section 501(c)(3) of the Internal Revenue Code. As described more fully herein, HHI operates and manages the day-to-day operations of Hoboken University Medical Center (the "Hospital")[1] pursuant to a *Master Manager and Operator Agreement* (as amended, the "Manager Agreement") dated February 1, 2007 between HHI and the Hoboken Municipal Hospital Authority (the "Authority"), which sets forth HHI's rights, duties, and responsibilities in the management and operation of the Hospital. Other than certain contract rights, other intangibles, and approximately twelve (12) vehicles, the Debtor does not own any of the assets of the Hospital.

---

[1] Hoboken University Medical Center is not a separate legal entity, but is the name of the facility managed and operated by the Debtor.

5. Founded in 1863 as St. Mary Hospital by Father Anthony Cauvin and the Franciscan Sisters, the Hospital, a 350-bed acute-care facility, is the oldest continuously operating hospital in the State of New Jersey. In 1985, St. Mary Hospital and St. Francis Hospital joined to form Franciscan Health System of New Jersey. On January 1, 2000, Franciscan Health System transferred ownership of the Hospital to Bon Secours New Jersey Health System, Inc., an affiliate of Bon Secours Health System, Inc., a healthcare facility network operated by the Sisters of Bon Secours ("Bon Secours").

6. In January 2005, having accumulated a reported $118 million of losses at the Hospital since acquiring it in 2000, Bon Secours put the Hospital up for sale but received no offers. The Hospital's dire financial condition was especially pronounced due to the fact that it has historically been a "safety-net" hospital serving a substantial volume of uninsured and underinsured patients. On January 1, 2006, Bon Secours filed a Certificate of Need application with the State of New Jersey Department of Health and Senior Services seeking authorization to close the Hospital.

7. In response to public outcry about the impending closure of the Hospital, local elected officials and others worked with members of the State Legislature on a plan to save the Hospital. On July 8, 2006, the Legislature enacted the Municipal Hospital Authority Law, N.J.S.A. 30:9-23.15 et seq. ("MHAL"), which enables a New Jersey municipality meeting certain criteria to create a hospital authority, an autonomous body corporate and politic with its own governing board, within certain parameters tailored to the acquisition of the Hospital. The MHAL requires any municipal hospital authority to contract with a not-for-profit entity to operate and manage day-to-day hospital operations. On August 9, 2006, the City of Hoboken (the "City") adopted an ordinance pursuant to the MHAL, thereby creating the Authority for the purpose of acquiring the Hospital. As required under the MHAL, the Debtor is in charge of the day-to-day operation of the Hospital. To date, the Authority is the only municipal hospital authority created under the MHAL.

8. On January 3, 2007, the Debtor, the Authority, and Bon Secours entered into an *Asset Transfer Agreement*, whereby Bon Secours agreed to transfer all of the assets comprising the Hospital to the ownership of the Authority. Pursuant to the Transfer Agreement, HHI assumed Bon Secours' collective bargaining agreements with its unionized employees and assumed many of Bon Secours' vendor contracts and other agreements. Upon closing of the transfer, the Authority changed the name of the Hospital from St. Mary Hospital to Hoboken University Medical Center, and February 1, 2007 was the hospital's first full day of operation under its new name.

9. Currently, the Hospital occupies a 300,000 square foot facility spanning multiple contiguous buildings. The Hospital is presently licensed for 344 beds and provides healthcare services to approximately 9,400 inpatients, treats approximately 36,000 emergency department patients, performs nearly 5,000 surgeries, and delivers over 1,500 babies annually. The Hospital's physical plant includes the main hospital complex (comprised of the North Building, South Building, New Emergency Department, West Tower, and Assumption Hall); The Center for Family Health (25,565 square feet); Faith Services Building (5,300 square feet) (each owned by the Authority); Giant Steps Building (4,000 square feet); Center for Mental Health (7,500 square feet) (each leased by the Authority); and leased office space in the City-owned Midtown Garage (9,500 square feet).

10. I joined HHI as Director of Finance in 2007, and later became Chief Financial Officer. I served as Chief Financial Officer until July 2011, at which time I was appointed the Chief Executive Officer of HHI. After graduating from Kean College with a Bachelors Degree in Management Science, I spent nineteen (19) years at Cathedral Health System in Newark, New Jersey. I held various jobs at Cathedral during my time there, ultimately reaching the position of Vice President by the time that I left in 2007.

