# EXHIBIT A

Execution Version

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT, dated as of the 22nd day of August, 2011 (hereinafter, this "Agreement"), by and between HUDSON HEALTHCARE, INC., a New Jersey non-profit corporation and debtor-in-possession in the Bankruptcy Proceeding described below ("HHI"), and HUMC HOLDCO, LLC, a New Jersey limited liability company ("Holdco"), and HUMC OPCO LLC ("Opco"), a Delaware limited liability company (collectively, "Purchaser").

### Recitals:

WHEREAS,   Hoboken Municipal Hospital Authority, a New Jersey body corporate and politic (the "Authority") owns, and HHI manages the day-to-day operations of, Hoboken University Medical Center, an acute care hospital located in Hoboken, New Jersey (the "Hospital"), which provides hospital services and other health care programs and services (the Hospital and the services and programs provided thereat being collectively referred to as the "Business"); and

WHEREAS, the Authority has previously engaged HHI, pursuant to that certain Master Manager and Operator Agreement, dated February 1, 2007, by and between the Authority and HHI (as amended to date, the "Management Agreement"), to manage and perform all duties necessary to supervise, direct, and control, and directly contract for the services necessary for, the day-to-day operations of the Business; and

WHEREAS, HHI has filed a voluntary petition for protection under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") pursuant to that certain proceeding, In re: Hudson Healthcare, Inc., Case No. 11-33014 (DHS), filed on August 1, 2011 (the "Bankruptcy Proceeding"), which is currently pending before the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"); and

WHEREAS, the Authority and Purchaser are party to that certain Asset Purchase Agreement, dated as of April 20, 2011 (the "Existing APA"), pursuant to which, among other matters, the Authority agreed to cause HHI to sell, transfer or assign certain of its assets to Purchaser as required by the Management Agreement; and

WHEREAS, the commencement of the Bankruptcy Proceeding required the execution of that certain Amendment to Asset Purchase Agreement by and between Purchaser and the Authority, of approximate even date herewith (the "Amended Authority APA" and, together with the Existing APA, the "Authority Sale Agreement"), to provide for the sale and purchase of the Authority's assets described therein to Purchaser and is conditioned upon the execution, delivery and performance of this Agreement providing for (i) the sale and purchase of the HHI assets described herein to Purchaser, so as to enable the Purchaser to operate the Hospital after the consummation of the transactions contemplated in this Agreement and the Authority Sale Agreement, (ii) certain real property leases to which HHI is a tenant party to be collaterally assigned to the Purchaser or its permitted assignee pursuant to collateral assignments in form and

substance reasonably satisfactory to the Purchaser and its permitted assignees, and (iii) HHI to use its best efforts to cause tenant estoppel certificates to be delivered to the Purchaser or its permitted assignees from all tenants of any real property leases to which HHI is a landlord party and which relate to the Hospital;

WHEREAS, upon the terms and subject to the conditions contained in this Agreement, HHI desires to sell to Purchaser and Purchaser desires to purchase from HHI substantially all of the assets owned or used by HHI relating to its management of the Business, including tangible and intangible property associated therewith, in exchange for the payment to HHI of the Purchase Price and the assumption by Purchaser of the Assumed Liabilities;

WHEREAS, certain terms used in this Agreement are defined in Article I below; and

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## DEFINITIONS

1.1    Certain Definitions.  For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1.

"Accounts Receivable" means: (a) all of HHI's present and future accounts, payment intangibles, instruments, chattel paper and all other rights of HHI, if any and whether generated before or after the commencement of the Bankruptcy Proceeding, to receive payments, including, without limitation, all rights to receive any payment, refund or credit in connection with any audit appeal, litigation, action, award, or other recovery, whether administrative or judicial, including, but not limited to, those pertaining to or in connection with Medicaid, Medicaid Managed Care, Medicare, Medicare Advantage or other Medicare managed care program, insurance company, managed care company, or other third-party insurance payments or reimbursements or private payor payments or reimbursements or any future or pending appeal before the Provider Reimbursement Review Board, and all amounts, including, but not limited to, the third party reimbursable portion of accounts receivable owing to HHI arising out of the delivery by the Business of medical, surgical, diagnostic, treatment or other professional or medical or healthcare related services or any other service and/or the supply of goods related to any of such services (whether such services are supplied by the Business in an inpatient or outpatient setting, whether on-site or offsite at the Hospital or by a third party), including, without limitation all health care insurance receivables, and all other rights to payment or reimbursement under any memoranda, letters of understanding or agreements (whether private or governmental); (b) all accounts, accounts receivable, general intangibles, rights, remedies, guarantees, supporting obligations, letter-of-credit rights, deposit accounts, collection accounts and security interests in respect of the foregoing (including bills of lading, warehouse receipts and other documents of title, whether negotiable or non-negotiable), and all rights of

enforcement and collection and all books and records evidencing or related to the foregoing; (c) all information and data compiled or derived by HHI in respect of such accounts receivable; and (d) all proceeds of any of the foregoing, whether received or accruing before or after the Closing Date. For avoidance of doubt: (i) "Accounts Receivable" shall not include cash received by HHI in the Ordinary Course of Business prior to the Closing Date for services rendered by the Authority or HHI prior to the Closing Date (including payments of charity care and other Subsidies received prior to the month in which Closing occurs, other than advances); (ii) charity care and other Subsidies received in the month in which the Closing occurs shall be prorated at Closing in accordance with Section 3.4(ii); and (iii) the amounts allegedly due to HHI by the Authority, whether under the Management Agreement or otherwise.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Business Day" means any day of the year on which national banking institutions in New Jersey are open to the public for conducting business and are not required or authorized to close.

"Charity Care Subsidy" means the Charity Care Subsidy defined in N.J.S.A. 26:2H-18.52.

"CMS" means the Centers for Medicare and Medicaid Services within HHS.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral Space Leases" means those certain leases and subleases for space and premises needed or used in the operation and use of the Hospital and the Facilities and all other property, buildings and improvements associated therewith, supported thereby and used in connection therewith, including, without limitation, properties located at 122-132 Clinton Street, 307 Willow Avenue and 308 Park Avenue Rear, and 300 and 326-336 Willow Avenue.

"Contract" means any written contract, indenture, note, bond, lease, license or other agreement, other than a real property lease, a personal property lease or an Intellectual Property License.

"Copyrights" means all copyrights and registrations and applications therefor and works of authorship, and mask work rights.

"Cost Reports" means all cost and other reports filed pursuant to the requirements of Medical Reimbursement Programs for payment or reimbursement of amounts due from such programs for services provided.

"DEP" means the New Jersey Department of Environmental Protection.

"Designated Contracts" shall have the meaning set forth in Section 2.6.

"Designation Period" shall have the meaning set forth in Section 2.6.

"DHS" means the New Jersey Department of Human Services.

"DMAHS" means the New Jersey Department of Medical Assistance for Health Services.

"DHSS" means the Department of Health and Senior Services of the State of New Jersey.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to the Business or the Purchased Assets in each case whether or not in electronic form, other than Patient Records.

"Employees" means all individuals, as of any date specified herein, whether or not actively at work as of such date, who are employed by HHI in the conduct of the Business (including, without limitation, employees whose employment is governed by collective bargaining agreements), together with individuals who are hired in respect of the conduct of the Business after the date hereof and prior to the Closing; provided, however, that "Employees" shall not include (i) any trustee, director or officer of HHI or (ii) individuals who regularly perform executive functions for HHI relating to the Business.

"Environmental Law" means any federal, state or local statute, law, regulation, code, ordinance, or rule of common law currently in effect relating to the protection of human health and safety or the environment or natural resources, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. §1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §6901 et seq.), the Clean Water Act (33 U.S.C. §1251 et seq.), the Clean Air Act (42 U.S.C. §7401 et seq.), the Toxic Substances Control Act (15 U.S.C. §2601 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. §136 et seq.),The Medical Waste Tracking Act (42 U.S.C. §6992 et seq.), the Oil Pollution Act (33 U.S.C. §2701 et seq.), the Emergency Planning and Community Right to Know Act (42 U.S.C. §11001 et seq.), the Occupational Safety and Health Act (29 U.S.C. §651 et seq.), the Industrial Site Recovery Act (N.J.S.A. 13:1k-6 et seq.) ("ISRA"); the New Jersey Water Pollution Control Act, N.J.S.A. 58:10A-1 et seq.; the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et seq. ("Spill Act"); the New Jersey Underground Storage of Hazardous Substances Act, N.J.S.A. 58:10A-22 et seq.; the Brownfield and Contaminated Site Recovery Act, N.J.S.A. 58:10B-1 et seq.; and the New Jersey Solid Waste Management Act, N.J. S.A. 13:1 E- 1 et seq., each as amended or supplemented, any analogous present or future federal, state or local statutes, laws, codes and ordinances, and the rules and regulations promulgated pursuant thereto.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any entity that would be deemed to be a "single-employer" with HHI under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"Excluded Contracts" means every Contract that is not: (i) an Assigned Contract, (ii) a Purchased Real Property Lease, a (iii) a Designated Contract that is assumed by Purchaser during the Designation Period or (iv) a Medicare or Medicaid provider agreement of the type described in Section 8.12 of the Authority Sale Agreement or Section 8.12 hereof.

"Facilities" means the healthcare facilities (including all real property and improvements thereon) utilized in the Business, including those identified on Schedule A and in Section 2.1, but excluding any asset defined in Section 2.2 as an Excluded Asset or on Schedule A as not being included.

"Furniture and Equipment" means all furniture, fixtures, furnishings, machinery, appliances and other equipment (including medical equipment) and leasehold improvements owned or used by HHI in the conduct of the Business and located in the Ordinary Course of Business at the Facilities, including, without limitation, all such desks, chairs, tables, Hardware, copiers, telephone lines, telecopy machines and other telecommunication equipment (and, to the extent assignable by HHI, the telephone numbers associated therewith), cubicles and miscellaneous office furnishings.

"GAAP" means generally accepted accounting principles in the United States as of the date hereof.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hardware" means any and all computer and computer-related hardware, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Hazardous Material" means any substance, material or waste which is regulated by any Government Body including petroleum and its by-products, asbestos, biomedical waste, medical waste and any chemical, material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" under any provision of Environmental Law.

"Healthcare Program Liabilities" means all Liabilities under any Medical Reimbursement Program Laws, including, but not limited to: (a) any obligations for settlement and retroactive adjustments under the Medicare and Medicaid programs for open periods ending on or before the Closing Date; (b) any obligations or liabilities of HHI by reason of any failure to comply with the rules and regulations of any Medical Reimbursement Program which is attributable to the

delivery by the Business of medical, surgical, diagnostic, treatment or other professional or medical or healthcare related services or any other service and/or the supply of goods related to any of such services (whether such services are supplied by the Business or a third party) ("Service Delivery") during any period of time ending on or before the Closing Date; (c) all obligations of HHI now existing or which may hereafter exist with respect to any payment or reimbursement owed by HHI to any Medical Reimbursement Program or other payor which is attributable to the Service Delivery during any period of time ending on or before the Closing Date; and (d) any obligations or liabilities to any Medical Reimbursement Program for overpayments and other financial obligations arising from adjustments or reductions in reimbursement attributable to events, transactions, circumstances, or conditions occurring or existing on or before the Closing Date.

"HHS" means the United States Department of Health and Human Services.

"Hired Employees" means the Employees hired by Purchaser effective as of the Closing Date in accordance with Section 8.20 of this Agreement.

"Intellectual Property License" means (i) any grant by HHI to a third Person of any right to use any of the Purchased Intellectual Property owned by HHI and (ii) any grant to HHI of a right to use in connection with the Business any Intellectual Property Rights owned by any other Person (other than HHI's Marks).

"Intellectual Property Rights" means all intellectual property rights that HHI has the authority or legal ability under applicable law to assign in respect of Copyrights, Marks, Software, trade secrets and Patents, whether registered or unregistered, and whether owned or licensed.

"Inventory" means all medical supplies, drugs, medications, food, janitorial, maintenance shop, housekeeping and office supplies and other consumables located in the Hospital, the Facilities or used in connection with the operation of the Business.

"IRS" means the Internal Revenue Service.

"Knowledge" means the actual knowledge, as of or prior to the Closing, as applicable, of those officers of Purchaser or of those officers, directors, trustees or board members of HHI identified on Schedule 1.1.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, alternative dispute resolution, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"Liability" means any claim (as that term is defined in Section 101(5) of the Bankruptcy Code), debt, liability or obligation (whether direct or indirect, known or unknown, absolute or

contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability, successor liability, or otherwise), and including all fines, penalties, costs and expenses relating thereto.

"Lien" means any lien (as that term is defined in Section 101(37) of the Bankruptcy Code), encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, adverse claim, and transfer restriction under any agreement, of any kind or nature, known or unknown.

"Management Agreement" has the meaning ascribed thereto in the Recitals to this Agreement.

"Marks" means all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof.

"Material Adverse Effect" means with respect to any Person, any change, event(s), occurrence(s) or effect(s), whether direct or indirect, that, both before and after giving effect to the transactions contemplated by this Agreement, could, individually or in the aggregate, have a material adverse effect on (i) the business, properties, results of operations, assets, revenue, income, prospects or condition (financial or otherwise) of, or the ability to timely satisfy the obligations or liabilities (whether absolute or contingent) of, such Person, (ii) such Person's business or assets, (iii) the ability of such Person to perform its obligations under, and/or consummate the transactions contemplated by, this Agreement within the time periods specified herein, or (iv) the ability of such Person to operate the Hospital or the Business after the Closing Date including, but not limited to, regulatory changes, the failure to obtain any approval from any Governmental Body or the imposition of conditions or restrictions for the issuance or transfer of any Permits or approvals. Notwithstanding the foregoing, in no event shall any of the following constitute Material Adverse Effect: (a) any occurrence, condition, change, event or effect resulting from or relating to changes in general economic or financial market conditions except in the event, and only to the extent, that such occurrence, condition, change, event or effect has had a disproportionate effect on such Person, as compared to other Persons engaged in the business of owning and operating an acute care hospital facility; or (b) any occurrence, condition, change, event or effect that affects the ownership and operation of acute care hospitals generally (including changes of a regulatory nature) except in the event, and only to the extent, that such effect has had a disproportionate effect on such Person, as compared to other Persons engaged in the ownership and operation of acute care hospitals.

"Medicaid" means any state program for medical assistance administered under Title XIX of the Social Security Act.

"Medical Reimbursement Program" means Medicare, Medicaid, any other federal health care program (as defined in 42 U.S.C. §1320a-7b(f)), and any other state sponsored reimbursement program.

"Medical Reimbursement Program Laws" means the Laws governing the Medical Reimbursement Programs, including: 42 U.S.C. §§1320a-7, 1320a-7a, 1320a-7b and 1395nn; the False Claims Act (31 U.S.C. §3729 *et seq.*); the False Statements Act (18 U.S.C. §1001 *et seq.*); the Program Fraud Civil Penalties Act (31 U.S.C. § 3801 *et seq.*); the anti-fraud and abuse provisions of the Health Insurance Portability and Accountability Act of 1996 (18 U.S.C. §1347, 18 U.S.C. §669, 18 U.S.C. §1035, 18 U.S.C. §1518); and the corresponding fraud and abuse, false claims and anti self-referral Laws of any other Governmental Body.

"Medicare" means the health insurance program administered under Title XVIII of the Social Security Act.

"Order" means any order, injunction, judgment, decree, ruling, consent, approval, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business through the date hereof consistent with past practice.

"Patents" means all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon.

