SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
Tele: 973-643-7000
Fax: 973-643-6500

*Proposed Attorneys for the Official Committee of*
*Unsecured Creditors of Hudson Healthcare, Inc.*

### UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re: | Chapter 11 |
| HUDSON HEALTHCARE, INC., | Case No. 11-33014 (DHS) |
| Debtor. | Hon. Donald H. Steckroth |

**APPLICATION IN SUPPORT OF THE MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER GRANTING LEAVE, STANDING AND AUTHORITY TO THE COMMITTEE TO COMMENCE, PROSECUTE AND SETTLE CLAIMS OF THE DEBTOR'S ESTATE**

The Official Committee of Unsecured Creditors (the "Committee") of Hudson Healthcare, Inc. (the "Debtor"), by and through its undersigned counsel, hereby submits its motion (the "Motion") for entry of an order pursuant to 11 U.S.C. §§ 105, 1103 and 1109 granting the Committee leave, standing and authority to commence, prosecute and settle any and all claims and/or causes of action on behalf of the Debtor's estate. In support of this Motion, the Committee respectfully states as follows:

### THE PRESSING NEED FOR RELIEF

1. The fairness of the Chapter 11 process depends upon a delicate system of checks and balances, all designed by Congress to foster the policy of protecting the bankruptcy estate as whole, and especially the interests of its creditors. Here, the Debtor has moved on an urgent basis for approval of a sale and a settlement (including broad releases and injunctions), all for the

ultimate benefit of the non-debtors, including the Hoboken Municipal Hospital Authority (the "Authority"). Because of the pervasive influence and control over the Debtor held and already exerted by the Authority, the necessary checks and balances are lacking in this case. For these and other reasons set forth below, the immediate granting of derivative standing to the Committee is essential.

2.      As a direct result of the Authority's influence and control, the management of the Debtor (i) lacks sufficient independence to honor its fiduciary duties to maximize the Debtor's estate for the benefit of its creditors; (ii) is subject to loyalties and motivations in conflict with those fiduciary duties; and (iii) both before and after the commencement of this case has managed the Debtor's affairs in breach of those fiduciary duties.

3.      The Debtor has determined to continue to render itself insolvent to the detriment of its creditors and to the continued benefit of the Authority and has declared its intent to phase itself out of existence, disperse all of its assets for illusory consideration, and broadly release and enjoin potential claims against a host of parties, including its own directors, former officers and directors, the proposed purchaser of the Debtor's assets, the Authority (and its officers and directors), the City of Hoboken, and bondholders of the Authority.

4.      The Debtor has elected not to pursue valuable claims and, instead, to grant broad releases and injunctions on an urgent basis, without appropriate attention to the potential claims from the point of view of the best interests of creditors and the estate as a whole. Accordingly, the Committee, as the only truly independent entity for the estate of the Debtor and the only representative body for creditors with an actual economic stake in the outcome of the cases, seeks the entry of an order authorizing it to pursue colorable claims and causes of action that may substantially benefit the Debtor's estate. The Debtor is hopelessly conflicted, cannot be

expected to vigorously pursue such claims, and is incapable of dealing at arm's length with these parties[1].

5.      From the day it was appointed, the Committee, consistent with its statutory obligations, began an investigation of the Debtor's affairs, assets and liabilities. The Committee's investigation is still in early stages, but it appears that the Debtor has significant claims against the Hoboken Municipal Hospital Authority (the "Authority"), including, without limitation, claims arising under the Manager And Operator Agreement between the Debtor and the Authority, dated February 1, 2007 (the "Manager Agreement"), the Debtor's officers and directors, and others. Attached hereto as Exhibit A is a copy of the Manager Agreement.

6.      The close relationship between the Debtor and the Authority impairs the Debtor's fiduciary duty to maximize value herein. The Debtor's five member board of directors consists of two members appointed by the Authority, two from the Hoboken community, and one by the Governor. This is a board interested in the continuity of community hospital services, not a board dedicated to the best interests of creditors and the estate to maximize the economic recovery for creditors herein.

7.      Pursuant to the Municipal Hospital Authority Law, N.J.S.A. 30:9-23.15, *et seq.*, the Debtor's By-Laws and the Manager Agreement, (i) the Authority has influence and control over the selection of the Debtor's board of directors and senior management (in fact, the Committee has been advised that the Authority had caused the termination of the Debtor's two

---

[1] A negotiation or transaction is conducted at "arm's length" if it is "'between two parties who are not related or not on close terms and who are presumed to have roughly equal bargaining power[.]'" *Allegheny Ludlum Corp. v. United States*, 367 F.3d 1339, 1348 (Fed. Cir. 2004) (quoting Black's Law Dictionary 103 (7th ed. 1999))( A transaction is characterized as having been made at "arm's length" if it was "negotiated by unrelated parties, each acting in his or her own self interest.).; *see also Cedar View, Ltd. v. Colpetzer*, 2006 U.S. Dist. LEXIS 7018, 2006 WL 456482 at *2 (N.D. Ohio Feb. 24, 2006) (following Ohio law in defining an arm's-length transaction "as characterized by the following elements: it is voluntary, i.e., without compulsion or duress; it generally takes place in an open market; and the parties act in their own self-interest"). *In re Nicole Energy Servs.*, 385 B.R. 201, 235 (Bankr. S.D. Ohio 2008)

prior chief executive officers and had caused a replacement of the Debtor's prior board members); (ii) the Authority exercises complete control over the Debtor's expenditures, which puts into question the Debtor's ability to fund any litigation against the Authority; and (iii) the Authority has unfettered control over the acquisition and disposition of the Debtor's assets, which include the Debtor's causes of action against the Authority.

