SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
Tel.: 973-643-7000
Fax: 973-643-6500

*Proposed Attorneys for the Official Committee of*
*Unsecured Creditors of Hudson Healthcare, Inc.*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| HUDSON HEALTHCARE, INC., | Case No. 11-33014 (DHS) |
| Debtor. | Hon. Donald H. Steckroth |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF HUDSON HEALTHCARE, INC'S OBJECTION TO THE JOINT MOTION OF DEBTOR AND HOBOKEN MUNICIPAL HOSPITAL AUTHORITY FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105 AND 364 AUTHORIZING CONTINUATION OF PREPETITION BUDGET MANAGEMENT PROCEDURES AND GRANTING ADMINISTRATIVE EXPENSE CLAIM**

The Official Committee of Unsecured Creditors (the "Committee") of Hudson Healthcare, Inc. (the "Debtor"), by and through its undersigned proposed counsel, submits this objection (the "Objection") to the motion (the "Motion") of the Debtor, filed for the benefit of the Hoboken Municipal Hospital Authority (the "Authority"), for entry of an Order pursuant to 11 U.S.C. §§ 105 and 364 (i) authorizing the Debtor and the Authority to continue their prepetition budget management procedures and (ii) granting the Authority an administrative expense claim for amounts advanced by the Authority to the Debtor post-petition for the purpose of funding the operations of Hoboken University Medical Center (the "Hospital"). In support of the Objection, the Committee respectfully states as follows:

1958603 v6

## PRELIMINARY STATEMENT[1]

1.    Prior the filing of this bankruptcy case, the Authority ill-used the Debtor and its creditors by failing to honor its obligation to fund nearly $37 million in liabilities incurred on its behalf.  The Authority now seeks to make matter worse for the creditors herein by having its reimbursement of the Debtor's expenses – which the Authority is contractually obligated to do – characterized as a loan with administrative priority.

2.    Instead of seeking the relief requested by the Debtor, the Debtor should be moving to compel the performance by the Authority of its obligations under the Master Manager and Operating Agreement by and between the Debtor and the Authority dated February 1, 2007 (the "Manager Agreement"), a copy of which is attached hereto as Exhibit A.  However, because the Debtor is not truly independent from the Authority, the Debtor has failed to enforce its contractual rights to be reimbursed under the Manager Agreement and has allowed a continuation of a relationship where the Debtor incurs all the debts while the non-debtor Authority receives all the assets and fails to honor its reimbursement obligations.

3.    Through the Motion, the Debtor requests that this Court excuse the Authority's performance under the Manager Agreement and transform the parties' principal/agent relationship into one of debtor/creditor.  The Authority is attempting to utilize this Court to improve its position in relation to the Debtor and force the estate to bear all the risk if the proposed sale is not consummated.

4.    In addition to the visceral impropriety of this overreach, the Authority and the Debtor have failed to meet both the standard for the incurrence of debt under section 364 of the Bankruptcy Code and the standard for the granting of administrative priority under section

---

[1] Any capitalized terms otherwise undefined in the Preliminary Statement shall have the meanings set forth subsequently in the Objection.

503(b)(1).   The Debtor and the Authority have paid "lip service" to section 364 of the Bankruptcy Code but have failed to articulate why the Debtor needs to borrow money rather than enforce the Authority's contractual obligations to this estate.  Similarly, the Authority and the Debtor have not demonstrated that the proposed advances are actual, necessary expenses of preserving the estate.

5.     As more fully set forth in this Objection, the Authority is already obligated under the Manager Agreement to fund all of the operating expenses of the hospital.  Through the Motion, the Authority seeks to shift a portion of the costs of the Debtor's post-petition operations onto the estate and its creditors and obtain an administrative expense claim for providing funding that it is already contractually required to provide.  The Second Interim Order granting the Motion, subject to further order of the Court, purports to allow the Authority an administrative expense "in an amount equal to the total amount of all advances to the Debtor by the Authority from the proceeds of the NJHCFFA Note, not to exceed $2,500,000 in the aggregate, … for actual and necessary costs of operating the hospital that cannot be paid from other revenue generated by the Debtor or the hospital …"  The Manager Agreement is clear that all operating expenses are to be funded by the Authority.  Thus, granting the Authority its requested administrative expense in this case would hand the Authority a $2,500,000 windfall at the estate's expense.