11. The Debtor is governed by its own five-member Board of Directors (the "Board"), comprised of its Chief Executive Officer and Chief Financial Officer, an appointee of the Governor,

4

and two Community Directors. As Chief Executive Officer, I am a member of the Board. The other four members include Linda Barrientos (HHI's Chief Financial Officer), James F. Doyle (appointed by Governor Christie), Frank Magaletta, Esq. (Community Director), and Erin Byron, Esq. (Community Director).

12. On February 1, 2007, the Authority and HHI entered into the Manager Agreement, which has a term of five (5) years and sets forth HHI's rights, duties, and responsibilities vis-à-vis the Hospital and the Authority.

13. The Debtor employs approximately 1,272 full- and part-time employees (the "Employees"), and is a party to collective bargaining agreements with three unions: District 1199J, National Union of Hospital and Health Care Employees AFSCME, AFL-CIO ("1199J"), JNESO District Council 1, IUOE/AFL-CIO ("JNESO"), and the Committee of Interns and Residents/SEIU ("CIR"). Approximately forty (40%) percent of the Employees are represented by 1199J, approximately twenty-five (25%) percent are represented by JNESO, twenty-two (22) resident physicians are represented by CIR, and the remainder of the Employees are non-union. Further, HHI has contracts with approximately 421 physicians and physician groups that provide patient care in the Hospital (collectively, the "Physician Contractors"). The Physician Contractors are independent contractors, not employees of the Debtor. Approximately 83 of the Physician Contractors are prepetition creditors of HHI.

14. HHI's responsibilities pursuant to the Manager Agreement include, *inter alia*, performing all duties necessary to supervise, direct, and control the day-to-day operations of the Hospital; negotiating and entering into contracts with vendors and suppliers; entering into collective bargaining agreements; preparing policies and procedures; billing and collecting for services provided by HHI; hiring professionals to perform services for HHI; preparing and maintaining

accounting and budget cycles, including the Annual Business Plan and Budget of HHI; maintaining the Hospital's physical facility; and coordinating the payment of all reimbursable expenses.

15. At the beginning of each year, HHI is required under the Manager Agreement to submit an Annual Budget and Business Plan (the "Budget") to the Authority for review and approval. The Manager Agreement requires HHI to update the Budget each month, and requires the Authority's approval of any variance in excess of $250,000. The Authority, in turn, funds the operating expenses set forth in the Budget each month.

16. HHI holds certain charitable assets in segregated accounts under the name of Hoboken University Medical Center Foundation, Inc. (the "Foundation"). The Foundation's assets are comprised of approximately $250,000 of donated funds, some of which are subject to certain donor-imposed restrictions on use. The New Jersey Attorney General has informed the Debtor and the Authority that the Foundation will be subject to a *cy pres* proceeding in the New Jersey Superior Court to ascertain the proper disposition of the Foundation's assets.

## HOSPITAL BONDS AND FUNDING MECHANISM

17. To fund renovations and other capital improvements, including construction of a new emergency department with the ability to treat 70,000 patients annually, and to provide the Hospital with working capital, the Authority issued $51.6 million of revenue bonds in 2007, and $9.72 million of bonds in 2009 (the "Bonds"). It is my understanding that HHI is not an obligor under the Bonds, which are secured by a pledge and assignment of all revenues generated by the Hospital and the proceeds of any sale of the Hospital.

18. It is my understanding that the terms and conditions of the Bonds are set forth in an *Indenture of Trust* between the Authority and TD Bank, N.A. (as successor-in-interest to Commerce Bank, N.A), as trustee (in such capacity, the "Bond Trustee"), dated February 1, 2007, and supplemented on five (5) separate occasions, the most recent being on April 1, 2009 (collectively, the

"Indenture"). It is my understanding that, pursuant to the Indenture, all revenues generated by the operation of the Hospital are pledged and assigned to the Bond Trustee and are deposited directly into a Revenue Fund, a segregated account maintained by the Bond Trustee. It is my understanding that Hospital revenues are distributed by the Bond Trustee among various operating and reserve funds pursuant to a waterfall set forth in the Indenture. The Authority, in turn, funds the agreed-upon Budget by wire transfer to HHI (customarily on a weekly basis, although the Manager Agreement provides for monthly funding).