"Patient Records" means any Documents containing information concerning medical, health care or behavioral health services provided to, or the medical, health care or behavioral health of any individual, or that are otherwise subject to regulation under applicable Law, including the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the Health Information Technology for Economic and Clinical Health Act ("HI TECH Act") and all regulations promulgated pursuant thereto, including the Transaction Code Set Standards, the Privacy Rules and the Security Rules set forth at 45 C.F.R. Parts 160 and 164.

"Permits" means any approvals, authorizations, consents, licenses, permits, provider numbers, certificates of need, certificates of exemption, franchises, accreditations, registrations or certificates of a Governmental Body or other regulatory entity.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, association, estate, Governmental Body or other entity.

"Plan" means any material "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other material bonus, profit sharing, pension, severance, deferred compensation, fringe benefit (as described in Code Section 132), insurance, welfare, post-retirement, health, life, tuition refund, service award, company car, scholarship, relocation, disability, accident, sick, vacation, holiday, unemployment, incentive, commission, retention, change in control, non-competition, and other plans, agreements, policies, or trust funds (a) established, maintained, sponsored or contributed to (or with respect to which any obligation to contribute has been undertaken) by HHI or any ERISA Affiliate or (b) with respect to which HHI or any ERISA Affiliate have or have had any obligation, in each case, under which any Hired Employee may receive benefits or may otherwise be subject.

-8-

"Purchased Intellectual Property" means all Intellectual Property Rights owned by HHI and/or used by HHI, including any in the form of or arising from or in respect of Patents, Marks, Copyrights, Software or Technology, except for any that is an Excluded Asset, that HHI has the authority or legal ability under applicable law to assign.

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, or leaching of Hazardous Material into the indoor or outdoor environment, or into or out of any property.

"Remedial Action" means any and all actions as required by a Governmental Body to (i) investigate, monitor, clean up, remove, remediate, treat or in any other way address any Hazardous Material; (ii) prevent any Release so it does not endanger or threaten to endanger public health or welfare or the indoor or outdoor environment or any natural resources; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care concerning Hazardous Material; or (iv) to correct a condition of noncompliance with, or in violation of, Environmental Law.

"Representatives" means with respect to any Person, any of its Affiliates, directors, trustees, officers, members, employees, consultants, agents, advisors, and other representatives.

"Software" means, except to the extent generally available for purchase from a third Person, any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (iv) all documentation including user manuals and other training documentation related to any of the foregoing, in each case, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business.

"Tax Authority" means any federal, state or local government, or agency, instrumentality or employee thereof, charged with the administration of any law or regulation relating to Taxes.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, *ad valorem*, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, excise taxes under Section 4358 of the Code, unrelated business income taxes, and estimated taxes, whether disputed or not, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business, other than any in the form of Software.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, the Millville Dallas Airmotive Plant Job Loss Notification Act, a/k/a the New Jersey Business Closing/Mass Layoff Notification Law, and all rules and regulations promulgated under and pursuant to the foregoing.

1.2    Terms Defined Elsewhere in This Agreement.  For purposes of this Agreement, the following terms have meanings set forth in the Sections indicated:

| Term | Section |
| --- | --- |
| Agreement | Recitals |
| Anti-Kickback Statute | 5.13(f) |
| Asset Acquisition Statement | 11.2 |
| Assigned Contracts | 2.6 |
| Assumed Liabilities | 2.3 |
| Audit Periods | 5.16(c) |
| Business | Recitals |
| Business Confidential Information | 8.6(b) |
| CBAs | 5.11(c) |
| Closing | 4.1 |
| Closing Date | 4.1 |
| COBRA | 2.4(q) |
| Competing Business | 8.13 |
| Contemplated Transactions | 2.1 |
| Contract Management System | 5.7 |
| Damages | 12.1 |
| Data Room | 5.7 |
| Excluded Contracts | 2.6 |
| Excluded Liabilities | 2.4 |
| Excluded Personal Property Leases | 2.2(d) |
| Financial Statements | 5.20 |
| Healthcare Applications | 8.4(a) |
| Healthcare Programs | 5.13(b) |
| HHI | Recitals |
| HHI Confidential Information | 8.6(a) |
| HHI Documents | 5.2 |

| | |
|---|---|
| Holdco | Recitals |
| Hospital | Recitals |
| Joint Commission | 5.13(e) |
| Opco | Recitals |
| Personal Property Leases | 5.7 |
| Purchased Assets | 2.1 |
| Purchased Intellectual Property Licenses | 2.1(c) |
| Purchased Personal Property | 2.1(b) |
| Purchased Personal Property Leases | 2.1(b) |
| Excluded Contracts | 2.6 |
| Purchased Real Property Leases | 2.1(a) |
| Purchaser Documents | 6.2 |
| Real Property Leases | 5.6 |
| Revised Statements | 11.2 |
| Transfer Taxes | 11.1 |

1.3     Other Definitional and Interpretive Matters.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     Calculation of Time Periods.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

(iii)     Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.  To the extent there is a conflict between the terms of this Agreement and a Schedule or Exhibit, the terms of this Agreement shall control.

(iv)     Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)     Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(vi)    <u>Herein</u>.    The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)    <u>Including</u>.    The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(viii)    <u>Made available to Purchaser</u>.    The phrase "made available to Purchaser" shall mean made available to Purchaser through posting in the Data Room, via email, facsimile or other electronic transfer or through other written means for purposes of this Agreement.

(ix)    <u>Survival of Certain Covenants</u>.    Any covenant which by its terms is to be performed after the Closing shall survive the Closing, notwithstanding the fact that the provision does not explicitly provide that the covenant shall survive the Closing.

(b)    The parties hereto have been advised by experienced counsel, and have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted in its entirety by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1    <u>Purchase and Sale of Assets</u>.    On the terms and subject to the conditions set forth in this Agreement, at the Closing and subject to Bankruptcy Court approval as provided under 11 U.S.C. Section 363, Purchaser shall purchase, acquire and accept from HHI, and HHI shall sell, transfer, assign, convey and deliver to Purchaser, or cause to be sold, transferred, assigned, conveyed and delivered all of HHI's right, title and interest (if any), direct and indirect, in, to and under the Purchased Assets, free and clear of any and all existing Liens (the "<u>Contemplated Transactions</u>").  "<u>Purchased Assets</u>" means all assets, rights and properties in which HHI has an interest pertaining to or used in connection with the Business as existing on the Closing Date (wheresoever located and whether or not carried or reflected on the books and records of HHI, the Authority or any other Person), or to which HHI has rights, directly or indirectly, other than the Excluded Assets, including:

(a)    all right, title and interest of HHI in and to the Real Property Leases, if any, set forth in <u>Schedule 2.1(a)</u> (the "<u>Purchased Real Property Leases</u>");

(b)    (i) the Furniture and Equipment; (ii) the tools, spare parts, supplies (including all of HHI's Inventory) and all other tangible personal property owned by HHI and used by HHI in

the Ordinary Course of Business and whether or not located at the Facilities ((i) and (ii) collectively, "Purchased Personal Property"); (iii) any additional Personal Property Leases primarily pertaining to or used in connection with the Business that are entered into after the date hereof but prior to the Closing with the consent of the Purchaser in accordance with Section 8.2(b) (the "Purchased Personal Property Leases"); and (iv) the motor vehicles described on Schedule 2.1(b)(iv);

(c)    (i)    the Purchased Intellectual Property and (ii) the rights of HHI as licensee under the Intellectual Property Licenses identified in Schedule 2.1(c) used by HHI primarily in connection with the Business and (along with any additional Intellectual Property Licenses primarily pertaining to or used in connection with the Business that are entered into after the date hereof but prior to the Closing with the consent of Purchaser in accordance with Section 8.2(b)) to the extent assignable (the "Purchased Intellectual Property Licenses");

(d)    subject to the provisions of Section 2.6, the executory contracts set forth on Schedule 2.1(d) (the "Assumed Executory Contracts") and the Designated Contracts Purchaser elects to assume during the Designation Period and all rights, including, but not limited to, all causes of action, setoffs or other claims, arising out of or with respect to the foregoing;

(e)    subject to any valid right of setoff or recoupment by the applicable creditor, all deposits (including customer deposits and security deposits for rent, electricity, telephone or other utilities and deposits posted under any Assigned Contract, Designated Contracts Purchaser elects to assume during the Designation Period, or Purchased Real Property Lease) and prepaid charges and expenses of HHI paid in connection with the Assigned Contracts, Designated Contracts Purchaser elects to assume during the Designation Period, or Purchased Real Property Leases;

(f)    all other advance payments, prepayments, prepaid expenses, deposits and the like which exist as of the Closing Date pertaining to (and only those pertaining to) the Assumed Executory Contracts, subject to normal proration in the manner customarily prorated upon the sale of assets of a going concern, which were made with respect to the Assumed Executory Contracts in the operation of the Business, the current categories and amounts of which are set forth on Schedule 2.1(f);

(g)    all insurance proceeds arising in connection with property damage to the Purchased Assets occurring after the execution of this Agreement and prior to the Closing Date, to the extent not expended on the repair or restoration of the Purchased Assets;

(h)    subject to the provisions of Section 8.7, all Documents that are primarily used in, held for use in or intended to be used in, or that arise primarily out of, the Business, including Documents relating to the services provided by the Business, the marketing of the Business's services (including advertising and promotional materials and marketing brochures), Purchased Intellectual Property, personnel files for Hired Employees and files including credit information and supplier lists, to the extent physically located at the Facilities, and including all Patient Records;

(i)    all Permits, if any, including those listed on Schedule 2.1(d), used by HHI in the Business that HHI has the authority or legal ability to assign, except in connection with the provider numbers as agreed to by the parties pursuant to Section 8.12 hereof;

(j)    all rights of HHI under non-disclosure or confidentiality, non-compete, non-disparagement or non-solicitation agreements with employees and agents of HHI or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(k)    all rights of HHI under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to services provided to HHI after the Closing or to the extent affecting any Purchased Assets;

(l)    all goodwill and other intangible assets owned by HHI and associated with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property;

(m)    all plans and surveys, including, without limitation, those related to utilities, easements and roads, "as-built" plans, plans, specifications, engineers' drawings and architectural renderings and similar items owned by HHI or in HHI's possession relating to the Facilities;

(n)    *intentionally omitted*;

(o)    all telephone numbers and facsimile numbers, and domain names and email addresses;

(p)    claims, rights, credits, causes of action and rights of set off of HHI against third parties whether known or unknown, contingent or not contingent, including all rights of indemnification by or through any other Person relating to the Business or the Hospital to the extent same are assignable by their terms or under applicable law;

(q)    to the extent permitted by applicable law (and subject to any *cy pres* hearing, if any, required pursuant to applicable law), all of the assets of any foundation affiliated with HHI;

(r)    all Accounts Receivable (as limited and defined hereinabove); and

(s)    all other assets owned by HHI or its Affiliates and used in connection with the Hospital or the Business other than the Excluded Assets.

2.2    Excluded Assets.    Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and HHI shall retain all right, title and interest to, in and under the Excluded Assets. "Excluded Assets" shall mean the following assets, properties, interests and rights of HHI:

(a)    the Excluded Contracts including, without limitation, any union contract, collective bargaining agreement or other labor agreement that is not an Assigned Contract;

(b)      any Contract to which either HHI is a party or under which it has rights that is not used primarily in the Business, including, but not limited to, those Contracts included in Schedule 2.2(b), unless included in Schedule 2.1(d) among the Assumed Executory Contracts or included in Schedule 2.6 as a Designated Contract and assumed by Purchaser during the Designation Period;

(c)      any Plan established, sponsored or maintained by HHI;

(d)      the Personal Property Leases identified on Schedule 2.2(d) (the "Excluded Personal Property Leases");

(e)      the amounts allegedly due to HHI by the Authority, whether under the Management Agreement or otherwise;

(f)      all cash and cash equivalents of HHI as of the Closing Date;

(g)      the right to object to claims under Bankruptcy Code Section 502 or any other authority to do so; all avoidance powers, actions, rights, remedies or affirmative defenses under chapter 5 of the Bankruptcy Code, including, but not limited to Section 544 through 553 and Section 724, under any similar or related law, or under any other fraudulent transfer or preference laws; and all claims against directors and officers of HHI, all rights arising from and proceeds of any errors and omissions of directors and officers, and all proceeds and rights under directors' and officers' insurance policies maintained by or on behalf of HHI; and

(h)      any and all deposits, prepayments or other amounts paid by HHI after the commencement of the Bankruptcy Proceeding, the amount and composition of which are set forth on Schedule 2.2(h) hereto.

2.3      Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely pay, perform and discharge in accordance with their respective terms, only the Liabilities accruing from and after the Closing with respect to the Purchased Assets, liabilities under the Medicare and Medicaid programs and the liabilities described in Section 8.20 (the "Assumed Liabilities").

2.4      Excluded Liabilities.  Except for the Assumed Liabilities, Purchaser shall not assume or become liable for the payment or performance of any Liability of HHI or otherwise related to the Business of any nature whatsoever, whether accrued or unaccrued, known or unknown, fixed or contingent ("Excluded Liabilities"), including the following, which shall remain Liabilities of HHI:

(a)      any Liability based upon any wrongful or negligent act or omission of HHI prior to the Closing;

(b)      except as otherwise provided in Article XI, any and all Liabilities and obligations

of HHI for Taxes including, but not limited to, any Liability of HHI arising from the operation of the Business for periods prior to the Closing or any Taxes in the nature of income tax imposed upon HHI in connection with the sale of the Purchased Assets contemplated hereby;

(c)    any Liability associated with any Excluded Assets;

(d)    any Liability relating to any breach of contract, breach of warranty, tort, infringement, or violation of Law by HHI;

(e)    any Liability arising out of events or omissions occurring prior to the Closing Date from or relating to any overpayment, duplicate payment, refunds, discounts or adjustments due to any commercial health insurance carrier, health maintenance organization, managed care plan, self-insured health plan or any other similar private sector healthcare cost reimbursement program or insurance coverage;

(f)    any Liability related to claims of medical malpractice and/or other professional Liability of HHI, or any of its employees, attending physicians, agents or independent contractors to the extent incurred prior to the Closing Date arising out of events or omissions occurring prior to the Closing Date;

(g)    all Healthcare Program Liabilities (other than those Medicare and Medicaid program liabilities expressly assumed by Purchaser pursuant to Section 2.3 above) incurred prior to or relating to or arising from a period prior to the Closing Date, whether assessed or demanded before or after the Closing Date including any amounts advanced for charity care or other Subsidies prior to their normally scheduled payment date which liabilities shall remain with and be the sole obligation of HHI or the Authority, as the case may be;

(h)    any Liability arising out of or in connection with any Legal Proceedings (whether instituted prior to or after Closing) to the extent arising from acts or omissions which occurred prior to the Closing Date;

(i)    any Liability related to Cost Report settlement payables arising from Cost Report periods ending on or before the Closing Date, whether assessed or demanded before or after the Closing Date;

(j)    any debt not specifically included in the Assumed Liabilities;

(k)    any Liability related to penalties, fines, settlements, interest, costs and expenses to the extent arising out of or incurred as a result of any violation by HHI prior to the Closing Date of any Law or Order, whether assessed or demanded before or after the Closing Date;

(l)    all Liabilities relating to amounts required to be paid by HHI hereunder;

(m)    except as otherwise specifically agreed by Purchaser, all Liabilities under HHI's or the Authority's Medicare and Medicaid provider number(s) and related provider agreements, whether assessed or demanded before or after the Closing Date pertaining to services rendered

by or on behalf of HHI prior to Closing;

(n)    all claims, demands, liabilities or obligations of the Business of any nature whatsoever which are based on events occurring on or before the Closing Date, or which are based upon products sold or services performed by the Business on or before the Closing Date, notwithstanding that the date on which such claim, demand, liability or obligation arose was after the Closing Date;

(o)    HHI's obligations and liabilities to any Employee of the Business or any other Person affiliated with the Business for any employee benefit plan or pension plan;

(p)    all claims, demands, liabilities or obligations arising out of any duty or violation of any applicable Environmental Laws, rules, regulations or obligations by HHI or the Business, or related to the Purchased Assets, occurring on or prior to the Closing Date, including, but not limited to, any Release of Hazardous Materials occurring after the Closing Date if the Hazardous Materials were disposed of by or for HHI prior to the Closing Date, whether assessed or demanded before or after the Closing Date;

(q)    any liability or obligation under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and regulations promulgated thereunder (collectively, "COBRA"), to any Employee of the Business or any other Person affiliated with the Business covered by HHI's health plans who is not offered, or is offered but does not accept, employment with Purchaser, and any liability or obligation under COBRA to any family member of such employee of Business or any other Person affiliated with the Business covered by HHI's health plans who is not offered, or is offered but does not accept, employment with Purchaser;

(r)    all of HHI's liabilities or obligations arising out of any violation of any laws, rules or regulations by HHI before, on or after the Closing Date or relating to the Business on or prior to the Closing Date;

(s)    any other liability or obligation of HHI that does not relate to or arise from the Business or the Purchased Assets;

(t)    all of HHI's liabilities or obligations arising out of any collective bargaining agreements or other agreements with any labor union or other employee representative for a group of employees;

(u)    all of HHI's liabilities or obligations to employees including, without limitation wages, benefits and paid time off (except for those employee liabilities that are expressly assumed by Purchaser pursuant to Section 8.20 of this Agreement);

(v)    all of HHI's liabilities or obligations to any Plan which HHI has established, sponsors or maintains, or to which HHI contributes, including any obligation to any "multiemployer plan" within the meaning of Section 3(37) of ERISA, including any obligation which could arise as a result of the Contemplated Transactions, including but not limited to withdrawal liability, if any, pursuant to Sections 4201 et seq. of ERISA;

(w)    all liabilities and obligations of HHI to Purchaser under this Agreement or with respect to or arising out of the Contemplated Transactions; and

(x)    any other liabilities of HHI which are not Assumed Liabilities, including without limitation, any liabilities of HHI to creditors.