8.    Given the Authority's express and *de facto* control of the Debtor, the Committee, by letter dated August 18, 2011, informed the Debtor of the Committee's concerns and requested that the Debtor pursue its claims against the Authority or enter into a consent order granting the Committee derivative standing to pursue any and all claims and causes of action that the Debtor has or may have against the Authority.  Incredibly, notwithstanding an obvious conflict on the Debtor's part, the Debtor has declined to agree to either option and in fact, did not consult with the Committee or its professionals regarding the terms of any proposed settlement, did not seek the Committee's input about the benefits of any proposed settlement or even advise the Committee that a settlement was reached until the filing of a motion.

9.    Because the claims of the estate include claims those against the Authority – an entity that created the Debtor and dominates every aspect of the Debtor's corporate existence – and against the Debtor's own directors and officers, the Debtor will not and cannot effectively pursue these claims.  The Committee should therefore be granted authority to step into the Debtor's shoes to pursue these claims for the benefit of the Debtor's estate.

10.    All of the legal requirements for granting the Committee derivative standing to pursue claims on behalf of the Debtor's estate are satisfied.  Prosecution of the claims is essential in this Chapter 11 case because it may, among other things, potentially produce a substantial

source of recovery for unsecured creditors. Given the Debtor's inability and unwillingness to prosecute the claims, the Committee is the only party in interest qualified to pursue them.

11. The Debtor's recent proposed asset sale and settlement agreement with the Authority are tantamount to the Authority negotiating with itself and are not arm's length transactions. Time is of the essence here as the Debtor has moved for approval of the sale and the settlement, seeking orders which would effectively release and enjoin virtually every imaginable claim held by the estate against a host of persons and entities. The Authority and the City of Hoboken (the ultimate beneficiary of the disposition of the hospital) are hurtling toward a closing of the sale of the hospital by the end of September 2011, to a for-profit entity that, in addition to preserving a hospital for its residents, would relieve the City of an approximately $52 million guaranty of the Authority's bond debt and add the hospital's real property to the City's tax base, all at the expense of creditors who were induced to provide goods and services in reliance on the Authority's obligations to reimburse the Debtor for all operating expenses of the hospital.

12. The "eleventh hour" proposed settlement between the Authority and the Debtor's management that the Authority and the community installed on its face is not arm's length. No individual or entity with an economic stake in the outcome of this bankruptcy case would have endorsed such a result. There was no one in the negotiation of that "settlement" representing the economic interests of creditors of the Debtor. Because the Committee cannot risk valuable estate claims being lost as a result it is filing this Motion so the Court and parties in interest may address the issues on the urgent basis the Debtor and the Authority have created by their sale and settlement motions.

13.     In effect, through its influence over the Debtor and the Debtor's bankruptcy, the Authority is attempting to obtain for itself and its parties in interest, the benefits of a bankruptcy debtor, including various releases and injunctions, without being subject to the burdens and scrutiny of bankruptcy.

14.     It is well-recognized that that a court cannot simply evaluate the end result obtained by the negotiating parties without also scrutinizing the process by which that outcome was reached. *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 499, 506 (Bankr. S.D.N.Y. 1991) (emphasizing the importance of evidence of arms' length negotiations); *In re Present Co.*, 141 B.R. 18 (Bankr. W.D.N.Y. 1992) (refusing to approve settlement based on absence of arms' length negotiations and parties' failure to give objecting entities access to information); *Matco Electronics, supra*, 287 B.R. 68 (Bankr. N.D.N.Y. 2002) (refusing to approve settlement agreement where "red flags" indicated negotiations not at arms' length).

15.     Granting standing to the Committee will provide the required and essential checks and balances, allow this Court to fully evaluate the process in which any outcome will be reached and insure a full and fair evaluation of the claims.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction to consider this Standing Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of this Standing Motion is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a), 1103 (c) and 1109(b) of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

## BACKGROUND

17.     On August 1, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor continue to operate its business and

manage its property as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

18.    On August 12, 2011, the United States Trustee, pursuant to section 1102 of the Bankruptcy Code, appointed the Committee to represent the interests of all unsecured creditors in the Debtor's case.