6.     The Committee respectfully requests that this Court examine the economic realities of the transaction underlying the Motion.  If the Authority desired to sell its Hospital and the Debtor had not filed for bankruptcy, the Authority would be required to fund the Hospital's operations until the sale under the express terms of the Manager Agreement.  The Authority would not be able to look to impose the expenses of the operation on the estate.  The Authority, a

non-debtor, should not be permitted to benefit from this bankruptcy filing by using the Debtor's

bankruptcy to force the estate to fund the Authority's own endeavors while also imposing on the

estate the risks of their failure.  If policy favors the continued operation of the Hospital as an

acute care facility, it is up to the Authority, and ultimately the City of Hoboken, to find a

solution.  The estate should not be made the Authority's emergency financier and should not be

utilized as credit enhancement for the Authority's obligations to NJHCFFA.

7.      For these reasons, set forth more fully below, the Motion should be denied to the

extent it seeks approval of an administrative expense claim for the Authority.  Instead, the

Debtor should insist on the Authority's compliance with its obligation to pay all expenses of the

hospital.

## **BACKGROUND**

**A.      The Debtor's Bankruptcy Filing and the Motion**

8.      On August 1, 2011 (the "Petition Date"), the Debtor filed a Voluntary Petition for

relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  The

Debtor continues to operate its business and manage its affairs as a debtor-in-possession pursuant

to sections 1107(a) and 1108 of the Bankruptcy Code.

9.      The Debtor and the Authority jointly filed the Motion on the Petition Date.  A

hearing on the Motion was held on August 2, 2011, and on August 4, 2011, the Court entered an

interim Order granting the Motion and scheduled a hearing on the entry of a final Order for

August 17, 2011.

10.      On August 12, 2011, the United States Trustee appointed the Committee.

11.      On August 18, 2011, the Court entered a second interim Order granting the

Motion and establishing a new date for the hearing on the entry of a final Order for September 7,

2011.  The second interim Order provides, in relevant part:

1958603 v6

> The Authority is hereby granted an administrative expense claim, allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code and entitled to priority in repayment under section 507(a)(2), in an amount equal to the total amount of all advances to the Debtor by the Authority from the proceeds of the NJHCFFA Note, not to exceed $2,500,000 in the aggregate, subject to further order of the Court; provided that those advances (i) shall be for actual and necessary costs of operating the hospital that cannot be paid from other revenue generated by the Debtor or the hospital and (ii) are otherwise consistent with the DIP Budget.

Second Interim Order dated August 18, 2011, ¶ 2.

**B.    The Authority and the Manager Agreement**

12.    The Debtor and the Authority are creatures of New Jersey state law and, for all intents and purposes, are interdependent.  The Authority needs the Debtor to manage the day-to-day operations of the Hospital in order to satisfy the requirements of the New Jersey Municipal Hospital Authority Law (the "MHAL"), N.J.S.A. § 30:9-23.15 to .23, and the Debtor needs the Authority to honor its obligations to fund the Hospital's operations and ensure the Hospital's institutional viability.

13.    The Authority is an autonomous municipal hospital authority created by the City of Hoboken, New Jersey (the "City") in 2007 pursuant to the MHAL for the purpose of acquiring the Hospital from Bon Secours New Jersey Health System, Inc.  The MHAL requires the Authority to contract with a manager to oversee the day-to-day operations of the Hospital as the Authority's agent, and the Debtor was created for that purpose.  N.J.S.A. § 30:9-23.20.

14.    Under the MHAL, the Authority retains ultimate responsibility for the Hospital's operations, as well as the acquisition and disposition of assets and the incurrence of debts and expenses.  Specifically, the MHAL provides as follows:

> Powers, duties of authority
>
> . . .
>
> The authority shall exercise its powers and duties to manage and operate the hospital owned by it through a contract or contracts

1958603 v6

> with a manager . . . provided, however, that the primary
> responsibility of operating the hospital shall remain that of the
> authority.
>
> . . .
>
> A contract with a manager shall provide that, in addition to such
> other matters as determined to be necessary by the authority or as
> otherwise required by law or regulation: . . Other than for routine,
> day-to-day business activities, the authority shall have the final
> determination regarding the acquisition and disposition of assets,
> or the incurring of debt or expenses.