## CIRCUMSTANCES LEADING TO BANKRUPTCY

19. For the past several years, hospitals nationwide, and particularly in northern New Jersey, have experienced substantial financial challenges. In addition to non-hospital competition for profitable core services such as outpatient surgery, New Jersey hospitals are faced with a strict State mandate to provide medical care to patients regardless of their ability to pay and the lowest (and declining) Medicaid reimbursements in the United States. Managed-care plans have successfully kept reimbursement rates low while the costs of providing care have risen dramatically. Hospitals throughout northern New Jersey have faced bankruptcy or closure in recent years, including West Hudson Hospital, Union Hospital, Irvington General Hospital, PBI Regional Medical Center, Pascack Valley Hospital, and Barnert Hospital closing or filing bankruptcy. The difficulties faced by hospitals generally are further compounded in Hudson County by the dense population and high concentration of uninsured residents.

20. In addition to the problems plaguing New Jersey hospitals generally, the Hospital is heavily dependent on State and federal government subsidies to fund operations. As a result of its safety net status, approximately twenty-nine (29%) percent of the Hospital's revenues come from these subsidies. By way of example, in 2010, the Hospital generated revenues of $132 million, of which approximately $39 million came from governmental subsidies. Despite the best efforts of the

State of New Jersey, the federal government, HHI, and the Authority, the Hospital has not generated sufficient revenues to meet HHI's operating expenses. Between 2008 and 2010, the Hospital operated at a net loss of approximately $39 million on cash revenues of approximately $375 million. Moreover, due to State budget cuts it became apparent the Hospital was facing the loss of State subsidies and could not rely on subsidies going forward.

21. Budget cutbacks at the State level have further reduced the continued viability of an operational model dependent on government subsidies. The Authority recently sought a bridge loan from the State to keep the Hospital in operation through the completion of the sale of the Hospital (discussed below). If the sale is not consummated promptly, the Hospital will run out of cash and cease to operate, putting over 1,200 Employees out of work and leaving the City and surrounding communities without a full-service acute-care facility.

## SALE OF THE HOSPITAL

22. Public ownership of the Hospital was an emergency measure designed solely to ensure the availability of a full-service acute-care facility to serve the residents of the City and the surrounding communities, but was intended only as an interim solution to avert the Hospital's unplanned closure. Neither the City nor the Authority is in a position to provide the working capital the Hospital needs to continue to operate and thrive in the long term. In early 2010, Lowenstein Sandler PC ("Lowenstein") and PricewaterhouseCoopers ("PwC") were retained to assist the Authority in evaluating strategic alternatives for the Hospital in order to ensure the Hospital's long-term viability as an acute-care facility with access to desperately needed capital for maintenance and improvements.

23. After an extensive strategic review in consultation with Lowenstein and PwC, the Authority determined that the best means of preserving the Hospital was through a privatization transaction – either a sale to or a partnership with another hospital or system of hospitals. On July

30, 2010, the Authority issued a *Request for Proposals for the Privatization of Hoboken University Medical Center* (the "RFP"), seeking proposals from parties interested in acquiring or partnering with the Hospital. Following an initial forty-five-day response deadline, the Authority received eight responses to the RFP. Five responses proposed asset purchases, one proposed a public-private partnership, and two did not specify a transaction structure. Proposed uses of the Hospital facilities ranged from a full-service acute-care hospital to a conversion into a mixed-use facility with medical services offices, a boutique hotel, and residential units. One response did not specify any prospective use at all.

24.   Upon review and evaluation of the eight responses to the RFP, the Authority requested supplemental information from five respondents. Four complied by submitting supplemental information and by conducting additional due diligence. The Authority ultimately determined that the proposal submitted by HUMC Holdco, LLC (the "Purchaser") best met the criteria set forth in the RFP, and negotiated a non-binding letter of intent with the Purchaser. Following extensive negotiations, the Authority entered into a definitive Asset Purchase Agreement (the "APA")[2] with the Purchaser on April 20, 2011 for the sale of the Hospital (the "Sale").

25.   Pursuant to the APA, the Purchaser will acquire substantially all of the Authority's assets relating to the Hospital in exchange for approximately $68 million in cash, the assumption of certain liabilities, and a commitment by Purchaser to invest $20.9 million in working capital and capital improvements in the Hospital and keep the Hospital open as a full-service acute-care facility for at least seven years. In addition to the cash consideration and assumption of certain liabilities, the Purchaser has agreed in the APA to offer employment to at least 75% of the Debtor's Employees and to continue to operate the Hospital as a general acute-care hospital for at least seven

---

[2] The Authority and the Purchaser are in the process of negotiating various amendments to the APA as a result of HHI's chapter 11 filing. HHI and the Purchaser are presently negotiating a separate Asset Purchase Agreement, pursuant to which the Purchaser will purchase certain assets and assume various contracts of HHI.

years after the Sale closes. The purchase price paid will be applied first to retire the Bonds, which were issued by the Authority and are secured by a pledge and assignment of the Hospital's revenues and by the proceeds of any sale of the Hospital property.