2.5    <u>Allocation of Purchased Assets and Assumed Liabilities</u>.  Opco shall purchase, acquire and accept from HHI all of HHI's respective right, title and interest in, to and under all Purchased Assets, including the Purchased Real Property Leases, and shall assume the Assumed Liabilities related thereto.

2.6    <u>Assigned Contracts and Designation Rights</u>.  HHI shall assign to Purchaser and Purchaser shall, to the extent executory, assume all of HHI's right, title and interest in and to the Purchased Real Property Leases set forth on <u>Schedule 2.1(a)</u>, Intellectual Property Licenses set forth on <u>Schedule 2.1(c)</u>, Assumed Executory Contracts set forth on <u>Schedule 2.1(d)</u> and any Permits set forth in <u>Schedule 2.1(d)</u> (collectively the "<u>Assigned Contracts</u>").  Set forth on <u>Schedule 2.6</u> attached hereto is a list of Contracts and other agreements and permits referred to as the "<u>Designated Contracts</u>."  Purchaser shall have the right, from the Closing Date until the date that is the later of January 31, 2012 or one hundred twenty (120) days after the Closing Date (the "<u>Designation Period</u>"), to decide whether or not to assume all of HHI's right, title and interest in and to any of the Designated Contracts.  Purchaser shall give notice of any Designated Contract Purchaser elects to assume during the Designation Period pursuant to procedures to be set forth in the Order to be entered by the Bankruptcy Court.  Any Contract not listed on the list of Assigned Contracts or the list of Designated Contracts and any Contract which is on the list of Designated Contracts but not assumed by Purchaser during the Designation Period shall be an "<u>Excluded Contract</u>."  From the date hereof until the date that is five (5) days before the hearing date in the Bankruptcy Court for approval of the sale of assets from HHI to Purchaser pursuant to this Agreement (the "<u>Pre-hearing Period</u>"), Purchaser may (upon the reasonable mutual consent of Purchaser and HHI) move one or more Contracts from the list of Assigned Contracts to the list of Designated Contracts and/or from the list of Designated Contracts to the list of Assigned Contracts. If Purchaser and Seller cannot agree as to moving a Contract between the list of Designated Contracts and the list of Assigned Contracts during the Pre-hearing Period, then either Purchaser or Seller shall have the right to terminate this Agreement upon providing the other with at least five (5) days prior written notice of such termination. After the end of the Pre-hearing Period, there shall be no further changes in the list of Assigned Contracts and the list of Designated Contracts.  Purchaser shall only be liable for those Contracts executed by HHI or pursuant to which HHI has or may have any direct or indirect obligations (i) listed as Assigned Contracts on <u>Schedule 2.1(d)</u> as of the end of the Pre-hearing Period, (ii) that are Purchased Real Property Leases and (iii) listed as Designated Contracts on <u>Schedule 2.6</u> as of the end of the Pre-hearing Period and assumed by Purchaser during the Designation Period, subject, however, in all events, to Purchaser's right to assume a Designated Contract as described above and resulting respective rights of the parties with respect thereto.  In no event shall Purchaser be liable for any Excluded Contract.  The allocation of cure costs and other procedures to be followed by the parties with respect to Designated Contracts, both pre-petition and post-petition/pre-assumption, as described herein, shall be incorporated into the Order and related Notice annexed hereto as

Exhibit A.

2.7    <u>Further Conveyances and Assumptions</u>.    From time to time following the Closing, each party shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to HHI and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the Contemplated Transactions.

2.8    <u>Cure Amounts—Assigned Contracts</u>.    All cure costs related to the Assigned Contracts listed on the Assigned Contracts list as of the date hereof are set forth on <u>Schedule 2.8</u> hereto and shall be paid by HHI.    In addition, HHI shall pay all cure costs relating to any additional Contracts that are added to the Assigned Contracts list during the Pre-hearing Period (which may only be so added as agreed to by the parties as set forth in Section 2.6) and HHI shall not be required to pay any cure costs for Contracts that have been removed from the Assigned Contracts list during the Pre-hearing Period. Purchaser shall have no obligation to pay cure costs for the Assigned Contracts listed on the Assigned Contracts list as of the end of the Pre-hearing Period. Purchaser shall pay and be responsible for the regular, normal course of business costs pursuant to the terms of the respective Assigned Contract incurred after the Closing Date. Notwithstanding anything herein to the contrary, HHI shall pay and be solely responsible for any and all costs incurred between August 1, 2011 and the Closing Date with respect to all Assigned Contracts.

2.9    <u>Cure Amounts—Designated Contracts</u>.    All cure costs related to the Designated Contracts listed on the Designated Contracts list as of the date hereof are set forth on <u>Schedule 2.9</u> hereto and shall be paid by Purchaser if assumed. HHI shall have no obligation to pay pre-petition cure costs for the Designated Contracts listed on the Designated Contract list as of the date hereof or so listed at the end of the Pre-hearing Period. To the extent Purchaser assumes any Contract identified as a Designated Contract after the end of the Pre-hearing Period, Purchaser shall pay any pre-petition cure costs and any post-Closing costs incurred associated with such Contract. To the extent Purchaser does not assume any such Designated Contract, Purchaser shall pay and be responsible for the regular, normal course of business costs pursuant to the terms of the respective Designated Contract incurred after the Closing Date until the earlier of the expiration of the Designation Period or the date Purchaser provides notice that it will not assume such Designated Contract and such notice becomes effective. Notwithstanding anything herein to the contrary, HHI shall pay and be solely responsible for any and all costs incurred between August 1, 2011 and the Closing Date with respect to all Designated Contracts. During the Designation Period, HHI shall use its best efforts to obtain any consents required in order to transfer to Purchaser any Designated Contract which Purchaser elects to assume during the Designation Period.

## ARTICLE III

## CONSIDERATION

3.1     <u>Consideration</u>.  The consideration for the Purchased Assets shall be comprised of: (a) the assumption by Purchaser of the Assumed Liabilities, including, subject to <u>Section 8.20</u>, the assumed Leave Time Benefits (as defined therein), and (b) the amount of Seven Hundred Fifty Thousand Dollars ($750,000.00).

3.2     <u>*Intentionally Omitted*</u>.

3.3     <u>Payment of Consideration</u>.  On the Closing Date Purchaser shall (i) assume the Assumed Liabilities including, subject to <u>Section 8.20(a)</u>, the assumed Leave Time Benefits and (ii) pay the sum of Seven Hundred Fifty Thousand Dollars ($750,000.00) pursuant to <u>Section 3.1(b)</u>.

3.4     <u>Prorations</u>.  (i) At Closing, Purchaser and HHI shall prorate real estate and personal property lease payments, real estate and personal property Taxes and other assessments, plus all other income and expenses (including utilities) with respect to the Hospital and the other operations of HHI which are normally prorated upon a sale of assets of a going concern and (ii) without limiting the foregoing, at Closing Purchaser and HHI shall also prorate any State Charity Care subsidy, State Hospital Relief Subsidy, State Mental Health Subsidy, State Stabilization Grants and Graduate Medical Education Grants and Medicaid DSH reimbursements (hereinafter collectively referred to as the "<u>Subsidies</u>") that are subsidies received by HHI in the month in which the Closing occurs, to the extent those Subsidies are received in the Ordinary Course of Business and consistent with the normal payment schedule of the State of New Jersey or other Governmental Body for such payment.  Proration shall be calculated on a per diem basis, with HHI responsible for all the above Taxes, payments and other assessments which accrue on and prior to (and entitled to the Subsidies for the period on and prior to) the Closing Date, and Purchaser responsible for all of the above Taxes, payments and assessments which accrue after (and entitled to the Subsidies for the period after) the Closing Date.

## ARTICLE IV

## CLOSING AND TERMINATION

4.1     <u>Closing Date</u>.  Subject to the satisfaction of the conditions set forth in <u>Sections 10.1, 10.2 and 10.3</u> (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in <u>Article II</u> hereof (the "<u>Closing</u>") shall take place at the offices of McElroy, Deutsch, Mulvaney & Carpenter, LLP, 40 West Ridgewood Avenue, Ridgewood, New Jersey 07450 (or at such other place as HHI and Purchaser may designate in writing) at 10:00 a.m. (Eastern time) on a date that is no less than three (3) Business Days after the satisfaction or waiver of the conditions set forth in <u>Article X</u> (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless

another time or date, or both, are agreed to in writing by HHI and Purchaser. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date." Unless otherwise agreed by HHI and Purchaser in writing, regardless of the time at which the Closing is completed, the Closing shall be deemed effective and all right, title and interest of HHI in any asset to be acquired by Purchaser hereunder, and any Assumed Liability and all risk of loss with respect to the Business, shall be considered to have passed to Purchaser as of 12:01 a.m. (Eastern time) on the Closing Date.

4.2     Deliveries by HHI. At the Closing, HHI shall deliver or cause to be delivered to Purchaser:

(a)     a certificate of good standing of HHI from the State of New Jersey or other evidence that HHI is existing as a New Jersey non-profit corporation;

(b)     a true and complete copy of the certificate of incorporation of HHI and all amendments thereto, certified by the State of New Jersey;

(c)     true and complete copies of the bylaws of HHI, certified by an authorized officer, director or trustee;

(d)     certificates from authorized officers of HHI that the certificate of incorporation of HHI has not been amended since the date of the certificate described in subsection (b) above, and that nothing has occurred since the date of issuance of the certificate of good standing specified in subsection (a) above, that would adversely affect HHI's corporate existence or good standing;

(e)     true and complete copies of the resolutions of HHI, certified by its Secretary, authorizing the execution, delivery and performance of this Agreement and all instruments and documents to be delivered in connection herewith, and the Contemplated Transactions by HHI;

(f)     certificates from the Secretary of HHI as to the incumbency and signatures of each officer of HHI executing this Agreement and any other documents required under this Agreement;

(g)     a duly executed bill of sale in a form reasonably acceptable to Purchaser and HHI;

(h)     a duly executed assignment and assumption agreement in a form reasonably acceptable to Purchaser and HHI, and duly executed assignments of the U.S. trademark registrations and applications included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. Patent and Trademark Office, and general assignments of all other Purchased Intellectual Property;

(i)     the officer's certificates required to be delivered pursuant to Sections 10.1(a) and 10.1(b);

(j)     *intentionally omitted*;

(k)    a duly executed Non-Foreign Person Affidavit for HHI in compliance with Section 1445 of the Code;

(l)    copies of all consents required by Section 10.3(b) for which HHI is responsible;

(m)    certified copies of the Final HHI Sale Order and the Final HHI Settlement Order having been entered by the Bankruptcy Court and docketed, in form and substance acceptable to Purchaser, together with a certification from HHI's counsel indicating that no appeal or stays pending appeal have been filed or applied for in connection with the entire docketing of the Final HHI Sale Order and the Final HHI Settlement Order;

(n)    duly executed assignment and assumption agreements in forms prepared by Purchaser's counsel at Purchaser's expense and reasonably acceptable to HHI for all Assigned Contracts and Purchased Real Property Leases and original counterparts of each Assigned Contract and Purchased Real Property Lease that is in HHI's possession, custody or control, to be delivered to Purchaser at Closing (and, if requested by Purchaser, assignment and assumption agreement duly executed by HHI in forms prepared by Purchaser's counsel at Purchaser's expense and reasonably acceptable to HHI for Designated Contracts subject to and contingent upon Purchaser electing to assume such Designated Contracts during the Designation Period);

(o)    all other instruments of conveyance and transfer executed by HHI, in form and substance reasonably acceptable to Purchaser, as may be necessary or appropriate to convey the Purchased Assets to Purchaser free and clear of all Liens (including, without limitation, certificates of title to any and all motor vehicles being sold, transferred and assigned to Purchaser as part of the Purchased Assets);

(p)    such other agreements, documents, instruments and certificates as Purchaser may reasonably request and which are necessary to effect the Closing; and

(q)    duly executed certified list of leases and security deposits prepared by Purchaser's counsel at Purchaser's expense and reasonably acceptable to HHI for each of the Real Property Leases that constitute Collateral Space Leases;

(r)    duly executed landlord consents and estoppels prepared by Purchaser's counsel at Purchaser's expense and reasonably acceptable to HHI for each of the Real Property Leases that constitute Collateral Space Leases;

(s)    duly executed certified list of leases, rent roll and security deposits prepared by Purchaser's counsel at Purchaser's expense and reasonably acceptable to HHI for each of the Real Property Leases that constitute leases, licenses or subleases for any part of the Facilities or the Hospital, each in forms prepared by Purchaser's counsel at Purchaser's expense and reasonably acceptable to HHI;

(t)    duly executed tenant estoppels prepared by Purchaser's counsel at Purchaser's expense and reasonably acceptable to HHI for each of the Real Property Leases that constitute leases, licenses or subleases for any part of the Facilities or the Hospital, each in forms prepared

by Purchaser's counsel at Purchaser's expense and reasonably acceptable to HHI;

(u)    duly executed termination agreement regarding that certain Lease and Parking Access Agreement as amended by that certain Agreement Amending HUMC Parking Privileges at Midtown Parking Garage dated June 2010;

(v)    evidence of the existence of the policies of insurance referred to in Sections 5.17 and 8.2(f); and

(w)    all the documents that were copied and constitute part of the Data Room or the Contract Management System other than those related to the Excluded Assets and Excluded Liabilities.