### *Creation of the Authority and the Debtor*

19.    The Authority and the Debtor came into existence in 2006 as part of a solution devised by the City of Hoboken and the State of New Jersey to save from closing what was then known as St. Mary Hospital and is now known as Hoboken University Medical Center.    The hospital's former owner, Bon Secours New Jersey Health System, Inc., having accumulated a reported $118 million of losses at the hospital between 2000 and 2005 and having received no offers to buy it, decided to seek authorization to close the hospital.    In response to opposition from the residents of the City and lobbying efforts, the State Legislature adopted the New Jersey Municipal Hospital Authority Law, N.J.S.A. 30:9-23.15, *et seq.*, (the "MHAL") pursuant to which the City formed the Authority for the purpose of acquiring the hospital, thus, effectively, placing the hospital into public ownership.

20.    The MHAL mandates that "[t]he authority shall exercise its powers and duties to manage and operate a hospital owned by it through a contract or contracts with a manager", but it makes clear that "the primary responsibility of operating the hospital shall remain that of the authority." *See* N.J.S.A. § 30:9-23.20(a).

21.    In accordance with the MHAL, the Authority caused the Debtor to be formed as a not-for-profit corporation and a support organization, as defined in Sections 501(c)(3) and 509(a)(3) of the Internal Revenue Code of 1986, to manage and operate the hospital on the

Authority's behalf.   Pursuant to the Manager Agreement, the Debtor is generally required to "perform all the duties necessary to supervise, direct and control the day-to-day operation of the Facility, . . .directly contract for services necessary for the day-to-day operation of the Facility, and . . . operate the Hospital as a general acute care hospital."  Manager Agreement, Section 2.2.

### *The Authority's Control and Supervision of the Debtor*

22.      The Debtor's By-Laws expressly reserve to the Authority, pursuant to the requirements of the MHLA, extensive control over every significant aspect of the Debtor's corporate existence in furtherance of the Authority's objectives, including:

- To approve the individuals that the [Debtor] proposes to designate as the Chief Executive Officer and the Chief Financial Officer of the municipal hospital managed by the [Debtor]; to remove such individuals from office, and to approve contracts or other arrangements setting forth terms and conditions of employment for those positions.

- To approve the management plan for the municipal hospital to be operated by the Authority, including monitoring and review methods of financial activities.

- To approve the minimum provisions that shall be set forth in the [Debtor's] management contract with the Authority.

- To approve and monitor the annual budgets of the municipal hospital operated by the Authority and of the [Debtor] and any amendments thereto.

- To authorize the [Debtor] to engage in or enter into any transaction providing for the acquisition or disposition of the assets of the municipal hospital operated by the Authority, unless authorized in the municipal hospital's annual budget.

- To approve the incurrence of debt or expenses by the municipal hospital operated by the Authority, unless authorized in the municipal hospital's annual budget.

*See* Debtor's By-Laws, Article III.  Attached hereto as Exhibit B is a copy of the Debtor's By-Laws.

23.      The Authority also controls the appointment and removal of two (2) of the five (5) members of the Debtor's board of directors.  "The Directors who serve by virtue of their service as President and Treasurer/Chief Financial Officer of the Corporation shall be approved by the Authority and shall serve until they resign or are removed by the Authority."  *See* Debtor's By-

Laws, Article IV, Section 3.    Further, "[n]o officer shall have the authority to enter into any contracts, obligations or undertakings on behalf of [the Debtor] in any mater unless the same are within the expenditure limits for various budget categories approved by the Authority in the annual budget."    See Debtor's By-Laws, Article VI, Section 10.    Also, contracts between the Authority and Debtor are specifically exempt from the heightened standards of scrutiny, disclosure and recusal provisions of the Debtor's By-Laws for transactions involving dual interests.    *See* Debtor's By-Laws, Article IX.

24.    The Authority's control and supervision of the key functions of the Debtor is also reflected in the Manager Agreement entered by the Authority and the Debtor pursuant to the MHAL, including (i) approval of the appointment of the Chief Executive Officer and Chief Financial Officer and their respective compensation (see Manager Agreement, Section 2.2.8); (ii) approval of the Proposed Annual Business Plan and Budget (see Manager Agreement, Sections 4.1 and 4.2); access to and inspection of all books and records and financial data (see Manager Agreement, Section 4.5); monthly, quarterly and annual reporting from the Debtor to the Authority reflecting financial results of the hospital's operations (see Manager Agreement, Section 4.6); and control of the acquisition and disposition of assets, the incurring of debts and expenses and the taking on of liabilities not normally associated with the day-to-day operation of a hospital (see Manager Agreement, Section 2.1.2).