N.J.S.A. § 30:9-23.20.

15.    The Authority's responsibility for the Hospital is manifested in the Debtor's

bylaws (the "Debtor's Bylaws"), attached hereto as Exhibit B.  Pursuant to the Debtor's Bylaws,

the Authority expressly retains the following powers:

> b.  To approve the management plan for the municipal hospital to
> be operated by the Authority, including monitoring and review
> [sic] methods of financial activities.
>
> . . .
>
> d.  To approve and monitor the annual budgets of the municipal
> hospital operated by the Authority and of the Corporation[2] and
> any amendments thereto.
>
> e.  To authorize the Corporation to engage in or enter into any
> transaction providing for the acquisition or disposition of the assets
> of the municipal hospital operated by the Authority, unless
> authorized in the municipal hospital's annual budget.
>
> f.  To approve the incurrence of debt or expenses by the municipal
> hospital operated by the Authority, unless authorized in the
> municipal hospital's annual budget.

Debtor's Bylaws, Article III.

16.    The Authority also retained the power to:

> . . . approve the individuals that the Corporation proposes to
> designate as the Chief Executive Officer and the Chief Financial

---

[2] As defined in the Debtor's Bylaws, the "Corporation" is the Debtor, Hudson Healthcare, Inc.

> Officer of the municipal hospital managed by the Corporation; to
> remove such individuals from office, and to approve contracts or
> other arrangements setting forth terms and conditions of
> employment for those positions.

Debtor's Bylaws, Article III.  The Chief Executive Officer and Chief Financial Officer serve on the Debtor's board of directors by virtue of their offices, thereby granting the Authority significant influence over the composition of the Debtor's board.  Debtor's Bylaws, Article IV.

17.    The rights, duties, and responsibilities of the Authority and the Debtor with respect to the Hospital are further set forth in the Manager Agreement.  Under the Manager Agreement, the Debtor is responsible for operating the Hospital on the Authority's behalf.  In addition to managing the day-to-day operations of the Hospital and undertaking other actions essential to that task, the Debtor's duties under the Manager Agreement include the preparation and submission of the Annual Business Plan and Budget (as defined in the Manager Agreement, the "Budget") for the Authority's approval.  Manager Agreement, Sections 2.2, 4.1.

18.    The Authority in turn is required to fund the Manager's Operating Account (defined in the Manager Agreement) in accordance with the Budget and reimburse the Debtor for all costs incurred by the Debtor in effectuating its duties:

> The Authority shall on the first Business Day of each month,
> transfer from the Operating Fund to the Manager's Operating
> Account 1/12 of the Annual Business Plan and Budget as adjusted
> in accordance with the monthly reports produced pursuant to
> Section 4.6.1.
>
> . . .
>
> The Manager shall be reimbursed by the Authority for all costs
> incurred by the Manager in carrying out the Manager's duties and
> obligations as set forth in this Agreement, including but not limited
> to those duties and obligations set forth in this Section 2.2.
>
> . . .

> The Authority acknowledges and agrees that by approving the Annual Business Plan and Budget, the Authority has approved all Reimbursable Expensed [sic] incurred by Manager for the ongoing operational expenses of the Hospital.  Accordingly, the Authority must concur in any payments made by the Manager for any such Reimbursable Expenses incurred for any reason unless the expenses have been incurred due to the gross negligence or criminal misconduct of the Manager.  Absent evidence of gross negligence or criminal misconduct, all Reimbursable Expenses incurred by the Manager pursuant to an approved Annual Business Plan and Budget shall be paid by the Manager and shall have the concurrence of the Authority.

Manager Agreement, Sections 2.1.3, 2.2.28, and 7.4.