26. It is anticipated that the closing of the Sale will occur in September 2011. As of that date, the Debtor will reject the Manager Agreement, cease to be the manager of the Hospital, and undertake an orderly wind-down and liquidation through a chapter 11 plan. In light of its dire financial condition discussed above, the Debtor, in order to be able to continue providing critical patient care services until the closing of the Sale, filed chapter 11 bankruptcy protection.

27. As discussed above, pursuant to the Manager Agreement, the Authority advances funds to the Debtor in compliance with an agreed-upon Budget, which the Debtor is in turn required to update monthly to reflect fluctuations in operating performance. Any Budget variance in excess of $250,000 requires the Authority's approval.

28. The Debtor has asserted that the Authority owes the Debtor approximately $36.9 million for accrued expenses and other liabilities incurred by the Debtor in the operation of the Hospital (the "HHI Claims"), an amount the Authority vigorously disputes. The Authority has asserted, among other things, that from 2007 to 2009 the Debtor incurred substantial financial losses and unapproved budget variances that were not discovered until 2009 for which the Authority believes it holds substantial claims and causes of action (the "Authority Claims"), allegations with which the Debtor vehemently disagrees. As a result, the Authority and the Debtor each believe they hold claims and causes of action of substantial merit against one another.

29. The Debtor rents certain of its administrative office space from the City, and rents parking spaces and the associated parking garage access transponders from the Hoboken Parking Utility, a unit of the City (the "Parking Utility"). On account of unpaid rental charges under these lease arrangements, the City and the Parking Utility (a unit of the City) have asserted that they hold

unsecured claims against the Debtor in amounts not less than approximately $900,000 (the "City Claim") and $1 million (the "Parking Utility Claim"), respectively. The Debtor disputes the amount and validity of the City Claim and the Parking Utility Claim, and believes that it owes substantially less than the amounts asserted by the City and the Parking Utility. The Debtor, the Authority, and the City have been engaged in settlement discussions for several months in an attempt to resolve all claims against one another, and anticipate reaching a consensual resolution in the near future.

## THE DEBTOR'S CHAPTER 11 FILING

30. HHI filed its chapter 11 petition on August 1, 2011 (the "Petition Date"). Until the closing date of the Sale, HHI intends to continue operating the Hospital. HHI has approximately $500,000 of cash on hand and on deposit as of the Petition Date, and it proposes to use its cash and future revenues in accordance with the debtor-in-possession operating budget annexed to the Joint Motion of Debtor and Hoboken Municipal Hospital Authority for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 364 Authorizing Continuation of Prepetition Budget Management Procedures and Granting Administrative Expense Claim filed on the Petition Date.

## FIRST-DAY MOTIONS

31. Concurrently with the filing of its chapter 11 petition, HHI has filed certain Motions and proposed Orders (collectively, the "First Day Orders"). The Debtor requests that each of the First Day Orders described below be entered, as each constitutes a critical element in achieving a successful result in the Debtor's chapter 11 case for the benefit of all parties-in-interest.

    (i)    Debtor's Motion for Order Pursuant to 11 U.S.C. §§ 105(A), 507(A)(4) and 507(a)(5): (A) Authorizing the Debtor to Pay Pre-Petition Wages, Salaries, Withholding and Payroll Related Taxes for Pre-Petition Periods; (B) Directing All Banks to Honor Pre-Petition Checks for Payment of Pre-Petition Employee Obligations; (C) Authorizing Debtor to Honor Workers' Compensation and Certain Employee Benefit Obligations; and (D) Authorizing Debtor to Pay Prepetition Debts of Physicians Performing Critical Services (the "Wages Motion")

32. The continued and uninterrupted service of the Employees is essential to the Debtor's continuing operations. To minimize the personal hardship the Employees will suffer if pre-petition Employee-related obligations are not paid when due, and to maintain the Employees' morale during this critical time, the Debtor, through the Wages Motion, seeks entry of an order (a) granting the Debtor authority to pay pre-petition wages, salaries, and withholding and payroll taxes for pre-petition periods; (b) directing all banks to honor pre-petition checks for payment of pre-petition employee obligations; and (c) permitting the Debtor to honor workers' compensation and certain employee benefit obligations (collectively, the "Employee Programs").