4.3    Deliveries by Purchaser.  At the Closing, Purchaser shall deliver or cause to be delivered to HHI:

(a)    a duly executed assignment and assumption agreement in a form reasonably acceptable to Purchaser and HHI;

(b)    the officer's certificates required to be delivered pursuant to Sections 10.2(a) and 10.2(b);

(c)    a certificate of good standing of each Purchaser from the States of Delaware or New Jersey, as applicable;

(d)    true and complete copies of the certificates of formation of each Purchaser and all amendments thereto, certified by the State of New Jersey or State of Delaware, as applicable, and true and complete copies of the certificates of authority to do business for each Purchaser certified by the State of New Jersey;

(e)    certificates from authorized officers of each Purchaser that the certificates of formation of Purchaser have not been amended since the date of the certificate described in subsection (d) above, and that nothing has occurred since the date of issuance of the certificate of good standing specified in subsection (c) above, that would adversely affect Purchaser's corporate existence or good standing;

(f)    true and complete copies of the resolutions of the members, managers or other applicable persons of each Purchaser, certified by its managing member, manager, secretary or other duly authorized person, authorizing the execution, delivery and performance of this Agreement and all instruments and documents to be delivered in connection herewith, and the Contemplated Transactions by Purchaser;

(g)    certificates from the managing member, manager, secretary or other duly authorized person of each Purchaser as to the incumbency and signatures of each officer, manager or other duly authorized person of each Purchaser executing this Agreement and any other documents required under this Agreement;

(h)    *intentionally omitted*;

(i)    *intentionally omitted*;

(j)    such other documents, instruments and certificates as HHI may reasonably request and which are necessary to effect the Closing.

4.4    <u>Termination of Agreement</u>.    This Agreement may be terminated prior to the Closing as follows:

(a)    <u>Termination by Purchaser</u>.    Purchaser may terminate this Agreement upon the occurrence of any of the following:

(i)    if any of the conditions to the obligations of Purchaser to close that are set forth in <u>Sections 10.1 and 10.3</u> shall have become incapable of fulfillment other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser; or

(ii)    if there shall be a material breach by HHI of any material representation, warranty, covenant or agreement contained in this Agreement which breach cannot be or has not been cured within ten (10) Business Days after the giving of written notice by Purchaser to HHI of such breach;

(iii)    upon written notice by Purchaser to HHI if the Closing shall not have occurred by the close of business on September 16, 2011; or

(iv)    as set forth in Section 2.6.

(b)    <u>Termination by HHI</u>.    HHI may terminate this Agreement upon the occurrence of any of the following:

(i)    if any of the conditions to the obligations of HHI to close that are set forth in <u>Sections 10.2 and 10.3</u> shall have become incapable of fulfillment other than as a result of a breach by HHI of any covenant or agreement contained in this Agreement, and such condition is not waived by HHI;

(ii)    if there shall be a material breach by Purchaser of any material representation, warranty covenant or agreement contained in this Agreement, which breach cannot be or has not been cured within ten (10) Business Days after the giving of written notice by HHI to Purchaser of such breach; or.

(iii)    as set forth in Section 2.6.

(c)    <u>Termination by Purchaser and HHI</u>.    Purchaser and HHI may terminate this Agreement by their mutual written consent.

(d)    Extension of Time Periods.  The time periods for termination of this Agreement set forth in Section 4.4(a) may be extended by Purchaser in its sole and absolute discretion, but without any obligation to do so.

4.5    Procedure For Termination.  In the event of termination of this Agreement by Purchaser or HHI, or both, pursuant to Section 4.4, written notice thereof shall forthwith be given to the other parties, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 4.4) the Contemplated Transactions shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by Section 4.6, without further action by the parties.

4.6    Effect of Termination.

(a)    In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to any party; provided, however, that the obligations of the parties set forth in Sections 4.6 and 8.6 of this Agreement and, to the extent necessary to effectuate the foregoing enumerated provisions, Article I of this Agreement, shall survive any such termination and shall be enforceable in accordance with their terms.  In addition, if this Agreement is terminated as provided herein, each party shall upon request redeliver or destroy as soon as practicable any or all documents, work papers and other material of any other party relating to its business or affairs or the Contemplated Transactions, whether obtained before or after the execution hereof, to the party furnishing the same, other than any material which is of public record.

(b)    Nothing in this Section 4.6 shall relieve the parties of any liability for a breach of this Agreement prior to the date of termination.  Notwithstanding the foregoing, no attorneys' fees reasonably incurred by a party in connection with the Contemplated Transactions,  or out-of-pocket expense reimbursement or other fees, shall be payable to any party upon termination of this Agreement pursuant to Section 4.4.

4.7    Risk of Loss.

(a)    The risk of loss, damage or condemnation of any of the Purchased Assets from any cause whatsoever shall be borne by HHI at all times prior to the Closing Date.  In the event of any material loss, damage or condemnation of any of the Purchased Assets prior to the Closing Date, with the prior written consent of Purchaser, HHI shall have the option, but shall not be required, to expend such funds and take such other actions as are necessary to repair, restore or replace such assets to their prior condition.

(b)    If any material loss, damage or destruction of the Purchased Assets occurs, and HHI has commenced but not completed the repair, restoration or replacement of such assets by the original Closing Date, with the prior written consent of Purchaser, the Closing Date shall be postponed for a period of up to twenty (20) days to permit HHI to complete such repair, restoration or replacement.

(c)    If the repair, restoration or replacement of damaged Purchased Assets is not completed within the number of days specified in Section 4.7(b) above, Purchaser may terminate this Agreement forthwith by written notice to HHI.  Alternatively, Purchaser may, at its option, proceed to close the Transaction and complete the repair, restoration and replacement of such damaged Purchased Assets after the Closing Date, in which event HHI shall assign to Purchaser the right to receive all insurance proceeds payable in connection with such damage.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF HHI; AS IS SALE

(a)    HHI hereby represents and warrants to each Purchaser as follows:

5.1    Organization and Good Standing.  HHI is a non profit corporation organized and existing under the laws of the State of New Jersey and has all requisite power and authority to own, lease and operate its properties and to carry on its operation of the Business as now conducted by it, in accordance with the Bankruptcy Proceeding.

5.2    Authorization of Agreement.  Subject to Bankruptcy Court approval: (i) HHI has full corporate power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by it in connection with the consummation of the Contemplated Transactions (the "HHI Documents") and to consummate the Contemplated Transactions and (ii) the execution, delivery and performance by HHI of this Agreement and each HHI Document have been duly authorized by all necessary corporate action on behalf of HHI.  This Agreement has been, and each HHI Document will be at or prior to the Closing, duly executed and delivered by HHI and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each HHI Document when so executed and delivered will constitute, the legal, valid and binding obligations of HHI, enforceable against HHI in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).  None of the execution and delivery by HHI of this Agreement and the HHI Documents, the consummation of the Contemplated Transactions or compliance by HHI with any of the provisions hereof or thereof will conflict with or result in any violation of the organizational documents of HHI.

5.3    Consents of Third Parties: Contractual Consents.

(a)    Except as designated on Schedule 5.3(a) or as otherwise required by this Agreement, HHI is not required to obtain any consent, approval, authorization, waiver, Order, license or Permit of or from or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery

of this Agreement or the HHI Documents by HHI, the compliance by HHI with any of the provisions hereof or thereof, the consummation of the Contemplated Transactions or the taking by HHI of any other action contemplated hereby or thereby, except for such consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications that have already been obtained or made.

(b)    Except as set forth on Schedule 5.3(b), none of the execution and delivery by HHI of this Agreement or any of the HHI Documents, the consummation of the Contemplated Transactions by HHI, or compliance by HHI with any of the provisions hereof or thereof will conflict with, or result in any violation of or a default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which HHI is a party or by which any of the properties or assets of HHI are bound.

(c)    As of the date hereof, except as set forth on Schedule 5.3(c), all of the Purchased Assets can be assigned to Holdco or Opco, as the case may be, without the consent of the counterparty or relevant Governmental Body, as applicable.

5.4    Taxes. HHI is an entity exempt from federal income tax under Section 501(c)(3) of the Code and exempt from New Jersey income, corporate or franchise tax under the comparable provisions of the Tax Law of the State of New Jersey and, as of the date of the commencement of the Bankruptcy Proceeding: (a)there was no action pending by any Tax Authority to revoke its tax-exempt status; (b) HHI had duly filed all federal, state and local Tax Returns required to be filed by it (all of which were true and correct in all material respects) and had duly paid or made provision for the payment of all Taxes (including any interest or penalties and amounts due state unemployment authorities) which are due and payable, whether or not in connection with such Tax Returns; (c) HHI (with respect to the operation of the Business) has withheld proper and accurate amounts from its employees' compensation, and made deposits of all such withholdings, in material compliance with all applicable withholding and similar provisions of the Code and any and all other applicable laws; (d) there were no liens for Taxes upon the Purchased Assets, except for statutory liens for current Taxes not yet due and payable or which may hereafter be paid without penalty or which are being contested in good faith by appropriate proceedings; and (e) there was no claim by any Tax Authority with respect to the Business (or operation thereof) or any of the Purchased Assets is pending in a jurisdiction where HHI does not file Tax Returns.

5.5    Real Property. Schedule 5.5 sets forth a true, correct and complete list of all real property and interests in real property leased, licensed or otherwise possessed by HHI or to which HHI has a right to possess, including all real property leased, licensed or otherwise possessed and used in the Business, as lessee, lessor, licensee, licensor or otherwise (the "Real Property Leases"), including, without limitation, the Collateral Space Leases.

5.6    Tangible Personal Property.    Schedule 5.6 sets forth all leases of personal property, including Equipment, used by HHI or the Authority in the Business ("Personal Property Leases") copies of which have been made available to Purchaser by providing access to the Data Room and the Contract Management System.

5.7    Employee Benefits.

(a)    Schedule 5.7(a) hereto sets forth a true and complete list of all Plans maintained by HHI, complete and accurate copies of which have been made available to Purchaser by providing access to the Data Room and the Contract Management System.

(b)    Except as set forth in Schedule 5.7(b), neither HHI or any ERISA Affiliate, nor any of their respective predecessors, has within the last six (6) years contributed to, contributes to, has been required to contribute to, has otherwise participated in, or has any liability with respect to any "multiemployer plan" within the meaning of Section 3(37) of ERISA or Section 414(f) of the Code or any single-employer pension plan (within the meaning of Section 4001(a)(15) of ERISA) which is subject to Sections 4063 and 4064 of ERISA with respect to Employees.

(c)    Except as set forth on Schedule 5.7(c), HHI is, and has been at all times during HHI's existence, in material compliance with the terms and conditions of all Laws applicable to the Plans.    Except as set forth on Schedule 5.7(c), HHI has no direct or indirect, actual or contingent liability with respect to the Plans, other than to make payments for contributions, premiums or benefits when due in the ordinary course, all of which payments that are due having been made, and any payments due at or before closing will be made.    Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in conjunction with any other event) result in, cause the vesting, funding, exercisability or delivery of, or increase in the amount or value of, any payment, right or other benefit to any Employee or Plan for which Purchaser would be liable.

(d)    Neither the Business nor any of the Purchased Assets are subject to any lien under ERISA or the Code.    Each Plan sponsored, established or maintained by HHI under which any Employee benefits has been operated in all material respects by HHI in conformity with the terms of such plan and in conformity with ERISA and the Code and regulations and other published rulings or guidance of the U.S. Department of Labor, the IRS, or the Pension Benefit Guarantee Corporation ("PBGC"), as applicable.    Neither HHI nor any other "disqualified person" or "party in interest" as defined in Section 4975 of the IRC and Section 3(14) of ERISA, respectively, has engaged in any "prohibited transaction" as defined in Section 4975 of the IRC or Section 406 of ERISA, with respect to any Plan, nor have there been any fiduciary violations under ERISA, which in either case could subject HHI or any officer, director or employee thereof to any material Taxes under Section 502(i) of ERISA or Sections 4971 and 4975 of the IRC.    There is no filing, application or other matter pending with the IRS, the PBGC, or the U.S. Department of Labor or any other governmental body regarding any such Plan.    No "reportable event" (as such term is used in Section 4043 of ERISA) or "accumulated funding deficiency" (as such term is used in Section 412 or 4971 of the IRC) has heretofore occurred with respect to any Plan.

(e)    Except as listed on <u>Schedule 5.7(e)</u>, HHI is not a party to, and does not either sponsor or maintain, any plan, program or agreement applicable to any Employee that constitutes a non-qualified deferred compensation plan under Section 409A of the IRC, nor does it sponsor or maintain any plan fund or program that provides health insurance benefits for retirees, except to the extent required by COBRA.

5.8    <u>Employment and Labor</u>.

(a)    <u>Schedule 5.8(a)</u> hereto sets forth a true and complete list of all Employees of the Business who are employed by HHI as of the date set forth therein.  All Employees of the Hospital are employed by HHI and not the Authority.  With respect to each Employee of HHI the following information concerning each Employee has been made available to Purchaser by providing Purchaser with access to the Data Room and the Contract Management System: (i) position; (ii) date of hire; (iii) current annual salary or hourly wage; (iv) average number of hours worked per week; (v) date of last salary increase; (vi) accrued vacation, holidays and/or sick leave as a result of the individual's employment; and (vii) to the Knowledge of HHI, the union, if any, of which the individual is a member.

(b)    Purchaser has been provided access to the Data Room and the Contract Management System, which contains complete and accurate copies of each employment, consulting and similar agreement pertaining to the Business to which HHI is a party, all of which are listed on <u>Schedule 5.8(b)</u>.  Except as disclosed on <u>Schedule 5.8(b)</u>, HHI is not party to or bound by any written agreement, employment manual, employment handbook, employment practice or policy constituting a contractual obligation, or any consent decree, court order or statutory obligation pertaining to the Business (i) for the employment of any individual, or the provision of services by any individual, who is not terminable by HHI at will and without penalty upon thirty (30) days notice or less or (ii) relating to the payment of any severance or termination payment, bonus or death benefit to any employee or former employee or his or her estate or designated beneficiary.

(c)    <u>Schedule 5.8(c)</u> identifies the labor or collective bargaining agreements applicable to the Employees of the Business ("CBA") to which HHI is a party.  Prior to the date hereof, HHI has made available to Purchaser by providing Purchaser with access to the Data Room and the Contract Management System, a true and complete copy of each CBA.  Except as described in <u>Schedule 5.8(c)</u>, in connection with HHI's operation of the Business, (i) no labor union or employee association has been certified as exclusive bargaining agent for any group of Employees and (ii) there are no current, outstanding or, to the Knowledge of HHI, threatened attempts to organize or establish any labor union, employee association or bargaining unit with respect to any Employees, nor have there been any such attempts in the past two years.

(d)    Except as set forth on <u>Schedule 5.8(d)</u>, HHI is not delinquent in payments to any of its employees or independent contractors for any wages, salaries, commissions, bonuses or other direct compensation for any services performed as of the date hereof or any reimbursable amounts (except for reimbursement of expenses incurred in the Ordinary Course of Business, which shall be reimbursed by HHI in the Ordinary Course of Business and in all events prior to

or at Closing) and neither is delinquent in any payments due pursuant to any CBA.

5.9    <u>Litigation.</u>    Except for the Bankruptcy Proceeding and the Legal Proceedings as set forth on <u>Schedule 5.9</u>, there are no Legal Proceedings pending or, to the Knowledge of HHI, threatened against HHI or involving the Business or the Purchased Assets before any Governmental Body.

5.10    <u>Government Reimbursement Participation; Health Care Law Compliance</u>.

(a)    HHI and/or the Authority are eligible to receive payment without restriction under Medicare and are "providers" with valid and current provider agreements with one or more provider numbers with Medical Reimbursement Programs administered by a Governmental Body or its contractors, listed by Medical Reimbursement Program and enrollment number(s), and national provider numbers on <u>Schedule 5.10(a)</u>. HHI is in compliance with the conditions of participation for the Medical Reimbursement Programs in all material respects.