### *The Authority's Obligations Under the Manager Agreement*

25.    While the Manager Agreement obligates the Debtor to perform all necessary duties and enter into contracts for goods and services necessary for the operation and management of the hospital, the Manager Agreement makes it abundantly clear that the Authority is responsible for funding all costs and expenses incurred by the Debtor in operating

the hospital pursuant to the Manager Agreement.   Among the key provisions requiring funding

by the Authority are:

- The Authority shall on the first Business Day of each month, transfer from the Operating Fund to the Manager's Operating Account 1/12 of the Annual Business Plan and Budget as adjusted in accordance with the monthly reports . . .. (see Section 2.1.3)

- The Manager shall be reimbursed by the Authority for all costs incurred by the Manager in carrying out the Manager's duties and obligations as set forth in this Agreement . . .. (see Section 2.2.28)

- The Authority acknowledges and agrees that by approving the Annual Business Plan and Budget, the Authority has approved all Reimbursable Expenses[2] incurred by Manager for the ongoing operational expenses of the Hospital.   Accordingly, the Authority must concur in any payments made by the Manager for any such Reimbursable Expenses incurred for any reason unless the expenses have been incurred due to the gross negligence or criminal misconduct of the Manager.   Absent evidence of gross negligence or criminal misconduct, all Reimbursable Expenses incurred by the Manager pursuant to an approved Annual Business Plan and Budget shall be paid by the Manager and shall have the concurrence of the Authority.   (see Section 7.4)

- By executing this Agreement, the Authority agrees to fund the capital projects as set forth in Exhibit I attached to the  Manager's Agreement.   (see Section 8.2.9)

- By executing this Agreement, the Authority agrees to fund the Reimbursable Expenses incurred by the Manager.   (see Section 8.2.10)

- The Authority is directly responsible to fully satisfy all of the liabilities and obligations of the Authority to the Manager under this Agreement, including the payment of all Reimbursable Expenses and any amounts due with regard to any Deficiency and/or any Withheld Payment.   To the extent permitted by law, the Authority hereby agrees to indemnify, defend and hold harmless the manager, its directors, officers, employees and agents for, from and against any cost, loss damage or expense (including, but not limited to, reasonable attorneys' fees and all court costs and other expenses of litigation, whether or not recoverable under local law) resulting from (i) a breach of this Agreement by the Authority, including any breach of any representation, warranty or covenant in this Agreement or failure to pay any amount, when due, owing to the Manager under this Agreement, (ii) the fraud, gross negligence or willful misconduct of the Authority, (iii) any act (or failure to act) undertaken and performed (or refused to be undertaken) by the Manager or its officers, employees or agents, in good faith within the scope of authority conferred by this Agreement, or (iv) the performance or failure to perform any acts by the Manager or its officers, employees or agents, in good faith reliance on the advice of accountants or legal counsel or in good faith reliance on the advice, instruction or

---

[2] "Reimbursable Expenses" means all expenses incurred by the Manager in operating the Facility under the terms of this Agreement identified on Exhibit D attached thereto.  See Manager's Agreement, Section 1.2.30

approval from the Authority.   Without limitation of the foregoing, the Authority's indemnification obligation includes the obligations to pay Manager pursuant to Section 7 of this Agreement.  (see Section 11.1)

26.     The foregoing provisions of the Manager Agreement leave no doubt that, to the extent the Authority has approved the Debtor's incurrence of expenses in connection with operating the hospital, the Authority has an unconditional obligation to ensure that such expenses are funded.   However, instead of complying with the terms of the Manager Agreement, the Debtor and the Authority entered into an entirely differently and unwritten policy where the Authority would receive all the benefits under the Manager Agreement and the Debtor would incur all the obligations – to the detriment of the Debtor's creditors.

### *The Authority's Breaches of the Manager Agreement*

27.     Despite the fact that the framework of the Manager Agreement was apparently intended to ensure that the Debtor would never be in a position where it had incurred an obligation in running the Hospital that would not be funded by the Authority, the Debtor found itself on the Petition Date with approximately $36.9 million of unpaid general unsecured claims as evidenced by the Debtor's filed Schedule F.

28.     The Declaration of Vincent Riccitelli, the Debtor's Chief Executive Officer, submitted in support of the Debtor's First Day Motions, recites that "the Debtor has asserted that the Authority owes the Debtor approximately $36.9 million for accrued expenses and other liabilities incurred by the Debtor in the operation of the Hospital, an amount that the Authority vigorously disputes."  See Riccitelli Declaration at p. 10.

29.     While the Debtor has acknowledged that it believes that the Authority has breached the Manager Agreement by failing to fund approximately $36.9 million of liabilities accrued by the Debtor in operating the hospital for the benefit of the Authority, the Debtor's current management has failed to pursue any claims or causes of action against the Authority

arising from such breach, despite the fact that an arbitration has been commenced by the Debtor's prior management.

### *The Committee's Investigation of Potential Claims*

30.     In its capacity as a fiduciary for unsecured creditors of the Debtor's estate, the Committee, in the short time that has elapsed since its formation, has undertaken an intensive investigation into potential claims of the Debtor's estate against the Authority.  To that end, the Committee professionals have analyzed the MHAL, the Debtor's organizational documents, and the Manager Agreement and held a meeting and teleconferences with the Debtor's and the Authority's professionals.  The Committee has also served subpoenas pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedures upon the Debtor and the Authority, which remain extant.

31.     It appears, based on the information obtained by the Committee to date, that the Debtor's current management has taken no affirmative action to pursue its claims against the Authority, despite the fact that the Debtor has acknowledged that these claims have merit and would benefit the Debtor's estate.  Notably, at least some of these claims were the subject of an arbitration commenced pre-petition by the Debtor's previous management and board of directors, who were subsequently dismissed by the Authority, but were not pursued by the current management and board following their appointment by the Authority.