19.     The Authority is also required to indemnify the Debtor, including for all costs of operation:

> The Authority is directly responsible to fully satisfy all of the liabilities and obligations of the Authority to the Manager under this Agreement, including the payment of all Reimbursable Expenses and any amounts due with regard to any Deficiency and/or any Withheld Payment.  To the extent permitted by law, the Authority hereby agrees to indemnify, defend and hold harmless the Manager, its directors, officers, employees and agents for, from and against any cost, loss, damage or expense (including, but not limited to reasonable attorneys' fees and all court costs and other expenses of litigation, whether or not recoverable under local law) resulting from (i) a breach of this Agreement by the Authority, including any breach of any representation, warranty or covenant in this Agreement or failure to pay any amount, when due, owing to the Manager under this Agreement, (ii) the fraud, gross negligence or willful misconduct of the Authority, (iii) any act (or failure to act) undertaken and performed (or refused to be undertaken) by the Manager or its officers, employees or agents, in good faith within the scope of authority conferred by this Agreement, or (iv) the performance or failure to perform any acts by the Manager or its officers, employees or agents, in good faith reliance on the advice of accountants or legal counsel or in good faith reliance on the advice, instruction or approval of the Authority.  Without limitation of the foregoing, the Authority's indemnification obligation includes the obligation to pay Manager pursuant to Section 7 of this Agreement.

20.    The foregoing provisions make it clear that, under the Manager Agreement, the Debtor is to have no independent debts, and that all such debts are to be funded by the Authority.

## C.    The Requested Administrative Expense Claim

21.    The Authority has allegedly arranged to borrow $2,500,000 from the New Jersey Healthcare Facilities Financing Authority ("NJHCFFA") for the purpose of funding the costs of operating the Hospital during the pendency of the Debtor's Chapter 11 case.  Motion, p.2.  The Authority's stated goal is to keep the Hospital operating until it can close the sale of the Hospital to HUMC Holdco, LLC (the "Purchaser").  *See* Declaration of Vincent Riccitelli in Support of First Day Matters (the "Riccitelli Declaration"), ¶¶24-26.  The Authority requests, under the guise of "DIP financing," that it be granted an administrative expense claim in the amount of up to $2.5 million for any funds provided even though, as set forth above, the Authority is already contractually obligated to provide such funding.

22.    Based upon a review of the available financial records, it does not appear that Authority has historically loaned money to the Debtor.  The Authority's audit as of December 31, 2009 contained a "Hospital-Wide Proforma Schedule of Financial Position as of December 31, 2009 and there is no indication of amounts due by HHI to the Authority (however, there is a line item of $27,851,938 showing unfunded requisitions due to HHI).

## OBJECTION

23.    The Committee objects to the Motion to the extent that it requests that the Court grant the Authority an administrative expense claim for funds advanced to the Debtor because (i) the Authority and the Debtor have not satisfied the requirements for obtaining post-petition credit under section 364 of the Bankruptcy Code, (ii) the Authority is contractually obligated to provide the necessary funds to the Debtor, and (iii) the Authority and the Debtor have not satisfied section 503(b)(1)'s requirements for administrative expense priority.

**A.    The Authority and the Debtor Have Not Satisfied the Requirements for Obtaining Post-Petition Credit Under Section 364 of the Bankruptcy Code**

24.    The Debtor proposes to grant the Authority an administrative expense claim for funds advanced to the Debtor as "credit" extended under section 364 of the Bankruptcy Code. As the parties seeking administrative priority for the Authority's claim, they bear the burden of proof with respect to section 364's applicability. *In re Keystone Surplus Metals, Inc.*, 445 B.R. 483, 488 (Bankr. E.D. Pa. 2010) ("Movant contends that he should be allowed an administrative expense . . . for his post-petition advances to Keystone based on 11 U.S.C. § 364(a). As the party seeking the allowance of an administrative expense, Movant bears the burden of proof in this matter.") (citing *In re Massetti*, 95 B.R. 360, 363 (Bankr. E.D. Pa. 1989); *In re Blessing Industries, Inc.*, 263 B.R. 268, 272 (Bankr. N.D. Iowa 2001)).