33. The Debtor also (i) requests that the Court authorize and direct applicable banks and other financial institutions to receive, process, honor and pay all pre-petition checks and transfers drawn on the Debtor's payroll accounts and to make the foregoing payments and (ii) seeks authority to pay all processing costs and administrative expenses related to the foregoing payments, if any. The Debtor submits that any payments that will be made in connection with pre-petition wages, salary, other compensation and benefit programs will not exceed the sum of $11,725 per employee entitled to priority under sections 507(a)(4) and (5) of the Bankruptcy Code except for certain payments to physicians.

34. Lastly, the Debtor submits the continued services of the Qualifying Physician Contractors are so essential to the health of HHI's patients, and to the public health and safety in

general, that it is absolutely necessary for HHI to receive approval to pay the Qualifying Physician Obligations.

   a. **Summary of the Debtor's Pre-Petition Employee Obligations Weekly Wages, Salaries, and Other Compensation**

35. The Employees are paid on a bi-weekly basis on Fridays. The Debtor does not use a payroll service, but calculates and issues the Employees' paychecks and direct deposits on its own. These paychecks are drawn on the Debtor's bank account. The Debtor seeks an order authorizing it to pay all outstanding wages, salaries, and other compensation owed to the Employees.

   b. **Vacation, Sick, Personal Leave, and Holidays**

36. The Debtor seeks an order authorizing, but not directing, it to honor all liabilities to the Employees with respect to vacation, sick pay benefits, personal days, and paid holidays that arose prior to the Petition Date and to continue its pre-petition policies with respect to same going forward. The Debtor anticipates that the Employees will utilize any accrued vacation, sick leave, or personal days in the ordinary course, without resulting in any material cash flow requirements beyond the Debtor's normal payroll obligations.

   c. **Reimbursable Business Expenses**

37. In the ordinary course of HHI's operations, Employees may incur a variety of business expenses that are typically reimbursed by the Debtor pursuant to its normal business practices (hereinafter, "Reimbursable Business Expenses"). All Reimbursable Business Expenses were incurred with the understanding that they would be reimbursed by the Debtor. The Debtor seeks an order authorizing, but not directing, it to pay all pre-petition Reimbursable Business Expenses.

   d. **Health Insurance Benefits**

38. In the ordinary course of its operations, HHI provides medical, prescription drug, and dental insurance to its non-union and JNESO member Employees (the "Health Benefits").

HHI self-insures the Health Benefits, which are administered by Horizon Blue Cross Blue Shield of New Jersey and Express Scripts (collectively, the "Administrators"). The Debtor seeks an order authorizing, but not directing, it to continue providing the Health Benefits and paying the obligations associated therewith to the Administrators.

### e. Workers' Compensation Obligations

39. Under the laws of the State of New Jersey, HHI is required to maintain workers' compensation policies and programs to provide the Employees with workers' compensation coverage for claims arising from or related to their employment with the Debtor. Accordingly, the Debtor maintains workers' compensation policies and programs pursuant to the applicable requirements of local law.

### f. Authority for Banks to Honor and/or Reissue Checks

40. HHI further requests that all applicable banks and other financial institutions be authorized to receive, process, honor, and pay any and all checks and transfers drawn on the Debtor's dedicated payroll accounts, whether such checks were presented before, or are presented after, the Petition Date. The Debtor seeks (i) authorization for and/or ratification of its banks' honoring of pre-petition payroll checks and transfers on or after the Petition Date, (ii) authorization for the banks to process and honor all other checks issued for payments approved by the Court, and (iii) authorization to reissue checks for payments approved by the Court where any check therefor is dishonored post-petition.

(ii) **Debtor's Motion for a Bridge Order and Final Order (I) Prohibiting Utility Companies from Discontinuing, Altering or Refusing Service, (II) Deeming Utility Companies to Have Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests for Additional Assurance Pursuant to 11 U.S.C. §§ 105(a) and 366 (the "Utilities Motion")**

41. In the operation of the Hospital, HHI incurs utility expenses in the ordinary course of business for, among other things, water, electricity, gas, and telephone service (the providers of

such utility services are the "Utility Companies"). Uninterrupted utility services are essential to the Debtor's ongoing operations. Indeed, any disruption to the Debtor's operations by virtue of the cessation of utility services by the Utility Companies will bring HHI's operations to an abrupt halt. If one or more of the Utility Companies refuse or discontinue service even for a brief period, HHI's operations would be severely disrupted. This would cause immediate, irreparable harm to the health and safety of existing patients and the public. Moreover, such an interruption would damage revenues and the critical patient care being provided by HHI, and would ultimately adversely affect HHI's chapter 11 efforts, to the detriment of its estate, its creditors, and the Employees. It is therefore critical that utility services provided to HHI continue uninterrupted.