(b)    Except as described on <u>Schedule 5.10(b)</u>, there are no pending or threatened Legal Proceedings or investigations under the Medical Reimbursement Programs involving HHI, nor is there any basis for such Legal Proceedings or investigations. The Cost Reports of HHI for the Medical Reimbursement Programs referred to above, and for payment and reimbursement of any other cost report settlements, filed or required to be filed prior to the Closing Date, have been or will be properly filed and are or will be complete and correct in all material respects. Without limiting the foregoing, a complete and correct Cost Report dated May 27, 2010, for the period January 1, 2009 through December 31, 2009 has been filed. The Cost Reports filed or required to be filed by HHI do not and will not claim, and HHI has not received and will not receive any payment or reimbursement in excess of, the amount provided by Law or any applicable agreement, except where excess reimbursement was noted on the cost report. Except as described on <u>Schedule 5.10(b)</u>, there are no claims, actions or appeals pending or to the Knowledge of HHI threatened before any commission, board or agency, including any Governmental Body or its contractors or the Administrator of the Centers for Medicare and Medicaid Services, with respect to any Medical Reimbursement Program Cost Reports or claims filed on behalf of HHI referred to above or any disallowances by any commission, board or agency in connection with any such Cost Reports.

(c)    Neither HHI nor any trustee, partner, member, director, officer or employee of HHI, nor any agent acting on behalf of or for the benefit of any of the foregoing, has directly or indirectly in connection with the Business or the Purchased Assets in violation of any Law: (i) offered or paid any remuneration, in cash or in kind, to, or made any financial arrangements with, any past, present or potential customers, past or present suppliers, patients, medical staff members, contractors or third party payors of HHI; (ii) given or agreed to give, or is aware that there has been made or that there is any agreement to make, any gift or gratuitous payment of any kind, nature or description (whether in money, property or services) to any customer or potential customer, supplier or potential supplier, contractor, third party payor or any other Person; (iii) made or agreed to make, or is aware that there has been made or that there is any agreement to make, any contribution, payment or gift of funds or property to, or for the private use of, any governmental official, employee or agent where either the contribution, payment or

gift or the purpose of such contribution, payment or gift is or was illegal under the Laws of the United States or under the Law of any state or any other Governmental Body having jurisdiction over such payment, contribution or gift; (iv) established or maintained any unrecorded fund or asset for any purpose or made any misleading, false or artificial entries on any of its books or records for any reason; or (v) made, or agreed to make, or is aware that there has been made or that there is any agreement to make, any payment to any Person with the intention or understanding that any part of such payment would be used for any purpose other than that described on the documents supporting such payment.

(d)    Neither HHI nor any trustee, partner, member, director, officer or employee of HHI is a party to any Contract (including any joint venture or consulting agreement) related to HHI, the Business or the Purchased Assets with any physician, health care facility, hospital, nursing facility, home health agency or other Person who is in a position to make or influence referrals to or otherwise generate business for HHI with respect to the Business or the Purchased Assets, to provide services, lease space, lease equipment or engage in any other venture or activity, to the extent that any of the foregoing is prohibited by Law.

(e)    The Hospital is fully accredited by The Joint Commission (the "Joint Commission"), and HHI has made available to Purchaser by providing Purchaser with access to the Data Room and the Contract Management System, true and complete copies of the most recent Joint Commission accreditation survey report and deficiency list for the Hospital, if any, and the Hospital's plan of correction, if any. Except as set forth on Schedule 5.10(e), HHI has not received any notices of deficiency from Joint Commission with respect to the Hospital's current accreditation period which require or request any action or response by HHI or the Hospital, and any such deficiencies have been corrected or otherwise remedied.

(f)    The Hospital and HHI are in compliance with the Medicare Fraud and Abuse Amendments of 1977, as amended by the Medicare Patient and Program Protection Act of 1987 (the "Anti-Kickback Statute"), federal prohibitions on physician "self-referrals" (the "Stark Law"), the administrative simplification provisions of HIPPA and the amendments thereto under the HI TECH Act, the civil monetary penalties law, 42 U.S.C. §1320a-7a(b) ("CMP"), the Federal False Claims Act, 42 U.S.C. §§3729 - 3733 ("FCA"), and all applicable New Jersey and local municipal statutes, laws, codes, ordinances, and regulations.

(g)    At no time during the past five years has the Hospital, HHI or any of HHI's trustees, members, directors or officers or, to the Knowledge of HHI, any of HHI's employees, residents, fellows, interns or medical service providers (i) been indicted or convicted of a crime or adjudicated to have liability for civil monetary penalty, (ii) been suspended or excluded from any Medical Reimbursement Programs, (iii) had a professional license suspended or revoked, (iv) been a party to any corporate integrity or similar agreement, (v) received notice (or have knowledge) of any reviews, audits, or other actions from any Governmental Body including any attorneys general or other governmental enforcement office pertaining to the Hospital, the Business, HHI or such Person, or (vi) had a Certificate of Need application denied, nor is there any indictment, conviction, suspension, exclusive revocation or denial threatened.

5.11    Compliance with Laws: Permits,

(a)     Hospital is duly licensed and authorized by all applicable Governmental Bodies including, but not limited to, the State of New Jersey, to operate all of its health care and medical services, with 350 licensed beds.

(b)     HHI is duly licensed and authorized by all applicable Governmental Bodies to manage the Hospital and its related health care and medical services.

(c)     HHI has all Permits that are necessary to enable it to own, lease or otherwise hold the Purchased Assets and to enable it to manage the Business as currently conducted.  Schedule 5.11(c)(i) lists all Permits of HHI material to its management of the Business.  Schedule 5.11(c)(ii) lists other Permits of HHI not material to the operation of the Business.  Except as set forth on Schedule 5.11(c)(iii), the Permits on Schedule 5.11(c)(i) and Schedule 5.11(c)(ii) are in full force and effect and no proceedings are pending or to the Knowledge of HHI threatened that would have the effect of revoking, limiting or affecting the transfer or renewal of the Permits.

(d)     Except as set forth on Schedule 5.11(d), HHI is in compliance in all material respects with all applicable Laws respecting the Business.  There are no charges of a violation of a Law pending or to the Knowledge of HHI threatened against or involving HHI.

(e)     The Business is in compliance with all applicable zoning ordinances of the City of Hoboken.

(f)     Neither HHI nor any of HHI's Affiliates are involved in any litigation, proceeding, or investigation by or with any Governmental Body which, if determined or resolved adversely, would have an adverse impact on the ability of HHI or Purchaser to obtain or maintain any governmental qualifications, registrations, filings, licenses, permits, orders, approvals or authorizations necessary for HHI or Purchaser to conduct the Business and to own or use the Purchased Assets, as the Business is conducted and the Purchased Assets are owned and used on the date hereof, where the failure to have such qualifications, registrations, filings, licenses, permits, orders, approvals or authorizations could reasonably be expected to prevent or materially delay the consummation of the Contemplated Transactions by HHI or Purchaser or the performance by either such party of any of its material obligations under this Agreement.

(g)     *Intentionally Omitted.*

(h)     With respect to the operation of the Business, HHI does not have any outstanding loan, grant or loan guarantee or other obligation pursuant to the Hill-Burton Act, 42 U.S.C. § 291a *et seq.*

(i)     Except as set forth on Schedule 5.11(i), there are no pending or, to the Knowledge of HHI, threatened disciplinary or corrective actions or appeals therefrom involving physician applicants, active medical staff members or affiliated health professionals under the medical staff bylaws at the Hospital or the State of New Jersey.

5.12     Environmental Matters.  Except as set forth on Schedule 5.12 hereto:

(a)    With respect to the Hospital and the Business, HHI is in compliance with all applicable federal, state and local laws, statutes, rules, regulations, ordinances, codes, licenses or permits of any Governmental Bodies regulating Hazardous Materials or generally relating to the environment or environmental matters;

(b)    HHI has obtained and is in compliance with all permits, consents, authorizations, certificates, approvals, permissions, waivers, importation licenses and other licenses that are required pursuant to any Environmental Law for the occupation of the Facilities and the operation of the Business;

(c)    HHI has operated the Hospital and at all times has received, stored, handled, used, treated and disposed of all Hazardous Materials in compliance with the Environmental Laws;

(d)    HHI has not Released, deposited, discharged, placed or disposed of Hazardous Materials in or on the Hospital or any of the Facilities except in compliance with the Environmental Laws, nor have the Hospital or any of the Facilities been used as a landfill or waste disposal site;

(e)    there are no underground storage tanks, asbestos-containing material, or monitoring wells located at the Hospital or any of the Facilities;

(f)    HHI has not received any written notice from any Governmental Body of any alleged violation, inquiry or request for information relating to the Hospital or any of the Facilities as to matters which are the subject of this Section 5.12;

(g)    HHI has not, either expressly or by operation of law, assumed or undertaken any liability, including any obligation for corrective or Remedial Action, of any other person relating to any Environmental Laws; and

(h)    to HHI's knowledge, no facts, events or conditions relating to the past or present facilities, properties or operations of the Hospital will prevent, hinder or limit continued compliance with any Environmental Laws, give rise to any investigatory, remedial or corrective obligations pursuant to any Environmental Laws, or give rise to any other liabilities pursuant to any Environmental Laws, including any relating to onsite or offsite Releases or threatened Releases of Hazardous Materials, personal injury, property damage or natural resources damage.

5.13    Insurance.  Schedule 5.13 lists all of the insurance policies maintained by HHI relating to the Business, all of which policies remain in full force and effect, and shall subject to the terms of this Agreement remain in full force and effect through the Closing Date, and indicates the insurer's name, policy number, expiration date and amount and type of coverage. HHI has made available to Purchaser certificates evidencing such insurance policies and complete copies of such insurance policies by providing Purchaser with access to the Data Room and the Contract Management System.  The properties and operations of HHI, including the Purchased Assets, that are of an insurable nature and are of a character usually insured by similar businesses, have been continuously insured by HHI since the date of their acquisition by HHI,

with the types and amounts of insurance that are customary to protect HHI, the Purchased Assets and their respective financial conditions against the risks involved in the Business and ownership of the Purchased Assets, either through the purchase of insurance from a reputable third party insurance company or through a self-insurance trust established by HHI. HHI is not presently delinquent with respect to any insurance premium payments nor is HHI in default or breach with respect to any material provision contained in any such insurance policies. HHI has not received and has no Knowledge of any notice or request, formal or informal, from any insurance company identifying any defects in any of the Purchased Assets that would have a material adverse effect on the insurability of the Purchased Assets. HHI has not been refused any insurance, nor has its coverage been limited by an insurance carrier to which it has applied for coverage.

5.14    Financial Advisors. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for HHI in connection with the Contemplated Transactions and no Person is entitled to any fee or commission or like payment from HHI or Purchaser in respect thereof.

5.15    Medical Staff; Physician Relations. HHI has delivered to Purchaser complete and genuine copies of the bylaws, rules and regulations of the medical staff and medical executive committees of the Hospital. Schedule 5.15 sets forth (a) the name and age of each member of the medical staff of the Hospital (active, associate, consulting, courtesy or other); and (b) the degree (M.D., D.O., etc.), title, specialty and board certification, if any, of each Hospital medical staff member. Except as set forth on Schedule 5.15 there are no pending, or to HHI's Knowledge, threatened disputes with Hospital medical staff members or applicants or allied health professionals, and all appeal periods in respect of any medical staff member or applicant against whom an adverse action has been taken have expired.

5.16    No Other Representations or Warranties; Schedules. Except for the representations and warranties contained in this Agreement, including Article V (as modified by the Schedules hereto), and in the Authority Sale Agreement, neither HHI nor any other Person makes any other express or implied representation or warranty with respect to HHI, the Business, the Purchased Assets, the Assumed Liabilities or the Contemplated Transactions, and HHI disclaims any other representations or warranties, whether made by HHI, HHI's Affiliates (if any) or any of their respective officers, directors, Employees, agents or other Representatives. The representations and warranties of HHI in this Agreement shall not survive the Closing. Except for the representations and warranties contained in this Article V, (as modified by the Schedules hereto), HHI disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or Purchaser's Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any manager, director, officer, employee, agent, consultant, or other Representative of HHI or any of its Affiliates). The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgement that any such matter is required to be disclosed or is material. Purchaser hereby acknowledges and agrees that, except as otherwise set forth herein, HHI makes no representation or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets. Without in any way limiting the foregoing, HHI hereby disclaims any warranty, express or implied, of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets. Accordingly, the Purchased Assets at the

Closing will be transferred "AS IS," "WHERE IS," and "WITH ALL FAULTS".

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to HHI that:

6.1     <u>Organization and Good Standing</u>.  Each Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the state of its formation and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

6.2     <u>Authorization of Agreement</u>.  Purchaser has full corporate power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by it in connection with the consummation of the Contemplated Transactions (the "<u>Purchaser Documents</u>"), and to consummate the Contemplated Transactions.  The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all necessary corporate action on behalf of Purchaser.  This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3     <u>Conflicts: Consents of Third Parties</u>.

(a)     Except as described on <u>Schedule 6.3(a)</u>, Purchaser is not required to obtain any consent, approval, authorization, waiver, Order, license or Permit of or from, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or Purchaser Documents by Purchaser, the compliance by Purchaser with any of the provisions hereof or thereof; the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, except for such consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications (A) that have already been obtained or made or (B) of which the failure to have obtained or made would not have a Material Adverse Effect or would not reasonably be expected to prevent or materially delay the ability of Purchaser to perform or consummate the Contemplated Transactions.

(b)     Except as set forth on <u>Schedule 6.3(b)</u>, none of the execution and delivery by

Purchaser of this Agreement or any of Purchaser Documents, the consummation of the Contemplated Transactions by Purchaser, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or a default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which Purchaser is a party or by which any of the properties or assets of Purchaser are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect on the ability of Purchaser to consummate the Contemplated Transactions.

6.4     <u>Financial Advisors</u>.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the Contemplated Transactions and no Person is entitled to any fee or commission or like payment in respect thereof.

6.5     <u>Healthcare Regulatory Compliance Status</u>.  To the Knowledge of Purchaser, except, as described on <u>Schedule 6.5</u>, neither Purchaser nor any of its Affiliates is involved in any litigation, proceeding, or investigation by or with any Governmental Body which, if determined or resolved adversely, would have a material adverse impact on the ability of Purchaser to obtain or maintain any governmental qualifications, registrations, filings, licenses, permits, orders, approvals or authorizations necessary for Purchaser to conduct the Business and to own or use the Purchased Assets, as the Business is conducted and the Purchased Assets are owned and used on the date hereof, where the failure to have such qualifications, registrations, filings, licenses, permits, orders, approvals or authorizations could reasonably be expected to prevent or materially delay the consummation of the Contemplated Transactions by Purchaser or the performance by Purchaser of any of its material obligations under this Agreement.

6.6     <u>Financing</u>.  Purchaser has, or by the Closing Date will have, adequate funds to perform its obligations hereunder including, without limitation, the payment of the consideration for the Purchased Assets in the manner described herein and the acquisition of financing by Purchaser is not a condition precedent to Purchaser's obligations hereunder (<u>provided</u>, <u>however</u>, the foregoing does not, and shall not be deemed to, alter, supersede, modify, qualify or amend any other condition to Closing provided in this Agreement).

6.7     <u>Litigation</u>.  Except for Legal Proceedings set forth in <u>Schedule 6.7</u>, there are no Legal Proceedings pending, or, to the Knowledge of Purchaser, threatened against Purchaser before any Governmental Body.

6.8     <u>Disclosure</u>.  No representation or warranty contained in this <u>Article VI</u> and no statement in any schedule referenced in this <u>Article VI</u> contains any untrue statement of material fact or omits to state any material fact necessary to make the statements therein not misleading.