32.     Given the Authority's extensive control of the Debtor, the Committee, by letter dated August 18, 2011, informed the Debtor of the Committee's concerns and requested that the Debtor pursue its claims against the Authority or enter into a consent order granting the Committee derivative standing to pursue any and all claims and causes of action that the Debtor has or may have against the Authority.

33.     The Debtor declined to agree to either of the Committee's options and the Committee is thus constrained to seek derivative standing from this Court.   Instead, the Debtor has focused on attempting to enter into a global settlement of all alleged claims between the Debtor and the Authority in order to pave the way to a closing of the proposed sale of the hospital by September 30, 2011.  The Authority's extensive control over the Debtor's affairs also raises concerns about the Debtor's ability to negotiate at arm's length a potential fair settlement of any claims against the Authority. Authority's control over the Debtor eliminated any meaningful adversity between the negotiating parties, and thus renders the proposed settlement non-arms' length.

34.     Based on its investigation to date, the Committee believes that there appear to be sufficient facts to support the Standing Motion to pursue claims, including claims against the Authority arising from the Authority's breaches of the Manager Agreement.[3]  Even at the early stages of this case, the Committee has identified the following potential claims which may be available to the bankruptcy estate:

(a)     breach by the Authority of the Master Manager and Operator Agreement;

(b)     contractual indemnification under Section 11.1 of the Master Manager and Operator Agreement;

(c)     common-law right by the Debtor as agent to reimbursement from the Authority as its principal for obligations incurred, *see, e.g., Biddle Adv. Co. v. Lloyd A. Fry Roofing*, 13 Ill. App. 3d 874, 877 (Ill. App. Ct. 4th Dist. 1973) (holding that agent had right to sue its principal for money obligations to third party);

---

[3] Because the Committee's investigation of potential claims continues, the Committee expressly reserves its rights to assert additional claims on behalf of the Debtor's estate, as and when circumstances warrant, and to add additional parties as they are identified.

(d)      breach of fiduciary duty by the Authority;[4]

(e)      negligence against the Authority, *see, e.g., Brunson v. Affinity Fed. Credit Union*, 199 N.J. 381, 400 (N.J. 2009) (defendant is liable for negligence when it has a duty of care, has breached that duty, and the breach is the proximate cause of actual damages);

(f)      alter ego, veil piercing against the Authority, *see Tsai v. Bldgs. by Jaime, Inc. (In re Bldgs. by Jaime)*, 230 B.R. 36,42-44 (Bankr. D.N.J. 1998) (holding that New Jersey permits corporate debtors to pierce their own veils and trustee has standing to assert alter ego claims on estate's behalf);

(g)      unjust enrichment against the Authority, *see, e.g., Iliadis v. Wal-Mart Stores, Inc.*, 191 N.J. 88, 110 (N.J. 2007) (a plaintiff has a claim for unjust enrichment when the "defendant received a benefit and retention of that benefit without payment would be unjust");

(h)      breach of fiduciary duty against the officers and directors of the Debtor;

(i)      mismanagement against the officers and directors of the Debtor;

(j)      negligence against the officers and directors of the Debtor;

(k)      professional negligence against the accountants for the Debtor and the Authority;

(l)      fraud and conspiracy to defraud against the directors and officers of the Debtor and/or the Authority and others;

(m)      successor liability and similar claims against the proposed purchaser, *see, e.g., Flagship Interval Owner's Ass'n v. Phila. Furniture Mfgs. Co.*, 2010 U.S. Dist LEXIS 26472, *18-*19 (D.N.J. Mar. 22, 2010) ("A successor corporation may be responsible for the liabilities of its predecessor in various circumstances where (1) the purchasing corporation expressly or impliedly agreed to assume such debts and liabilities; (2) the transaction amounts to a

---

[4] The Committee believes that the potential claims against the Authority and its principals are outside of sovereign immunity limitations or are subject to recognized exceptions to such immunity including, but not limited to, the palpably unreasonable standard and the abrogation of sovereign immunity set forth in 11 U.S.C. § 106.

consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a

continuation of the selling corporation; or (4) the transaction is entered into fraudulently in order

to escape responsibility.") (citing *Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 431 (N.J.

1981) (quotations omitted); and

(n)     fraudulent conveyance against the Authority, where the Debtor and the Authority

have acted in concert to render the Debtor insolvent to the benefit of the Authority.

35.     These claims, along with any others which may arise in the course of

investigation, should be actively investigated, and if need be, pursued, litigated and/or settled in

an arm's length manner and not by parties with an actual conflict of interest.  A Debtor with no

economic stake in the outcome of a case should not dictate the recovery for those creditors which

hold the actual economic interest.

### RELIEF REQUESTED

36.     By this Standing Motion, and pursuant to sections 105, 1103 and 1109 of the

Bankruptcy Code, the Committee requests that the Court enter an order authorizing and

appointing the Committee to commence, prosecute and, if appropriate, settle any and all of the

Debtor's claims against the Authority and others, as the case may be.  The Committee requires

the requested relief to fulfill its fiduciary responsibilities, as mandated by Congress pursuant to

sections 1103(c) and 1109 of the Bankruptcy Code.