25.    The Debtor cites both subsections (a) and (b) of section 364 as grounds for the relief requested in the Motion but does not demonstrate that either is applicable in this instance. Subsection (a) provides that "the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense." 11 U.S.C. § 364(a). In the Third Circuit, courts apply a two-pronged test consisting of "vertical" and "horizontal" dimensions to determine whether a debt has been incurred in the ordinary course of business for the purpose of section 364(a). *Keystone*, 445 B.R. at 488 (citing *In re Roth American, Inc.*, 975 F.2d 949, 952-53 (3d Cir. 1992); *U.S. Trustee v. Lombardozzi* (*In re RJC Industries, Inc.*), 369 B.R. 845, 851 (Bankr. M.D. Pa. 2006)). The focus of the vertical dimension is the debtor's pre-petition business practices and conduct. *Keystone*, 445 B.R. at 488-89 (citing *Roth American*, 975 F.2d at 953). The focus of the horizontal dimension is whether the transaction is of the sort commonly undertaken by companies in the relevant industry. *Id.*

26.     Extension of credit by the Authority does not satisfy the vertical dimension because it was not the Debtor's practice to borrow funds from the Authority pre-petition to operate the Hospital.  Rather, the Authority provided those funds as required by the Manager Agreement.  *See* Motion, ¶7; Riccitelli Declaration, ¶¶15, 27; Manager Agreement, Sections 2.1.3, 2.2.28.  The Authority's pre-petition relationship to the Debtor was not that of a creditor, but now the Authority makes the highly unorthodox request to have the funds it is contractually obligated to provide deemed "credit."  There is no precedent for such a recharacterization.

27.     Extension of credit by the Authority does not satisfy the horizontal dimension of the ordinary course test either, because the proposed transaction is not of the sort commonly undertaken by companies in the health care industry.  As set forth in the Riccitelli Declaration, the MHAL was enacted specifically to save the Hospital.  Riccitelli Declaration, ¶7.  Pursuant to the MHAL, the City adopted an ordinance creating the Authority for the express purpose of acquiring the Hospital.  *Id*.  Then, the Debtor was created to manage the Hospital's day-to-day operation.  *Id*.  To date, no municipal hospital authority other than the Authority has been created under the MHAL.  *Id*.  By extension, the Debtor is the only hospital manager affiliated with any such authority.  These circumstances are wholly unique.  As a result, no transactions between the Authority and the Debtor are of the sort commonly undertaken by companies in the health care industry.  For these reasons, the incurrence of a debt to the Authority would not be in the ordinary course of business, and section 364(a) is inapplicable.

28.     Subsection (b) of section 364 provides that "[t]he court, after notice and a hearing, may authorize the trustee to obtain unsecured credit and incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense."  11 U.S.C. § 364(b).  The Court should not permit the Debtor to obtain credit from the

Authority because there is no reason for the Debtor to do so.  As set forth above, and in Section B below, the Authority is already obligated to provide all necessary funding under the Manager Agreement.  The Debtor should demand the Authority's compliance with the Manager Agreement, the Authority should be made to comply, and the Hospital's operations will be adequately funded if the Authority performs under the Manager Agreement.

29.     In addition, as set forth in Section C below, the Authority and the Debtor have not demonstrated that the requirements of section 503(b)(1) for administrative priority are satisfied. This is a prerequisite for obtaining credit under section 364(b).  *See In re Massetti*, 95 B.R. 360, 362 (Bankr. E.D. Pa. 1989) (holding that, after notice and a hearing, "one who extends unsecured credit to a debtor, post-petition, may have a valid claim for recovery on a priority basis" and observing that, because it was agreed that certain payments in satisfaction of post-petition debt were actual, necessary costs and expenses of preserving the estate, the court did not need to decide whether those payments fell within the scope of section 503(b)(1) on the merits) (emphasis added) (citing *In re Hartley*, 39 B.R. 273 (Bankr. N.D. Ohio 1984)).

**B.      The Authority Is Contractually Obligated to Provide Necessary Funding and this Court Should Not Excuse the Authority's Performance under the Manager Agreement**

30.     The Authority is not entitled to an administrative expense claim for any funds advanced to the Debtor because the advances do not create any right to payment.  The advances therefore do not give rise to any claim by the Authority against the Debtor.  *See* 11 U.S.C. § 101(5) ("The term 'claim' means – (A) right to payment, whether or not such right is reduced to a judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured…").