42. Through the Utilities Motion, HHI seeks entry of (i) a Bridge Order and (ii) a Final Order, pursuant to sections 105(a) and 366 of the Bankruptcy Code, (a) prohibiting its the Utility Companies from discontinuing, altering, or refusing service to the Debtor, except as set forth herein, (b) deeming the Utility Companies adequately assured of future performance on the basis of payment of a two-week security deposit (the "Utility Deposit"), and (c) establishing procedures for resolving requests for additional assurance of payment. The Utility Companies are identified on Exhibit "A" to the Utilities Motion.

> (iii) **Motion for an Order (A) Authorizing Debtor to Continue Using Existing Cash Management System, Bank Accounts, and Business Forms; and (B) Granting a Waiver of the Deposit Guidelines Set Forth in Section 345 of the Bankruptcy Code (the "Cash Management Motion")**

43. In the Cash Management Motion, HHI seeks entry of an order (a) authorizing HHI to continue using its existing cash management system, bank accounts, and business forms; (b) granting a waiver of the deposit guidelines set forth in section 345 of the Bankruptcy Code; and (c) granting such other relief as this Court deems just and equitable.

### a.  Request to Maintain Bank Accounts and Cash Management System

44. In the ordinary course of its operations, HHI maintains a cash management system (the "Cash Management System") to receive and disburse funds. In order to lessen the disruption caused by the bankruptcy filing and maximize the value of its estate in this chapter 11 case, it is vital to HHI that it maintain its existing system of managing cash.

45. Currently, HHI has eight bank accounts (collectively, the "Bank Accounts") (four (4) of the Bank Accounts are in the name of the Foundation.). In the ordinary course of its operations, HHI receives, deposits, and issues checks, wire transfers, and ACH transfers into and out of its checking account.

46. The Cash Management System includes the necessary accounting controls to enable HHI, as well as its creditors and the Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable. HHI maintains and will continue to maintain detailed and accurate accounting records reflecting all transfers of funds. HHI's cash management procedures are ordinary, usual, and essential business practices. They are similar to those used by other corporate enterprises and provide significant benefits to HHI, including the ability to (a) accurately and immediately report receipts and expenditures; (b) control corporate funds centrally; (c) ensure the availability of funds when necessary; and (d) reduce administrative expenses by centralizing the movement of funds.

### b.  Request for Authorization to Maintain Existing Business Forms

47. HHI also seeks authority to continue to use its pre-petition business forms, including, but not limited to, letterhead, invoices, checks, and deposit slips (collectively, the "Business Forms"), without reference to its status as a debtor-in-possession. Requiring HHI to immediately print new business forms will be burdensome, expensive, and disruptive, particularly in light of the nature and scope of its operations and the expected discontinuance of its operations in

the near future.

48. HHI submits that authorization to use the Business Forms will facilitate a smooth and orderly chapter 11 case and minimize the disruption to HHI's operations (without violating the policies underlying the Bankruptcy Code). Accordingly, HHI requests that it be authorized to use its existing Business Forms without being required to label each with the "debtor-in-possession" identifier.

  c. **Request for Waiver of Section 345 Guidelines**

49. HHI seeks a waiver of the deposit guidelines set forth in section 345(b) of the Bankruptcy Code to permit HHI to maintain its existing Bank Accounts even though the balance in the operating account may, from time to time, exceed the amount insured by the FDIC.

  (iv) **Motion for an Order Pursuant to 11 U.S.C. §§ 105 and 364 Authorizing Continuation of Prepetition Budget Management Procedures and Granting Administrative Expense Claim (the "Budget Management Procedures Motion")**

50. HHI also seeks entry of an order authorizing and directing HHI and Authority to continue to abide by the prepetition budget management procedures and granting the Authority an administrative expense claim for amounts borrowed by the Authority from the New Jersey Healthcare Facilities Financing Authority and advanced to the Debtor for restructuring-related cash disbursements.

I hereby declare that the foregoing statements made by me are true. If any of the foregoing statements made by me are willfully false, I recognize that I am subject to punishment.

Dated: August 1, 2011            /s/ *Vincent Riccitelli*
                             VINCENT RICCITELLI

427350_1.DOC