6.9     <u>No    Other    Representations    or    Warranties;    Schedules</u>.  Except for the representations and warranties contained in this <u>Article VI</u> (as modified by the Schedules hereto) and in the Authority Sale Agreement, neither Purchaser nor any other Person makes any other express or implied representation or warranty with respect to Purchaser or the Contemplated Transactions, and Purchaser disclaims any other representations or warranties, whether made by Purchaser, any Affiliate of Purchaser or any of their members, managers, officers, directors,

employees, agents or other Representatives.   Except for the representations and warranties contained in this Article VI, (as modified by the Schedules hereto), Purchaser disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to HHI or HHI's Representatives (including any opinion, information, projection, or advice that may have been or may be provided to HHI by any manager, director, officer, employee, agent, consultant, or other Representative of Purchaser or any of its Affiliates).   The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material.   The representations and warranties of Purchaser are for diligence purposes only and do not survive the Closing, however, its disclaimers survive.

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

7.1   Expense Reimbursement Fee.

(a)   If the Bankruptcy Court does not approve this Agreement and issues an order approving the sale of a substantial part of the Purchased Assets to a third Person, Purchaser shall, with the support of HHI, have the right to make application to the Bankruptcy Court for an administrative expense payment to Purchaser in consideration of the benefit conferred upon HHI by the Purchaser.

(b)   Purchaser acknowledges and agrees that any entitlement to such a payment is subject to the approval of the Bankruptcy Court in all respects.

7.2   Bankruptcy Court Filings.   On or before August 19, 2011, HHI shall file all motions, notices and other instruments and give all requisite notice (including publication in a newspaper of general circulation in Hudson County) to all creditors and other parties in interest necessary to enable the Bankruptcy Court to issue the final Orders described in Section 10.3. Purchaser agrees that it will promptly take such actions as are reasonably requested by HHI to assist in obtaining entry of the Final HHI Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.   In the event the entry of the Final HHI Sale Order shall be appealed, each party shall use their respective commercially reasonable efforts to defend against such appeal.   In the event that an appeal is taken, or a stay pending appeal is requested from the Final HHI Sale Order, HHI shall promptly notify Purchaser of such appeal or stay request and shall provide Purchaser, within three (3) Business Days, with a copy of the relevant notice of appeal or order of stay.   HHI shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders.

## ARTICLE VIII

## COVENANTS

8.1    <u>Access to Information, Employees and Properties</u>.  Subject to the other provisions of this <u>Section 8.1</u>, HHI agrees that, prior to the Closing Date:

(a)    Purchaser, and any permitted assignee pursuant to <u>Section 13.9</u> shall be entitled, through their Representatives, to make such investigation of the assets, properties and operations of the Business and such examination of the books and records of HHI pertaining to the Business, the Purchased Assets and the Assumed Liabilities as they reasonably request and to make extracts and copies of such books and records; it being understood, however, that the foregoing shall not entitle Purchaser or any permitted assignee to access (i) any books, records or Documents that HHI reasonably determines that access to which by Purchaser or any permitted assignee would be competitively disadvantageous to HHI in any material respect or (ii) any books, records or Documents the disclosure of which by HHI to Purchaser or such permitted assignee would (A) violate any patient confidentiality obligation of HHI or (B) any other agreement or any obligation of confidentiality to which HHI is a party or are bound prior to the date hereof or (C) any obligation of confidentiality by which HHI is bound under applicable Law.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances, any request for such examination shall be made to one of the Persons identified on <u>Schedule 8.1</u> and any access to any of the Facilities by Purchaser or any such permitted assignee must be approved by one of such Persons, and Purchaser's and any such permitted assignee's access to such information shall be subject to any restrictions on disclosure by HHI to Purchaser and/or such permitted assignee or use of the information contained therein by Purchaser or such permitted assignee applicable pursuant to any agreement to which HHI is a party or are bound prior to the date hereof or under applicable Law.  Prior to Closing HHI shall provide office space reasonably acceptable to Purchaser at the Hospital for Purchaser or such permitted assignee and their Representatives to review information pursuant to this <u>Section 8.1</u> and provide access to key management personnel in connection with Purchaser's and such permitted assignee's due diligence review.  HHI shall cause its Representatives to cooperate with Purchaser or such permitted assignee and their Representatives in connection with such investigation and examination, and Purchaser or any of its permitted assignee and their Representatives shall cooperate with HHI and their Representatives and shall use its commercially reasonable efforts to minimize any disruption to HHI's business and operations, including the Business.  Notwithstanding anything herein to the contrary, HHI shall not be required to permit any such investigation or examination if, and to the extent that, HHI, upon advice of counsel, determines that such investigation or examination by Purchaser or any permitted assignee would or is reasonably likely to result in a loss of any attorney-client or attorney work product privilege available to HHI.

(b)    Without limiting the foregoing, HHI shall grant Purchaser's and any permitted assignee's respective Representatives reasonable access to HHI's employees for the purpose of administering the hiring process as to such employees.  Thus, by way of example and without limitation, HHI will grant reasonable access to enable Purchaser and its permitted assignees to disseminate information to such employees; interview such employees and their supervisors and

managers; investigate the backgrounds, experience, education, qualifications and work records of such employees; offer employment to such employees; hire such employees; and obtain necessary information from such employees.

(c)     Without limiting the foregoing, Purchaser and any permitted assignee pursuant to Section 13.9 and their respective representatives and consultants, shall have the right to inspect, at reasonable hours, the Purchased Assets and all books, records, contracts and other documents or data pertaining to the Purchased Assets, including, without limitation, the ownership, operation, environmental and other condition and maintenance thereof and to perform tests with respect thereto; provided, however, in conducting its inspection Purchaser, its assignee, and their respective consultants or representatives, as the case may be, shall not unreasonably interfere with the Business and operation of the Hospital.

8.2     Conduct of the Business.

(a)     Prior to the Closing Date, except (1) as set forth on Schedule 8.2(a), (2) as required by applicable Law, (3) as otherwise expressly contemplated by this Agreement or (4) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), HHI shall:

(i)     conduct the Business only in the Ordinary Course of Business (taking into account HHI's status as a debtor-in-possession), which covenant is expressly deemed to include an on-going obligation on the part of HHI to continue to manage the Hospital in accordance with the most recent budget (the "Budget"), a copy of which is annexed hereto as Schedule 8.2(a)(i);

(ii)     use its commercially reasonable efforts to retain the provider numbers for the Hospital's Medicare and Medicaid programs and other major payors and, without limiting the foregoing, HHI covenants to advise Purchaser in advance of any correspondence between or among HHI on the one hand, and Medicare and/or Medicaid (or their representatives) on the other, and any settlements, prospective settlements, compromises or other agreements between those parties; and all such settlements, prospective settlements, compromises or other agreements must be reasonably acceptable to Purchaser;

(iii)     use its commercially reasonable efforts to (A) maintain the Purchased Assets in good working order and condition consistent with past practices, ordinary wear and tear excepted and (B) maintain the insurance coverage currently in place with respect to the Purchased Assets (or comparable replacement coverage);

(iv)     perform when due all obligations under the Assigned Contracts, Designated Contracts, Purchased Intellectual Property Licenses, Real Property Leases, and Personal Property Leases;

(v)     comply in all material respects with all Laws and Orders pertaining to the Business;

(vi)     accurately maintain the books and records of the Business consistent with past practice;

(vii)    operate the Business, including collection of the Accounts Receivable, consistent with past practices in substantially the same manner as presently conducted, using commercially reasonable efforts consistent with past practices to preserve the goodwill thereof and HHI's relationships with the patients, suppliers and others with whom it deals;

(viii)   perform when due all obligations under Excluded Contracts and timely pay, perform and discharge in accordance with their respective terms the Excluded Liabilities; and

(ix)     repay, prior to the Closing Date, any and all advances received by HHI under charity care or other Subsidies, prior to the normal schedule for payment thereof (subject to any proration, if any, of such Subsidies pursuant to Section 3.4(ii)).  For the avoidance of doubt, HHI shall not be required to repay the charity care advances received by the Authority on or after August 2, 2011 in the amount of $2,577,367.

(b)      Except (1) as set forth on Schedule 8.2(b), (2) as required by applicable Law, (3) as otherwise contemplated by this Agreement or (4) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), HHI shall not, and shall not permit, solely as it relates to the Business:

(i)      other than in the Ordinary Course of Business, (A) increase the annual level of compensation of any Employee or other Person who works in the Business, (B) grant any bonus, benefit or other direct or indirect compensation to any Employee or other Person who works in the Business, (C) with respect to any Employee or other Person who works in the Business, increase the coverage or benefits available under any (or create any new) Plan or (D), enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) with any Employee or other Person who works in the Business, except, in each case, as required by applicable Law from time to time in effect or by any of the Plans or the employee pension plans maintained by HHI;

(ii)     subject any of the Purchased Assets to any Lien;

(iii)    acquire or lease any material properties or assets that would be Purchased Assets or sell, assign, license, transfer, convey, lease or otherwise dispose of any of the Purchased Assets (except pursuant to an existing Contract for fair consideration in the Ordinary Course of Business or for the purpose of disposing of obsolete or worthless assets);

(iv)     cancel or compromise any material debt or claim or waive or release any material right of HHI that constitutes a Purchased Asset except in the Ordinary Course of

Business;

     (v)    enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, recognize, make any commitment or incur any liability to any labor organization;

     (vi)    permit or allow relocation of (other than within the Facilities or onto the Facilities from other locations), or changes in, or disposition of, any services or programs of the Business;

     (vii)    other than in the Ordinary Course of Business, remove from the Facilities any Furniture and Equipment or other tangible personal property used in the Ordinary Course of Business without replacing such property with substantially equivalent or better property;

     (viii)    utilize any reserves or restricted cash available under the Bond Financing (as defined and described in the Authority Sale Agreement) for any purpose not permitted under the Bond Financing; or

     (ix)    agree to do anything prohibited by this Section 8.2(b).

     (c)    HHI shall notify Purchaser of any written notice given by HHI or other party thereto prior to Closing to any other party to a Contract listed on Schedule 2.1(d) that such party is in default thereunder or in breach thereof, which default or breach remains uncured, or any notice of termination thereof.

     (d)    HHI shall fully disclose to, and consult and coordinate with, Purchaser all information in connection with, and consult and coordinate with Purchaser, and keep Purchaser fully informed, regarding the Bankruptcy Proceedings and all matters related thereto;

     (e)    *Intentionally omitted.*

     (f)    From and after the Closing Date, HHI shall maintain the existence of such group health policy that covers non-union employees of the Business for a period of up to eighteen (18) months after the Closing for all persons who were receiving COBRA coverage under such policy as of the date of Closing and for any Non-Hired Employees (as defined in Section 8.20(a)) who are eligible for, and who elect, COBRA coverage under such policy; provided, however, that the obligation to maintain such group health policy shall expire in the event that the insurance carrier that issued such policy cancels, terminates or otherwise discontinues such policy.

     8.3    Consents and Permits; Insurance.

     (a)    HHI shall use its commercially reasonable efforts, and Purchaser shall cooperate with HHI, including, without limitation, by taking the actions referred to in Section 8.4, to obtain at the earliest practicable date all consents, approvals, authorizations, waiver and Orders required to be obtained by HHI (including all consents listed in Schedule 5.3(a), and to give at the earliest

practicable date any notices required to be given by HHI, in order for HHI to consummate the Contemplated Transactions on the terms and in the manner provided hereby; provided, however, that HHI shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than filing or application fees payable to any Governmental Body) or to initiate any litigation or legal proceedings to obtain any such item except as otherwise provided by Section 8.4. Purchaser shall use its commercially reasonable efforts, and HHI shall cooperate with them, including by taking the actions referred to in Section 8.4, to obtain at the earliest practicable date all consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Purchaser (and HHI shall provide reasonable assistance and cooperation with respect to the foregoing at no cost to HHI), and to give at the earliest practicable date any notices required to be given by Purchaser, in order for Purchaser to consummate the Contemplated Transactions on the terms and in the manner provided hereby and to operate the Business after the Closing; provided, however, that Purchaser shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than filing or application fees payable to any Governmental Body) or to initiate any litigation or legal proceedings to obtain any such consent or approval except as otherwise provided by Section 8.4. Without limiting the foregoing, HHI shall cooperate with Purchaser to ensure prior to Closing the transfer of all Permits that are assignable to Purchaser necessary for the operation of the Hospital and Business as currently conducted. Nothing contained herein shall require HHI to expend any funds in order to remove or eliminate any Lien on any Purchased Asset in order to deliver such Purchased Asset to Purchaser pursuant to this Agreement free of such Lien; provided, however, in respect of any such Lien, Purchaser nevertheless shall not be required to consummate the Contemplated Transactions unless the conditions referred to in Section 10.1 are satisfied (such that the Purchased Assets shall be free and clear of such Liens) or waived by Purchaser.

(b)     As of the Closing, Purchaser shall have appropriate insurance coverage in place for the Business consistent with what would be maintained under good industry business practices.

8.4     Regulatory Approval

(a)     *Intentionally omitted.*

(b)     Each Purchaser and HHI shall use its reasonable best efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable Law in connection with the Contemplated Transactions. Each such party shall promptly inform the other parties through counsel of any material oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. No such party shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation, or other inquiry without giving the other parties prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate.

(c)     Subject to applicable law, Purchaser and HHI will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs,

arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under Antitrust Laws. Each such party may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 8.4 as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials.

8.5     Further Assurances.

(a)     Each party shall use its commercially reasonable efforts to: (i) take all actions necessary or appropriate to consummate the Contemplated Transactions and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Contemplated Transactions.

(b)     Without limiting the generality of the foregoing, promptly after the discovery by HHI or any of HHI's Affiliates after the Closing of any item included within the definition of Purchased Assets but not transferred, conveyed or assigned to Purchaser:

(i)     HHI will deliver written notice to Purchaser of the existence and non-transfer, non-conveyance or non-assumption of such item and provide Purchaser with all the information in HHI's possession about, and with access to, such item as Purchaser may reasonably request and

(ii)     if requested by Purchaser, HHI shall and shall cause its Affiliates to, use commercially reasonable efforts to transfer, convey or assign to Purchaser such item in the manner and on the terms and conditions as applicable to a Purchased Asset.

(c)     With respect to any unresolved objection to Cure Amounts related to Designated Contracts, the parties shall bear joint responsibility for addressing and resolving such objections, and HHI shall cooperate fully with Purchaser by means of providing information, documentation, testimony or otherwise in aid of Purchaser's attempt to resolve such objections. For the avoidance of doubt, HHI shall not be responsible for the payment of any Cure Amounts related to Designated Contracts that are assumed by Purchaser.

(d)     The provisions of this Section 8.5 shall survive the Closing.

8.6     Confidentiality.

(a)     From and after the date hereof, Purchaser shall, and shall cause its Representatives to, maintain in confidence, not disclose to any third party without the prior written consent of HHI, and not use to the detriment of HHI, any HHI Confidential Information relating to or obtained from HHI or its Representatives. For purposes of this Section 8.6, "HHI Confidential Information" shall mean any information that is confidential or proprietary in nature that is related to the Purchased Assets, the Assumed Liabilities, the Business, the Excluded Assets, or the Excluded Liabilities, including methods of operation, patient information, prices,

fees, costs, Technology, Software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided, however, that HHI Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Purchaser or any of its Representatives, (ii) becomes available to Purchaser on a non-confidential basis from a source other than HHI or its Representatives, provided that such source is not known by Purchaser to be bound by a confidentiality agreement with, or other obligation of secrecy to, HHI, (iii) is lawfully received by Purchaser from a third party having the right to disseminate HHI Confidential Information without restriction on disclosure or (iv) can be shown by Purchaser through written documents or evidence maintained by Purchaser to have been independently developed by Purchaser; and, provided, further, that upon the Closing, the restrictions contained in this Section 8.6 shall not apply to confidential or proprietary information related primarily to the Purchased Assets, the Assumed Liabilities or the Business. Purchaser may disclose HHI Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who agree to keep it confidential. Purchaser shall instruct its Representatives having access to HHI Confidential Information of such obligation of confidentiality. If Purchaser or anyone to whom it has transmitted Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Confidential Information, Purchaser shall provide HHI with prompt notice prior to making any disclosure so that HHI may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, or such HHI waives compliance with the provisions of this Section 8.6(a), Purchaser shall furnish only that portion of HHI Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed.