37.     The Bankruptcy Code authorizes the trustee or the debtor-in-possession to pursue

causes of action on behalf of the estate and obligates such estate representative to maximize the

estate's value for the benefit of creditors. *See, e.g., Commodity Futures Trading Comm'n v.

Weintraub*, 471 U.S. 343, 352 (1985) ("the trustee is accountable for all property received, and

has the duty to maximize the value of the estate") (internal citations and quotation omitted); *see

also, In re Commodore Int'l Ltd.*, 262 F.3d 96,99 (2d Cir. 2001) ("the [debtor in possession] has

an obligation to pursue all actions that are in the best interests of creditors and the estate")
(citation omitted).

38.    Nevertheless, it has long been acknowledged that the "debtor-in-possession often
acts under the influence of conflicts of interest" which prevents it from pursuing potentially
viable claims that would result in a benefit to unsecured creditors.  *See, e.g., Canadian Pac.
Forest Prods. Ltd. v. JD. Irving Ltd. (In re Gibson Group, Inc.)*, 66 F.3d 1436, 1441 (6th Cir.
1995).  In order to address the problem that arises where a debtor is unwilling or unable to fulfill
its obligation to maximize the value of the estate, "[t]he practice of authorizing the prosecution
of actions on behalf of an estate by committees ... upon a showing that such is in the interests of
the estate, is one of long standing, and nearly universally recognized."  *In re Adelphia Commc'ns
Corp.*, 330 B.R. 364,373 (Bankr. S.D.N.Y. 2005) (citations omitted).  Granting a creditors'
committee standing to prosecute actions on behalf of a debtor's estate

> provides creditors and other stakeholders with the comfort that potentially
> valuable (and sometimes critical) claims on behalf of the estate will be
> prosecuted-without requiring bankruptcy judges to ... resort[] to much more
> draconian or ineffective mechanisms to ensure the prosecution of those claims,
> with the destruction to going concern value and creditor recoveries that would
> frequently be the result.

*Id*.  In fact, it has been noted by courts in this circuit that the primary purpose of official
unsecured creditor committees "is to represent the interests of unsecured creditors and to
strive to maximize the bankruptcy dividend paid to that class of creditors."  *See, e.g., In
re Nationwide Sports Distribs., Inc.*, 227 B.R. 455, 463 (Bankr. E.D. Pa. 1998).

39.    It is well settled within this and other circuits that bankruptcy courts may allow a
creditors' committee to pursue litigation on behalf of the estate under appropriate circumstances.
*See Official Comm. Of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548,575
(3d Cir. 2003); *Official Comm. Of Unsecured Creditors v. Barron (In re Polaroid Corp.)*, No.

03-56404, 2004 WL 1397582 (Bankr. D. Del. June 22, 2004); *Official Comm. Of Unsecured Creditors v. Cablevision Sys. Corp.* (*In re Valley Media, Inc.*), No. 01¬11353, 2003 WL 21956410 (Bankr. D. Del. Aug. 14, 2003); *Official Comm. Of Unsecured Creditors v. Clark (In re Nat 'I Forge Co.)*, 304 B.R. 214 (Bankr. W.D. Pa. 2004), aff'd, 326 B.R. 532 (W.D. Pa. 2005); *Liberty Mut. Ins. Co. v. Official Unsecured Creditors Comm. (In re Spaulding Composites Co.)*, 207 B.R. 899,904 (B.A.P. 9th Cir. 1997); *La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 247 (5th Cir. 1988); *Unsecured Creditors Comm. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 904 (2d Cir. 1985).

40.    Derivative standing is generally granted where a debtor unjustifiably or unreasonably refuses to pursue claims that the Bankruptcy Court finds would benefit the estate. *See, e.g., Cybergenics*, 330 F.3d at 561 (citing *Fogel*, 221 F.2d at 965-66).   Indeed, creditors' committees have an "implied, but qualified, right ... to initiate adversary proceedings in the name of the debtor in possession under 11 U.S.C. §§ 1103(c)(5) and 1109(b)." *In re STN Enters.*, 779 F.2d at 904; *see also Cybergenics*, 330 F.3d at 568 (a bankruptcy court may, in appropriate circumstances, utilize its equitable powers to authorize derivative standing). As the Third Circuit has explained, the statutory language of the Bankruptcy Code suggests that:

> [C]ongress intended for creditors' committees to perform services on behalf of the estate, and that Congress consciously built a measure of flexibility into the scope of those services. As the question before us today is whether a bankruptcy court can authorize a creditors' committee to represent the estate when the usual representative is delinquent, the "flexible representation" role evidenced in § 1103(c)(5) militates in the affirmative.

*Cybergenics*, 330 F.3d at 563.   The Third Circuit has recognized that granting derivative standing to a creditors committee "[p]rovides a critical safeguard to prevent against lax pursuit" of claims "that would amount to reputational self-immolation" for a debtor or its managers. *Id*. at 573.