31.    As set forth above, the Authority is required under the Manager Agreement to

fund the Manager's Operating Account (defined in the Manager Agreement) and reimburse the

Debtor for all costs incurred by the Debtor in the effectuation of its duties:

> The Authority shall on the first Business Day of each month, transfer from the Operating Fund to the Manager's Operating Account 1/12 of the Annual Business Plan and Budget as adjusted in accordance with the monthly reports produced pursuant to Section 4.6.1.
>
> . . .
>
> The Manager shall be reimbursed by the Authority for all costs incurred by the Manager in carrying out the Manager's duties and obligations as set forth in this Agreement, including but not limited to those duties and obligations set forth in this Section 2.2.
>
> . . .
>
> The Authority acknowledges and agrees that by approving the Annual Business Plan and Budget, the Authority has approved all Reimbursable Expensed [sic] incurred by Manager for the ongoing operational expenses of the Hospital.  Accordingly, the Authority must concur in any payments made by the Manager for any such Reimbursable Expenses incurred for any reason unless the expenses have been incurred due to the gross negligence or criminal misconduct of the Manager.  Absent evidence of gross negligence or criminal misconduct, all Reimbursable Expenses incurred by the Manager pursuant to an approved Annual Business Plan and Budget shall be paid by the Manager and shall have the concurrence of the Authority.

Manager Agreement, Section 2.1.3, 2.2.28, 7.4.

32.    The Debtor has not rejected the Manager Agreement, and the Authority is still

obligated to perform thereunder.  *See, e.g., In re Pac. Gas and Elec. Co.*, 2004 U.S. Dist. LEXIS

22023, *14 (N.D. Cal. Sept. 30, 2004) ("[C]ourts and legal treatises have consistently opined that

[non-debtors] are responsible for the continuation of performance under the terms of an

executory contract upon the debtor's filing of petition [sic] for bankruptcy but before the

affirmative assumption or rejection of the contract."); *Phillips v. McLane Co. (In re Fas Mart*

*Convenience Stores, Inc.*), 296 B.R. 414, 420 (Bankr. E.D. Va. 2002) ("The Trustee has not determined whether to assume or reject the agreement with McLane. The Trustee, therefore, should be entitled to enforce debtors' rights under the agreement relating to post-petition date obligations and benefits until a final determination is made and approved by the Court.") (citing *In re University Med. Ctr.*, 973 F.2d 1065, 1078 (3d Cir. 1992); I*n re Whitcomb & Keller Mortgage Co., Inc.*, 715 F.2d 375, 379 (7th Cir. 1983)).

33.     Any argument by the Authority that it is entitled to a claim for funds provided to cover expenses that cannot be paid from the Hospital's revenue is misleading and incorrect. The obligation to fund the Debtor's expenses under the Management Agreement is open-ended and absolute. It is not dependent on the source of the funds. The Manager Agreement does not contain any language limiting the obligation to reimburse expenses that can be paid with revenue generated by the Hospital. Neither does the source of the funds advanced (here, NJHCFFA) have any bearing on the Authority's obligation to fund all of the Debtor's expenses. The Authority's provision of funds obtained from NJHCFFA is not a "new money" loan to the Debtor to sustain the Debtor's operations. Rather, it is the fulfillment of a pre-existing contractual obligation that is not dependent in any way upon repayment.

**C.    The Authority and Debtor Have Not Satisfied the Requirements for Administrative Expense Priority Under Section 503(b)(1) of the Bankruptcy Code**

34.     Section 503(b)(1) provides for the allowance of administrative expenses for "the actual, necessary costs and expenses of preserving the estate[.]" 11 U.S.C. § 503(b)(1). Priority under section 503(b)(1) is disfavored and construed narrowly in keeping with the Bankruptcy Code's policy of equal distribution. *See, e.g., In re United Healthcare Sys.*, 282 B.R. 330, 335 (Bankr. D.N.J. 2002) ("[E]quality of distribution among creditors is a central policy of the Bankruptcy Code…[I]t is well recognized that statutory priorities are narrowly construed

because it is presumed that the debtor's limited resources will be equally distributed among his creditors.") (quotations omitted); *In re Molnar Bros.*, 200 B.R. 555, 558 (Bankr. D.N.J. 1996) ("Allowances for administrative expenses are narrowly construed for proper protection of other creditors."); *In re Lease-A-Fleet, Inc.*, 140 B.R. 840, 844 (Bankr. E.D. Pa. 1992) ("Since the affording of priority status to one creditor has an impact upon other creditors of the debtor's estate and conflicts with the goal of bankruptcy to provide creditors with an equal distribution of a debtor's resources, this court has consistently held that administrative claims must be narrowly construed.").