(b)     From and after the date hereof, HHI shall, and shall cause its Representatives to, maintain in confidence, not disclose to any third party without the prior written consent of Purchaser, and not use to the detriment of Purchaser, any Business Confidential Information, other than in connection with (i) operating the Business in the Ordinary Course of Business prior to the Closing Date, (ii) any investigations by Governmental Bodies, (iii) compliance activities prior to or after the Closing related to periods occurring prior the Closing Date; (iv) any Legal Proceedings; (v) enforcing any rights or other claims of HHI under this Agreement; (vi) performing any obligations of HHI under this Agreement or (vii) as otherwise may be required by applicable law. For purposes of this Section 8.6(b), "Business Confidential Information" shall mean any information that is confidential or proprietary in nature that is related to the Purchased Assets, the Assumed Liabilities or the Business, other than information primarily pertaining to the Excluded Assets, or the Excluded Liabilities, including methods of operation, patient access, prices, fees, costs, Technology, Software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided, however, that Business Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by HHI or any of its Representatives, (ii) becomes available to HHI on a non-confidential basis from a source other than Purchaser or its Representatives, provided that such source is not known by HHI to be bound by a confidentiality agreement with, or other obligation of secrecy to, Purchaser or (iii) is lawfully received by HHI from a third party having the right to disseminate the Business Confidential Information without

restriction on disclosure. HHI may disclose Business Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who agree to keep it confidential. HHI shall instruct its Representatives having access to Business Confidential Information of such obligation of confidentiality. If HHI or anyone to whom it has transmitted Business Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Business Confidential Information, HHI shall provide Purchaser with prompt notice prior to making any disclosure so that Purchaser may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, or Purchaser waives compliance with the provisions of this Section 8.6(b), HHI shall furnish only that portion of the Business Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed.

(c)    The obligations contained in this Section 8.6 shall survive the Closing and are in addition to any separate confidentiality agreements between HHI and Purchaser.

8.7    Preservation of Records.  HHI and Purchaser agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the operation of the Business prior to the Closing Date for a period of seven (7) years from the Closing Date or the maximum period of time required by law, whichever is longer, and shall, make such records and personnel available to the other as may be reasonably required by such party in connection with, among other things, (i) Purchaser's operation of the Business, (ii) any insurance claims by, Legal Proceedings, tax audits or other governmental or healthcare payor investigations or audits of HHI or Purchaser or any of their Affiliates or (iii) enabling HHI or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby.  In the event HHI or Purchaser wish to destroy such records before that time, such party shall first give ninety (90) days prior written notice to the other party, and such other party shall have the right at its option and expense, upon prior written notice given to such party within such ninety (90) day period, to take possession of the records within one hundred and eighty (180) days after the date of such notice.

8.8    Supplementation and Amendment of Schedules.  The Schedules and Exhibits to this Agreement are to be completed and attached hereto.  Any amendments or modifications to the Schedules and Exhibits after they are attached hereto shall require the mutual consent of HHI and Purchaser which consents shall not be unreasonably withheld.

8.9    Final Cost Report.  HHI shall file or cause to be filed the final Cost Reports for the period prior to the Closing required to be filed with the Medicare or Medicaid programs or any other third party payor or Governmental Body as a result of the consummation of the Contemplated Transactions.  HHI shall assume and be responsible for any and all liabilities incurred as a result of the filing of any of said reports or as a result of filing any previous Cost Report for periods prior to the Closing and shall be entitled to receive any refund or other benefit which may result from the filing of said reports or otherwise allocable to periods prior to the Closing.  Such reports shall be prepared in accordance with applicable Law and consistent with past practices.  HHI shall provide Purchaser with copies of said reports within a reasonable period of time prior to the filing thereof in order for Purchaser to review and provide HHI with comments thereon solely regarding reimbursement issues for periods after the Closing.  HHI

shall consider Purchaser's changes and shall incorporate Purchaser's comments into any such Cost Report, by amendment or otherwise to the extent said comments are applicable. HHI shall provide to Purchaser copies of all such documents promptly after filing.

8.10    <u>Cooperation</u>. HHI and Purchaser agree to reasonably cooperate with each other in good faith, from the date hereof up through and following the Closing Date, in an effort to satisfy all further conditions, undertakings and agreements contemplated by this Agreement. HHI and Purchaser further agree to reasonably cooperate with each other in good faith, from the date hereof up through and following the Closing Date, in an effort to satisfy all conditions, undertakings and agreements contemplated by the Authority Sale Agreement.

8.11    *Intentionally omitted.*

8.12    <u>Application for Assignment of Existing Medicare Provider Agreement and Obtaining New Medicaid Provider Agreement</u>. After the date hereof, (a) Purchaser shall apply to CMS for the assignment of the Hospital's existing Medicare Provider Agreement and all corresponding Medicare provider numbers for the Hospital or shall apply to CMS for a new Medicare Provider Agreement and corresponding provider numbers for the Hospital, (b) Purchaser shall apply to the applicable government entity of the State of New Jersey for the assignment of the Hospital's existing Medicaid Provider Agreement and all corresponding Medicaid provider numbers for the Hospital or shall apply to the applicable government entity of the State of New Jersey for a new Medicaid Provider Agreement and corresponding provider number for the Hospital, and (c) Purchaser shall diligently prosecute such applications including confirmation that Purchaser shall be entitled to participate in any and all State programs for payments and subsidies available to HHI (if any) prior to Closing. HHI shall cooperate with Purchaser in prosecuting all of such applications; *provided*, *however*, that HHI shall not be required to expend any funds in enabling Purchaser to acquire new Provider Agreements and provider numbers. Purchaser and HHI shall report to each other frequently on their progress in prosecuting such applications and any communications with CMS, any applicable government entity of the State of New Jersey or any other Governmental Body in connection therewith.

8.13    <u>Non-Competition Obligation on HHI</u>. Effective as of the Closing Date, and for the shorter of HHI's existence or a period of five (5) years following the Closing Date, HHI shall not offer, build, assist in the development of, operate, invest in, or have any management role in, any Competing Business within twenty-five (25) miles of the Hospital. For purposes hereof, "<u>Competing Business</u>" shall mean any health care facility, including, without limitation, any acute care hospital, behavioral health hospital, inpatient or outpatient rehabilitation facility, skilled nursing facility, outpatient surgery center, outpatient medical facility, ambulatory care facility, or diagnostic imaging center. In the event of violation of this <u>Section 8.13</u>, Purchaser shall be entitled to interim restraints and permanent injunctive relief against HHI for the enforcement thereof in addition to an award of damages or other remedies to which Purchaser may be entitled. Moreover, if Purchaser prevails in a proceeding for damages or injunctive relief arising out of this <u>Section 8.13</u>, Purchaser, in addition to any other relief to which it may be entitled, shall be entitled to reimbursement of reasonable attorneys' fees, costs and the expenses of litigation incurred by Purchaser in securing the relief granted by the court. This <u>Section 8.13</u> shall survive the Closing.

8.14    Post-Closing Date Matters.   Any asset that is determined by this Agreement, or, absent such agreement, determined by litigation, to be an Excluded Asset, and that is or comes into the possession, custody or control of Purchaser shall forthwith be transferred, assigned or conveyed by Purchaser to HHI and, until such transfer, assignment and conveyance, Purchaser shall not have any right, title or interest in such Excluded Asset, but instead shall hold such Excluded Asset in trust for the benefit of HHI.  Any asset that is determined by this Agreement or, absent such agreement, determined by litigation, to be or otherwise relate to a Purchased Asset and that is or comes into the possession, custody or control of HHI shall forthwith be transferred, assigned and conveyed by HHI to Purchaser, and until such transfer, assignment and conveyance, HHI shall not have any right, title or interest in such Purchased Asset, but instead shall hold such Purchased Asset in trust for the benefit of Purchaser.

8.15    *Intentionally Omitted*.

8.16    *Intentionally Omitted*.

8.17    *Intentionally Omitted*.

8.18    Payment of Accounts Payable.   Except for those liabilities that are expressly assumed by Purchaser as Assumed Liabilities, HHI shall, subject to the Bankruptcy Proceeding, remain solely liable and responsible for payment of all of its accounts payable related to the Purchased Assets or its management of the Hospital arising or related to the period prior to Closing.

8.19    Notice of Developments.    After the date of this Agreement, each Party will immediately notify the other in writing of (a) any fact or condition existing prior to or on such date that constitutes a breach of any representation or warranty of that respective Party in this Agreement (or other agreement pursuant to which HHI is providing representations and warranties) and (b) any fact or condition developing after such date that would constitute a breach of any representation or warranty of such party in this Agreement (or other agreement pursuant to which HHI is providing representations and warranties) if such representation or warranty were made on the date of the occurrence or discovery of such fact or condition.

8.20    Employment of Certain Employees.    As of the Closing Date, Purchaser shall offer to employ no less than seventy-five percent (75%) of the Employees of HHI as of the Closing Date (the "Hired Employees") and to assume all of the Leave Time Benefits (as herein defined) of those Hired Employees who accept Purchaser's offer of employment and become employees of Purchaser on the Closing Date.  In no event shall the Leave Time Benefits assumed by Purchaser pursuant to this Section 8.20(a) be less than seventy-five percent (75%) of the aggregate Leave Time Benefits of the Employees of HHI as of the Closing Date regardless of whether the number of Hired Employees who accept employment with Purchaser is less than seventy-five percent (75%) of HHI's Employees.  For purposes of this Agreement, the term "Leave Time Benefits" shall mean accrued vacation and holiday leave time, and accrued sick time, but expressly exclude, without limitation, any health and welfare obligations including any pension obligations related to any Employee.  HHI Employees that are not employed by

Purchaser pursuant to this Agreement shall be referred to as the Non-Hired Employees. Purchaser will offer its standard employee benefits package to the Hired Employees. Purchaser shall provide HHI with a list of the Hired Employees at least twenty (20) days prior to the Closing Date. As of the Closing, the Hired Employees shall become employees of Purchaser unless the designated Hired Employee resigns his or her position prior to Closing or otherwise declines employment with Purchaser. HHI shall provide Purchaser at least ten (10) days prior to Closing with a then current schedule of the Leave Time Benefits for the Hired Employees.

8.21    *Intentionally Omitted*.

8.22    *Intentionally Omitted*.

8.23    Union Agreements.    Purchaser agrees to negotiate in good faith with existing unions at the Hospital as required by law in an attempt to reach mutually satisfactory CBAs or similar labor agreement with such unions; provided, however, that nothing herein shall be deemed to obligate Purchaser to assume any existing CBA or labor agreement previously entered into by HHI and/or to enter into any new CBA or labor agreement with existing unions at the Hospital should Purchaser in its sole and exclusive discretion deem the terms of such new or existing CBA or labor agreement to be unacceptable.

8.24    *Intentionally Omitted*.

8.25    *Intentionally Omitted*.

8.26    *Intentionally Omitted*.

8.27    *Intentionally Omitted*.

8.28.    Government Reimbursement Programs.    HHI covenants and agrees from the date hereof through the Closing Date to complete and timely submit all necessary applications for the continued receipt of all stabilization payments, subsidies, reimbursements and other payments under or pursuant to any Medical Reimbursement Program or other state of federal program.

8.29    *Intentionally omitted*.

8.30    Tail Insurance.    With respect to the period from and after the Closing Date, Purchaser shall obtain and maintain  tail insurance coverage ("Tail Coverage") to protect the interests of HHI, among others, in accordance with the provisions of Section 8.30 and Schedule 8.30 of the Authority Sale Agreement.

## ARTICLE IX

## EMPLOYEES AND EMPLOYEE BENEFITS

9.1    Employment Terms: Employee Benefits.

(a)      Subject to <u>Section 8.20</u>, Purchaser shall have sole and exclusive discretion to offer employment to individuals previously employed by HHI. Thus, Purchaser shall not be obligated to offer employment to any specific employees previously employed by HHI. HHI also shall have sole and exclusive discretion to establish salaries, wages, benefits and all other terms and conditions of employment for its employees. Thus, Purchaser shall not be obligated to continue salaries, wages, benefits or other terms and conditions of employment applicable to employees of HHI.

(b)      Other than with respect to the Leave Time Benefits referenced in <u>Section 8.20</u>, as between Purchaser on the one hand and HHI on the other, with respect to any Employees whom Purchaser hires, HHI shall be responsible for all Liabilities attributable to the period prior to the Closing Date (and Purchaser shall not be responsible for such Liabilities) and HHI also shall be solely responsible for all Liabilities with respect to the Employees whom Purchaser does not hire.

(c)      Except to the extent otherwise required by law, HHI shall be responsible for providing and paying for continuation coverage, as required by COBRA or any similar law, to all employees and former employees of HHI who are not retained by Purchaser or who are offered employment but do not accept employment (and other qualified beneficiaries under COBRA with respect to such employees).

(d)      HHI shall be responsible for providing notice of any plant closing or mass layoff in accordance with WARN occurring up to and including the Closing Date and HHI shall indemnify Purchaser and its directors, trustees, officers and employees against such Liability. Purchaser shall be responsible for providing notice of any plant closing or mass layoff in accordance with WARN occurring after the Closing Date. Accordingly, HHI will retain all liability for any failure of HHI or its Affiliates to comply with any of the requirements of WARN, including applicable notice requirements related to any "plant closing" or "mass layoff" (as defined under WARN), with respect to any and all Employees who are not hired by Purchaser.

(e)      HHI shall be solely responsible for any obligations or Liabilities to any multiemployer plans to which HHI contributes pursuant to any CBAs, including any contributions related to the period prior to the Closing Date, and any Liabilities to such multiemployer plans which may arise as a result of the transaction contemplated by this Agreement, including but not limited to any claims for withdrawal liability pursuant to Sections 4201 *et seq.* of ERISA.

## ARTICLE X

## CONDITIONS TO CLOSING

10.1    <u>Conditions Precedent to Obligations of Purchaser</u>.  The obligations of Purchaser to consummate the Contemplated Transactions as provided by this Agreement is subject to the

fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of HHI set forth in this Agreement shall be true and correct in all material respects at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date) and Purchaser shall have received a certificate signed by authorized officers of HHI, dated the Closing Date, to the foregoing effect;

(b)    HHI shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date and Purchaser shall have received a certificate signed by an authorized officer of HHI, dated the Closing Date, to the forgoing effect;

(c)    with the exception of the Bankruptcy Proceeding, there shall have been no changes to the Business or prospects of HHI or Purchased Assets that, individually or in the aggregate, could be expected to result in a Material Adverse Effect;

(d)    HHI shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2;

(e)    all conditions to the closing of the transactions contemplated under the Authority Sale Agreement shall have been satisfied, and Purchaser shall have consummated such transaction thereunder;

(f)    HHI shall have delivered, or caused to be delivered, to Purchaser all documents and instruments relating to the Purchased Real Property Leases that are reasonably necessary or desirable to Purchaser to have satisfactorily completed their due diligence review thereof (including, without limitation, reasonably satisfactory evidence of HHI's good and marketable title to its leasehold or other interests with respect thereto);

(g)    Purchaser has either, in Purchaser's sole discretion: (i) accepted the assignment of the Hospital's existing Medicare and Medicaid Provider Agreements and corresponding provider numbers, which assignments have been authorized and recognized by the Medicare and Medicaid programs, without any restrictions or conditions, except for restrictions or conditions satisfactory to Purchaser in its sole discretion; (ii) entered into new Medicare and Medicaid Provider Agreements and been issued new Medicare and Medicaid provider numbers, without any restrictions or conditions, except for restrictions or conditions satisfactory to Purchaser in its sole discretion; or (iii) received (A) notice from the Medicare and Medicaid fiscal intermediaries and/or applicable State agencies that they have completed the site survey required as for the issuance of new Medicare and Medicaid Provider Agreements and (B) written assurance from the applicable government entities of the State of New Jersey that (I) the only conditions to Purchaser receiving new Medicare and Medicaid Provider Agreements and corresponding provider numbers are the closing of the Contemplated Transactions and the correction of minor

deficiencies reflected on the survey that can be corrected by Purchaser without incurring costs exceeding $10,000 in the aggregate, and (II) the new Medicare and Medicare Provider Agreements to be issued on satisfaction of such conditions shall be without any restrictions or conditions, except for restrictions or conditions satisfactory to Purchaser in its sole discretion.