41.     Accordingly, this Court has the authority to grant permission to the Committee to prosecute the claims against the Authority and others, and the Court should grant such permission here.  The Debtor, which is hopelessly conflicted by virtue of its close relationship with the Authority and the Authority's influence over every key aspect of the Debtor's corporate existence and its management, has not prosecuted and cannot be expected to vigorously prosecute the claims or resolve them through an arm's length settlement.  The Committee, in contrast, stands ready to protect the interests of the estate and to vigorously prosecute the Claims against the Authority unhindered by any such conflict of interest.  A failure to grant the Committee authority to prosecute these claims would result in a loss to the estate and its creditors and would unjustly allow the Authority to benefit from its breaches of the Manager Agreement and other wrongdoing.

## BASIS FOR RELIEF

**A.      Standard for Derivative Standing**

42.     Generally, the prerequisites for derivative standing are: (i) whether a colorable claim exists that would affect distributions to unsecured creditors; (ii) whether the debtor has unjustifiably refused to bring the claim itself; and (iii) whether the committee sought permission from the bankruptcy court to initiate the action.  *See Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141, 145 (D. Del. 2004).  Numerous courts in this and other circuits have applied these same or similar standards.  *See, e.g., Fogel v. Zell*, 221 F.3d 955, 965 (7th Cir. 2000); *In re Gibson Group, Inc.*, 66 F.3d at 1438; *La. World Exposition*, 858 F.2d at 247; *In re STN Enters.*, 779 F.2d at 904-05.  Here, all requirements for derivative standing have been met.

**B.**    **The Committee Clearly Satisfies the Test for Derivative Standing**

**(a)**    **The Claims Are Colorable And Would Benefit The Estates**

43.    The first element of the derivative standing test is that the Committee must assert "a colorable claim or claims for relief that on appropriate proof would support a recovery." *In re STN Enters.*, 779 F.2d at 905. The requisite "colorable" claim showing is a relatively low standard to satisfy. *See, e.g., In re Adelphia Commc'ns Corp.*, 330 B.R. at 369 (noting that the Court need only be satisfied that there is "some factual support" for the claims); *Official Comm. Of Unsecured Creditors v. Fishbein & Co., P.C.* (*In re Corell Steel*), No. 91-4919, 1992 WL 196768, at *2 n.3 (E.D. Pa. Aug. 10, 1992) (creditors' committee seeking to prosecute estate causes of action need only demonstrate that its proposed claims are "potentially meritorious"); *Official Comm. Of Unsecured Creditors v. Hudson United Bank (In re Am. 's Hobby Ctr., Inc.)*, 223 B.R. 275,288 (Bankr. S.D.N.Y. 1998) (noting that standing to sue should be denied where claims are "facially defective").

44.    In determining whether a claim is colorable, the Court is not required to conduct a mini-trial.  Instead, the Court may "weigh the 'probability of success and financial recovery', as well as the anticipated costs of litigation, as part of a cost/benefit analysis" to determine whether the prosecution of claims is likely to benefit the estate.  *In re iPCS, Inc.*, 297 B.R. 283,291 (Bankr. N.D. Ga. 2003) (citing *In re Am's Hobby Ctr.*, 223 B.R. at 282).

45.    Thus, the Committee need only establish the existence of a plausible claim -- which is easily demonstrated here by virtue of the fact that the Debtor itself has admitted in its Schedule F and the Riccitelli Declaration that it holds claims of approximately $36.9 million arising from the Authority's breaches of the Manager Agreement.  A recitation of the potential claims is also set forth above.

46.     The potential benefit to the estate from prosecution of these claims, aggregating at least $36.9 million by the Debtor's own account, could clearly be substantial.   A successful prosecution or settlement of the claims against the estate is likely to substantially augment the Debtor's estate, and could yield significant value to the unsecured creditors.   In addition, the costs of the proposed litigation are likely to be outweighed by the potential recovery that the claims could achieve for the Debtor's estate.   Under such circumstances, the determination of whether the  claims are colorable and whether their pursuit by the Committee would benefit the estate militates in favor of granting standing.

### (b)     The Debtor Has Rejected the Committee's Demand

47.     As stated by the court in *National Forge*:

The policy concerns underlying the general requirement of a formal demand are to ensure that the debtor is (i) informed of the committee's intent to assert the subject claims and (ii) afforded an opportunity to explain its reasons, if any, for declining to pursue the claims itself.

*In re Nat 'l Forge Co.*, 326 B.R. at 544.

48.     Here, the Committee has formally demanded, by letter dated August 18, 2011, that the Debtor prosecute the claims against the Authority or consent to the a grant of standing to the Committee to prosecute these claims.   The Debtor has also been advised repeatedly through discussions among counsel that the Committee intended to seek standing to pursue the claims against the Authority.   Those discussions also afforded the Debtor an opportunity to explain its reasons for declining to pursue the Claims.