35.    The test under section 503(b)(1) is two-pronged: "the expense must have arisen from a post-petition transaction between the creditor and the debtor, and the transaction must have been 'actual and necessary' to preserve the estate." *In re Unidigital, Inc.*, 262 B.R. 283, 288 (Bankr. D. Del. 2001). *See also* 11 U.S.C. § 503(b)(1). The Authority, as claimant, bears the burden of proving that its alleged claim satisfies this test. *See, e.g., In re Nat'l Steel Corp.*, 321 B.R. 901, 905 (Bankr. N.D. Ill. 2005) ("Creditors who claim priority status usually bear the burden of showing that they are entitled to the asserted priority."); *In re Harnischfeger Indus.*, 293 B.R. 650, 659 (Bankr. D. Del. 2003) ("Claimants who seek payment ahead of other unsecured claims bear the burden of establishing that their claim qualifies for priority status."); *Unidigital*, 262 B.R. at 288 ("Claimants who seek payment ahead of other unsecured claims bear the burden of establishing that their claim qualifies for priority status."); *In re Terra Distrib., Inc.*, 148 B.R. 598, 600 (Bankr. D. Idaho 1992) ("The burden to demonstrate the elements required for priority status lies upon the claimant."); *In re Philadelphia Mortg. Trust*, 117 B.R. 820, 827 (Bankr. E.D. Pa. 1990) ("The burden of proving entitlement to a priority is on the person claiming priority.") (quotations omitted). *See also Calpine Corp. v. O'Brien Envtl.*

*Energy, Inc.* (*In re O'Brien Envtl. Energy, Inc.*), 181 F.3d 527, 533 (3d Cir. 1999) ("A party seeking costs and fees as an administrative expense must carry the heavy burden of demonstrating that the costs and fees for which it seeks payment provided an actual benefit to the estate and that such costs and expenses were necessary to preserve the value of the estate assets.") (quotations omitted).

36.     This burden is not satisfied here.  First, as discussed above, the provision of funds to the Debtor does not give rise to any claim by the Authority.  The Authority is not advancing funds for the Debtor's operations as a lender, but has a contractual obligation to fund expenses incurred by the Debtor on behalf of the Authority under the Manager Agreement.  Further, for the reasons set forth below, the claim alleged by the Authority is not actual, necessary costs of preserving the estate.

37.     The alleged benefit to the estate identified by the Authority – the funding of the expenses of the Hospital that cannot be paid for out of the Debtor's revenues until the closing of the prospective sale to the Purchaser – is unclear, conditional, risky, and potentially illusory. There may be uses for the property that are more beneficial to the estate than its sale as an acute care facility.  For example, the property may have more value if it is sold as commercial or mixed-use property.  The alleged benefit also requires the prospective sale of the Hospital to close.  If the sale does not close, the result of the administrative claim will be the diminution of the estate by up to $2.5 million.  The estate has no assurances that the sale will actually be consummated and would bear all the risk of it not being consummated.  Even if the prospective sale is consummated, the estate might not receive any of the proceeds.  The Authority denies liability for the nearly $37 million it owes to the Debtor under the Manager Agreement for

unfunded expenses.  As it stands, the only guarantee is that, if the Authority is granted an administrative expense claim, the estate will accrue a potentially multimillion dollar liability.

38.     Moreover, it is disingenuous to characterize the proposed sale of the Hospital as a benefit to the estate.  The Authority, as the asserted owner of the Hospital, is the party that stands to directly benefit from its sale.  The City, which guaranteed in excess of $50 million in bonds issued by the Authority to fund the Hospital, would also benefit.