(h)      subject to the cure provisions of Sections 2.8 and 2.9 and any Orders issued as a consequence of the Bankruptcy Proceeding, each party to the Assigned Contracts and Purchased Real Property Leases shall have consented, in writing, to the assignment to Purchaser of HHI's rights under such party's contract arising after the Closing and the assumption by Purchaser of HHI's obligations under such contract arising after the Closing, and all Assigned Contracts and Purchased Real Property Leases shall be free of any and all existing defaults.

(i)      with the exception of the Bankruptcy Proceeding, no action, suit, or proceeding before any court or any Governmental Body, pertaining to the Contemplated Transactions or to their consummation, will have been instituted or threatened on or before the Closing Date;

(j)      *intentionally omitted*;

(k)      *intentionally omitted*;

(l)      *intentionally omitted*;

(m)      Purchaser shall have received, at Purchaser's expense, a Phase I Environmental Site Assessment Report of the Facilities, prepared by a firm selected by Purchaser, and the scope, findings, and conclusions of such report shall have been satisfactory to Purchaser in its sole discretion and, if required by Purchaser, a Phase II Environment Report of the Facilities, prepared by a firm selected by Purchaser, at Purchaser's expense, and the scope, findings and conclusions of such report shall have been satisfactory to Purchaser in its sole discretion;

(n)      HHI shall have obtained and delivered to the Purchaser an estoppel certificate, in form and substance reasonably satisfactory to Purchaser, with respect to each of (i) the Purchased Real Property Leases and (ii) any other leases of portions of real property owned by the Authority, in each case dated not more than thirty (30) days prior to the Closing Date, from the other party to such lease and from each subtenant, if any.  In the event a collateral assignment of any or all of the Collateral Space Leases is required in connection with Purchaser's financing related to the Facilities, then HHI shall obtain and deliver said collateral assignment and any required consent thereto, in each case in form and substance reasonably satisfactory to Purchaser. In addition, HHI shall deliver to the Purchaser, no later than thirty (30) days prior to the Closing Date: (a) copies of each Purchased Real Property Lease and each other lease or sublease affecting the Facilities or the Hospital, (b) copies of each lease or sublease relating to all real property owned by the Authority, (c) a certified list of all leases described at items (a) and (b) above and the rents rolls and security deposits relating thereto; and (d) a landlord consent and estoppel, in form and substance reasonably satisfactory to Purchaser, from each property leased by the Authority or HHI from a third party.

(o)      all liens and encumbrances on the Purchased Assets shall have been released and

evidence thereof satisfactory to Purchaser in its sole discretion delivered to Purchaser;

(p)    the Bankruptcy Court shall have issued the final, non-appealable Orders described in Section 10.3(c), (d) and (e) and HHI shall have satisfied all of its covenants and obligations under said Section 10.3(c), (d) and (e);

(q)    *intentionally omitted*;

(r)    *intentionally omitted*;

(s)    the form and content of Schedules and Exhibits to this Agreement shall have been agreed to by the parties;

(t)    *intentionally omitted*; and

(u)    *intentionally omitted*.


10.2    Conditions Precedent to Obligations of HHI.    The obligation of HHI to consummate the Contemplated Transactions as provided by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by HHI in whole or in part to the extent permitted by applicable Law):

(a)    The representations and warranties of Purchaser set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date), and HHI shall have received a certificate signed by authorized officers of Purchaser, dated the Closing Date, to the foregoing effect; provided, however, that in the event any such representation or warranty has been breached, the condition set forth in this Section 10.2(a) shall nevertheless be deemed satisfied unless the effect of all such breaches of representations and warranties taken together would prevent or materially delay the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions;

(b)    Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by them on or prior to the Closing Date, and HHI shall have received a certificate signed by authorized officers of Purchaser, dated the Closing Date, to the foregoing effect; provided, however, that in the event any such obligation or agreement has not been performed or complied with, the condition set forth in this Section 10.2(b) shall be deemed satisfied unless all such failures to so perform or comply taken together prevent or materially delay the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions; and

(c)    Purchaser shall have delivered, or caused to be delivered, to HHI all of the items set forth in clauses (a) through (k) of Section 4.3.

10.3    Conditions Precedent to Obligations of Purchaser and HHI. The respective obligations of the parties to consummate the Contemplated Transactions as provided by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by both Purchaser and HHI in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Contemplated Transactions or which would make the consummation of such transactions unlawful and no action or proceeding shall have been instituted and remain pending before a Governmental Body to restrain or prohibit the Contemplated Transactions;

(b)    the parties shall have received the consents, approvals, licenses or Permits, or waivers thereof, as specified on Schedule 10.3(b) and shall have given any notices required thereby;

(c)    an Order of the Bankruptcy Court pursuant to Sections 363 and 365 of the Bankruptcy Code, in the form attached hereto as Exhibit B (with any changes thereto being subject to the approval of Purchaser in its sole and absolute discretion) and reasonably acceptable to HHI and the Authority, (i) authorizing and approving the sale of the Purchased Assets to the Purchaser on the terms and conditions set forth herein free and clear of all Liabilities and Liens, the assumption and assignment of the Assumed Liabilities, the Assumed Contracts, the Purchased Personal Property Leases, and the Purchased Real Property Leases to Purchaser and (ii) authorizing and approving the procedures for the assumption of certain Designated Contracts, the amounts of cure associated therewith and the notice provisions related thereto, and (iii) containing findings of fact that the Purchaser is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code shall have been entered and become a final and non-appealable order (the "Final HHI Sale Order"); and

(d)    an Order of the Bankruptcy Court pursuant to Section 365 of the Bankruptcy Code, in form reasonably acceptable to Purchaser, the Authority, and HHI, approving of the cure amounts described in Section 2.8 hereof shall have been entered and become a final, non-appealable order; and

(e)    an Order of the Bankruptcy Court pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, in the form attached hereto as Exhibit C (with any changes thereto being reasonably acceptable to Purchaser, the Authority, and HHI), approving of the settlement, compromise, and release of all claims by and among HHI, the Authority, and the City of Hoboken shall have been entered and become a final and non-appealable order (the "Final HHI Settlement Order").

If any of the mutual closing conditions set forth in this Section 10.3 are not satisfied, then each of

HHI and Purchaser shall have the right to terminate this Agreement upon three (3) Business Days' prior written notice to the other.

10.4    <u>Frustration of Closing Conditions</u>.  No party may rely on the failure of any condition set forth in <u>Section 10.1, 10.2 or 10.3</u>, as the case may be, to excuse it from consummating the Contemplated Transactions if such failure was caused by such party's failure to comply with any provision of this Agreement.


# ARTICLE XI

# TAXES

11.1    <u>Transfer Taxes</u>.  HHI shall pay any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the transactions contemplated by this Agreement, if any ("<u>Transfer Taxes</u>").  The parties shall cooperate and otherwise take commercially reasonable efforts to facilitate HHI's efforts to obtain any available relief from or refunds for Transfer Taxes.

11.2    <u>Purchase Price Allocation</u>.  For tax purposes only, prior to the Closing Date, HHI and Purchaser shall agree in good faith upon an allocation of the purchase price and other consideration delivered hereunder (including the Assumed Liabilities) among the Purchased Assets in accordance with Section 1060 of the Code and, in accordance with such allocation, Purchaser shall prepare and deliver to HHI copies of Form 8594 and any required exhibits thereto (the "<u>Asset Acquisition Statement</u>").  Purchaser shall prepare and deliver to HHI from time to time revised copies of the Asset Acquisition Statement (the "<u>Revised Statements</u>") so as to report any matters on the Asset Acquisition Statement that need updating (including purchase price adjustments, if any) consistent with the agreed upon allocation.  To the extent that HHI disagrees with Purchaser's allocation in the Asset Acquisition Statement or the Revised Statements, HHI and Purchaser shall work in good faith to resolve any such disagreements.  If Purchaser and HHI cannot reach a final resolution of the matter, Purchaser and HHI will jointly retain an independent financial expert to resolve any remaining disagreements, the cost of which shall be borne equally by the parties.  The purchase price for the Purchased Assets shall be allocated in accordance with the Asset Acquisition Statement or, if applicable, the last Revised Statements, provided by Purchaser to HHI, and all income Tax Returns and reports filed by Purchaser and HHI shall be prepared consistently with such allocation.

11.3    <u>Cooperation on Tax Matters</u>.  The parties shall furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other filings relating to Tax matters, for the preparation for any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters.

11.4    <u>Tax Reporting</u>.  The parties agree that any indemnity payment shall be treated for

all Tax purposes as an adjustment to Purchase Price, unless, and then only to the extent, otherwise required by a final determination under applicable law.

## ARTICLE XII

### *INTENTIONALLY OMITTED*

## ARTICLE XIII

### MISCELLANEOUS

13.1    <u>Survival of Representations, Warranties and Covenants</u>.  The covenants of the parties contained in this Agreement shall survive the Closing, unless otherwise expressly provided in this Agreement.  The representations and warranties of the parties hereto shall not survive the Closing.

13.2    <u>Expenses</u>.  Except as otherwise provided in this Agreement, each party shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.

13.3    <u>Injunctive Relief</u>.  Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any party hereto shall be entitled to injunctive relief with respect to any such breach, including specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this <u>Section 13.3</u> shall be in addition to any other rights which a party may have at law or in equity pursuant to this Agreement.

13.4    <u>Submission to Jurisdiction; Consent to Service of Process; Waiver of Jury</u>.  The parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States Bankruptcy Court for the District of New Jersey sitting in Newark, New Jersey and any appellate court to which an appeal may be taken therefrom, for the resolution of any such claim or dispute; <u>provided</u>, <u>however</u>, if for any reason said bankruptcy court shall decline to exercise jurisdiction over any particular claim or dispute, the United States District Court for the District of New Jersey or a New Jersey state court of competent jurisdiction shall assume jurisdiction thereover.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of

Section 13.7.

**EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO DEMAND THAT ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT OR THE RELATIONSHIPS OF THE PARTIES HERETO BE TRIED BY JURY. THIS WAIVER EXTENDS TO ANY AND ALL RIGHTS TO DEMAND A TRIAL BY JURY ARISING FROM ANY SOURCE INCLUDING, BUT NOT LIMITED TO, THE CONSTITUTION OF THE UNITED STATES OR ANY STATE THEREIN, COMMON LAW OR ANY APPLICABLE STATUTE OR REGULATIONS. EACH PARTY HERETO ACKNOWLEDGES THAT IT IS KNOWINGLY AND VOLUNTARILY WAIVES ITS RIGHT TO DEMAND TRIAL BY JURY.**

13.5    Schedules; Exhibits; Entire Agreement; Amendments and Waivers.    This Agreement (including the schedules and exhibits) represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

13.6    Governing Law.    This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey applicable to contracts made and performed in such State without regard to conflict of laws principles.

13.7    Notices.    All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), or (ii) one business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

    (a)    If to Purchaser, to:    HUMC Holdco, LLC
    % 2000 Market Street, 20th Floor
    Philadelphia, PA 19103
    Attention: Bruce Gilbert, Esq.
    Email: bgilbert@bayonnemedicalcenter.org

|                  |                                                        |
|------------------|--------------------------------------------------------|
| with a copy to:  | McElroy, Deutsch, Mulvaney & Carpenter, LLP            |
|                  | 40 West Ridgewood Avenue                               |
|                  | Ridgewood, NJ 07450                                    |
|                  | Attention:  Michael G. Keating, Esq.                   |
|                  | Email: mkeating@mdmc-law.com                           |

(b)    If to HHI, to:

Hudson Healthcare, Inc.
308 Willow Avenue
Hoboken, NJ 07030
Attention: Vincent Riccitelli
Email: vriccitelli@Hobokenumc.com

with a copy to:

Trenk, DiPasquale, Webster, Della Fera & Sodono, PC
347 Mt. Pleasant Avenue
West Orange, NJ 07052
Attention: Joseph J. DiPasquale
Email: jdipasquale@trenklawfirm.com
Attention: Henry M. Karwowski
Email: hkarwowski@trenklawfirm.com

13.8    Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Contemplated Transactions is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the Contemplated Transactions are consummated as originally contemplated to the greatest extent possible.

13.9    Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.  A successor to HHI shall include HHI as a reorganized debtor.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below.  No assignment of this Agreement or of any rights or obligations hereunder may be made by any party (by operation of law or otherwise) without the prior written consent of Purchaser and HHI and any attempted assignment without the required consents shall be void; provided, however, that: (i) Purchaser may assign its right to acquire any or all of the Purchased Assets and its other rights hereunder to an entity wholly owned by it that also assumes all of Purchaser's obligations hereunder (but such assumption shall not relieve Purchaser of its obligations hereunder) with the consent of HHI, which shall not be unreasonably withheld, conditioned or delayed or (ii) Purchaser may assign its right to acquire any or all of the Purchased Assets to a third Person at Closing, provided that Purchaser's assignment to a third Person (other than to MPT of Hoboken Real Estate, LLC and MPT of Hoboken TRS, LLC or their respective Affiliates, which assignment(s) is hereby consented to by HHI) of any Purchased

Assets shall require HHI's consent, which shall not be unreasonably withheld, conditioned or delayed.  Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires.  No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations.

13.10  <u>No Personal Liability</u>.  In entering into this Agreement, the parties understand, agree and acknowledge that no director, trustee, officer, manager, member, employee, shareholder, attorney, accountant, advisor or agent of any party hereto shall be personally liable or responsible to any other party or its Affiliates, directors, trustees, officers, managers, members, employees, shareholders, attorneys, accountants, advisors or agents for the performance of any obligation under this Agreement of any party to this Agreement or the truth, completeness or accuracy of any representation or warranty contained in, or statement made in, this Agreement or any document prepared pursuant hereto and that all obligations hereunder are those of the named parties only (but nothing contained herein shall limit the liability of any person for his or her fraudulent acts).

13.11  <u>Plan of Reorganization</u>.  Notwithstanding anything set forth herein to the contrary, any plan of reorganization filed in connection with the Bankruptcy Proceeding and any Order confirming same shall in all events be consistent with and shall not conflict with this Agreement or the HHI Sale Order.

13.12  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

*[no further text this page; signature page(s) follow(s)]*

IN WITNESS WHEREOF, the parties have caused this Amendment to be duly executed and delivered as of the date first above written.

HUDSON HEALTHCARE, INC.
HHI


By: _____
Title: _____


HUMC OPCO LLC
Opco/Purchaser


By: _____
Title: _____


HUMC HOLDCO, LLC
Holdco/Purchaser


By: _____
Title: _____