49.     The Debtor's rejection of the Committee's demand is not surprising and further illustrates that the Debtor is but a tool of the Authority, manipulated to advance the Authority's own interests and not the interests of this estate.   As demonstrated above, the Authority controls (i) the appointment and dismissal of the Debtor's senior management and two members of the

Debtor's board of directors; (ii) the Authority exercises complete control over the Debtor's expenditures, which puts into question the Debtor's ability to fund any litigation against the Authority; and (iii) the Authority has unfettered control over the acquisition and disposition of the Debtor's assets, which include the Debtor's causes of action against the Authority.  Given the deep and irreconcilable conflicts of interest facing the Debtor, it would be futile to expect the Debtor to vigorously pursue any claims against the Authority or consent to the Committee's standing to do so.

50.     The fact that the arbitration of the claims against the Authority that had been commenced by the Debtor's prior board and management had been apparently discontinued by the Debtor's current management that was appointed by the Authority following its dismissal of the Debtor's prior board and management further reveals the extent to which the Authority dominates the Debtor and how hopelessly conflicted the Debtor is from making independent decisions with respect to claims or any other matters involving the Authority.  The same lack of independence is obvious also true with regard to claims against the Debtor's own officers and directors.

51.     "[I]t is difficult objectively to determine whether a potential action is meritorious when one would be a defendant in that action." *Cybergenics*, 330 F.3d at 575.  Here, the reality is that the Authority controls the Debtor, so the likelihood that the Debtor could maintain such objectivity is slim, because the Authority would be a defendant in the action to hold it liable for breaches of the Manager Agreement.  This is analogous to the situation contemplated by the Third Circuit in *Cybergenics*, where it noted:

> [t]his situation immediately gives rise to the proverbial problem of the fox guarding the henhouse.... One suspects that if managers can devise any opportunity to avoid bringing a claim that would amount to reputational self-immolation, they will seize it.

*Cybergenics*, 330 F.3d at 573. Given all of these facts, it is clear that in this case the Committee satisfied the demand requirement of the standing analysis even though such a demand appears to have been futile.

### (c)    The Committee Is Seeking Prior Court Approval to Prosecute the Claims

52.    The third factor this Court must consider when deciding whether to grant a Committee derivative standing is whether the Committee has sought Court approval prior to asserting claims on behalf of the estate.  That factor is satisfied by the relief sought herein.

53.    Therefore, pursuant to Bankruptcy Code sections 1103 and 1109 and relevant Third Circuit case law, the Committee should be granted standing to commence and prosecute causes of action on behalf of the Debtor's estate against the Authority based on the Authority's breaches of the Manager Agreement.

### C.    An Action Brought by the Committee
### Could Potentially Enhance the Sale Proceeds Available to the Estate

54.    Finally, there is an additional, practical reason why the Committee here should be granted standing to pursue the claims of the estate against the Authority and others.  The Authority and the City of Hoboken (the ultimate beneficiary of the disposition of the hospital) are hurtling toward a closing of the sale of the hospital by the end of September 2011, to a for-profit entity that, in addition to preserving a hospital for its residents, would relieve the City of an approximately $52 million guaranty of the Authority's bond debt and add the hospital's real property to the City's tax base.

55.    The Debtor has moved for the approval of a settlement of all claims between the Debtor and the Authority pursuant to which, among other things, the Authority would turn over to the Debtor only certain net sale proceeds to the extent they exist.  The proposed settlement

includes broad releases to a host of parties and third-parties and injunctions protecting them. Granting the Committee standing will enable the estate, through the Committee, to have a stronger hand, unhindered by the Debtor's conflict of interest, at the negotiating table with the Authority, the City and, potentially, the purchaser of the hospital to ensure that the estate does not bear the brunt of the costs of saving the hospital. It will help prevent the Authority from dominating through its captive the Debtor, a resolution of this case which permits the Authority to be unjustly enriched by the benefits of the goods and services which the creditors provided, the costs of which goods and services the Authority was obligated to reimburse. Thus, granting standing to the Committee could also have the indirect effect of increasing the potential recoveries to the Debtor's unsecured creditors.

## NO PRIOR REQUEST

56.    No prior request for the relief sought herein has been made to this or any other court.

## WAIVER OF BRIEF

57.    No brief is necessary as the factual and legal bases for the relief requested are adequately set forth in the Application and the motion presents no novel issues of law.

## **CONCLUSION**

58.     This Court can and should authorize the Committee to bring any and all claims on behalf of the Debtor's estates, including to recover damages caused by the Authority's breaches of the Manager Agreement.   The Committee therefore respectfully requests that the Court: (i) grant standing and authority to the Committee to commence, prosecute and, if appropriate, settle the claims on behalf of the Debtor's estate; and (ii) grant such other and further relief as the Court deems just and proper.

Dated: August 24, 2011

SILLS CUMMIS & GROSS P.C.

By:___/s/ Andrew H. Sherman_____
       Andrew H. Sherman
       George R. Hirsch
       Boris I. Mankovetskiy
One Riverfront Plaza
Newark, New Jersey 07102
Telephone:973-643-7000
Facsimile: 97943-643-6500
*Proposed Counsel to the Official Committee
of Unsecured Creditors*