39.     The Authority's request (and the Debtor's championing that request) for an administrative expense is an improper attempt to capitalize on the Debtor's bankruptcy and improve its position by forcing the estate to incur a $2.5 million liability that would otherwise be the Authority's responsibility.  The Authority should not be granted an administrative claim for providing funds on this basis.  *Philadelphia Mortg. Trust*, 117 B.R. 820, 828 (Bankr. E.D. Pa. 1990) ("When a creditor incurs expenses primarily to protect its own interest the creditor is not entitled to a priority administrative claim.").  Outside of the context of the Debtor's bankruptcy, the Authority would have no means of compelling the Debtor to fund the operation of the Hospital.  The Authority would have to account for and reimburse those expenses itself. Granting the Authority its requested administrative expense in this case would hand the Authority a $2.5 million windfall at the estate's expense.

40.     In addition, it is not clear that NJHCFFA requires the granting of an administrative claim as a precondition of lending funds to the Authority.  Even if NJHCFFA did so require, that would be irrelevant.  The Authority's obligation to reimburse the Debtor's expenses is absolute, and it does not matter how the Authority obtains the funds it is contractually obligated to fund.

41.     To the extent that policy considerations favor the sale of the Hospital as an acute care facility and such a sale requires emergency short term funding, the Authority, and ultimately the City, must bear the burden of that funding.  How to obtain the necessary funds is a matter for the Authority and the City to decide.  It is improper to impose that burden on the estate and ultimately, the creditors, simply because it is expedient to do so.

42.     The Committee submits that, instead of incurring further debt in the form of DIP obligations to the Authority, the Debtor should be moving to compel performance by the Authority of its obligations under the Manager Agreement, including but not limited to the obligation to provide all necessary funding to the Debtor.  Indeed, it is truly remarkable that the Debtor has allowed itself to be insolvent at all.  It appears that the Debtor has allowed and continues to allow itself to be used for the benefit of the Authority, as a mere instrumentability of the Authority.  The Debtor is simply not independent.

43.     As discussed at length above, the Manager Agreement requires the Authority to fund the Manager's Operating Account (defined in the Manager Agreement) and reimburse the Debtor for all costs incurred by the Debtor in the effectuation of its duties.  Because the Manager Agreement has not been rejected, the Authority is obligated to continue to perform thereunder. *See, e.g., In re Pac. Gas and Elec. Co.*, 2004 U.S. Dist. LEXIS 22023, \*14 (N.D. Cal. Sept. 30, 2004); *Phillips v. McLane Co.* (*In re Fas Mart Convenience Stores, Inc.*), 296 B.R. 414, 420 (Bankr. E.D. Va. 2002) (citing *In re University Med. Ctr.*, 973 F.2d 1065, 1078 (3d Cir. 1992); *In re Whitcomb & Keller Mortgage Co., Inc.*, 715 F.2d 375, 379 (7th Cir. 1983)).

44.     Yet as the Motion makes clear, the Authority does not intend to perform, and the Debtor is perfectly comfortable making itself administratively insolvent in furtherance of its relationship with the Authority.  The Authority seeks to avoid its obligations by forcing the

Debtor to pay back the Authority for funds provided to cover post-petition expenses.  In light of

the Motion, as well as the nearly $37 million in unfunded obligations already accrued by the

Debtor on the Authority's behalf, the estate has no assurances that the Authority will uphold its

obligations post-petition.  If it does not, and the operation of the Hospital results in unfunded

post-petition expenses that meet the criteria of section 503(b)(1) of the Bankruptcy Code, the

resulting expenses will further diminish the estate.

45.    To ensure performance by the Authority, the Debtor should seek compel the

Authority to perform under the Manager Agreement and fund all administrative expenses of this

estate until the Manager Agreement is assumed or rejected.  This will preserve the *status quo* and

prevent the depletion of the estate in the interim.

WHEREFORE, for the foregoing reasons, the Committee respectfully requests that the

Court deny the Motion to the extent that it seeks administrative expense priority for any funds

provided to the Debtor by the Authority.

<div style="margin-left:40%">

Respectfully submitted,

</div>

Dated: August 24, 2011            SILLS CUMMIS & GROSS P.C.


By:    */s/ Andrew H. Sherman*
       Andrew H. Sherman
       George Hirsch
       Boris I. Mankovetskiy
       Lucas F. Hammonds
One Riverfront Plaza
Newark, New Jersey 07102
Tel.: 973-643-7000
Fax: 973-643-6500

*Proposed Attorneys for the Official Committee of*
*Unsecured Creditors of Hudson Healthcare, Inc.*

1958603 v6